**WATERS KRAUS & PAUL**
Jennifer McIntosh (CA Bar No. 264903)
jmcintosh@waterskraus.com
711 Van Ness Ave.
Suite 220
San Francisco, CA 94102
Telephone: (415) 296-6060
and (800) 226-9880
Fax: (214) 777-0470

**WATERS & KRAUS**
Wm. Paul Lawrence, II (*Pro Hac Vice*
pending)
plawrence@waterskraus.com
Washington D.C. Metro Office
37163 Mountville Road
Middleburg, VA 20117
Telephone: (540) 687-6999
Fax: (540) 687-5457

**WATERS & KRAUS**
Loren Jacobson (*Pro Hac Vice* pending)
ljacobson@waterskraus.com
3219 McKinney Ave.
Dallas, TX 75204
Telephone: (214) 357-6244
and (800) 226-9880
Fax: (214) 357-7252

FILED

**Jun 26, 2012**

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

## SEALED

Attorneys for Plaintiff/Relator

### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. Loyd F. Schmuckley Jr., § § § | Civil Action No. _2:12-cv-1699 KJM EFB_ |
| STATE OF CALIFORNIA ex rel. Loyd F. Schmuckley, Jr., Relator, § § § | **FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)** |
| STATE OF COLORADO ex rel. Loyd F. Schmuckley, Jr., Relator, § § § | **DO NOT ENTER INTO PACER DO NOT PLACE IN PRESS BOX** |
| STATE OF CONNECTICUT ex rel. Loyd F. Schmuckley, Jr., Relator, § § | **JURY TRIAL DEMAND** |
| STATE OF DELAWARE ex rel. Loyd F. Schmuckley, Jr., Relator, § § § | **COMPLAINT FOR: VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT (31 U.S.C. § 3729, *ET SEQ.*), THE** |
| DISTRICT OF COLUMBIA ex rel. Loyd F. Schmuckley, Jr., Relator, § § § | **CALIFORNIA FALSE CLAIMS ACT (CA. GOV'T CODE §§ 12650 *ET SEQ.*), AND OTHER STATE** |
| STATE OF GEORGIA ex rel. Loyd F. Schmuckley, Jr., Relator, § § § | **FALSE CLAIMS ACTS** |

1  STATE OF INDIANA ex rel. Loyd F.   §
   Schmuckley, Jr., Relator,            §
2                                       §
   STATE OF LOUISIANA ex rel. Loyd F.  §
3  Schmuckley, Jr., Relator,            §
                                        §
4  STATE OF MARYLAND ex rel. Loyd      §
   F. Schmuckley, Jr., Relator,         §
5                                       §
   STATE OF MASSACHUSETTS ex rel.      §
6  Loyd F. Schmuckley, Jr., Relator,    §
7                                       §
   STATE OF MICHIGAN ex rel. Loyd F.   §
8  Schmuckley, Jr., Relator,            §
                                        §
9  STATE OF NEVADA ex rel. Loyd F.     §
   Schmuckley, Jr., Relator,            §
10                                      §
   STATE OF NEW JERSEY ex rel. Loyd    §
11 F. Schmuckley, Jr., Relator,         §
                                        §
12 STATE OF NEW YORK ex rel. Loyd F.   §
   Schmuckley, Jr., Relator,            §
13                                      §
14 STATE OF NORTH CAROLINA ex rel.     §
   Loyd F. Schmuckley, Jr., Relator,    §
15                                      §
16 STATE OF RHODE ISLAND ex rel.       §
   Loyd F. Schmuckley, Jr., Relator,    §
17                                      §
18 STATE OF TENNESSEE ex rel. Loyd F.  §
   Schmuckley, Jr., Relator,            §
19                                      §
   STATE OF VIRGINIA ex rel. Loyd F.   §
20 Schmuckley, Jr., Relator,            §
21                                      §
   STATE OF WASHINGTON ex rel Loyd     §
22 F. Schmuckley, Jr., Relator,         §
                                        §
23                                      §
                                        §
24 vs.                                  §
                                        §
25 RITE AID CORPORATION

26   Defendant.

27

28                              - 2 -

# FALSE CLAIMS ACT COMPLAINT

## PRELIMINARY STATEMENT

1. This is an action brought by Loyd F. Schmuckley Jr. ("Relator") to recover damages and civil penalties on behalf of the United States of America, and the various states for false and/or fraudulent claims made, used, and caused to be made, used, or presented, by Rite Aid, ("Rite Aid" or "Defendant") in violation of the False Claims Act ("FCA"), 31 U.S.C. § 3729, *et seq.*, the California False Claims Act (Ca. Gov't Code §§ 12650) and various state False Claims Acts.

## INTRODUCTION

2. This action comes before the Court due to the knowing submission of false claims for substandard pharmacy services by a high-volume pharmacy chain that has traded speed and profits for professionalism.

3. Rite Aid seeks to maximize corporate profits by minimizing the role of high-paid professionals and turning over many of the decisions that should be made by pharmacists to computer systems and poorly-trained technicians.

4. While these corporate efficiencies are an effective strategy for generating profits, they are in conflict with the responsibilities owed by professional pharmacists to their patients and government healthcare programs.  The time constraints placed upon pharmacists to meet these corporate goals make it impossible for pharmacists to properly serve the safety and health needs of patients, or the fiscal interests of government healthcare programs, in accordance with legally-mandated professional standards.

5. Federal and state healthcare programs -- including Medicaid, Medicare Part D, Tricare, the federal employee health care benefit plans and numerous others -- reimburse Rite Aid and other pharmacies not just for dispensing drugs to customers, but also for providing important professional services to patients that improve health outcomes and thereby reduce overall costs

of healthcare.  Each billing to a government healthcare program involves both a product component, the prescription drug itself, and a service component, comprised of the pharmacist's monitoring of dosage quality, amounts, potential interactions with other prescriptions and over-the-counter and herbal medications, and the dispensing of advice to patients.  In other words, the pharmacy bills a government healthcare program for a combination of both the product and the service.  If the service component is not provided or is provided in a substandard way, any claim made for that service is a false claim actionable under the False Claims Act.

6. In a highly-decentralized healthcare system where patients purchase over-the-counter and herbal medications without physician oversight and see a variety of specialist physicians prescribing an ever-increasing array of pharmaceuticals thrust upon them by profit-seeking drug manufacturers, the pharmacist stands in a critical position as the only professional capable of comprehending a patient's overall drug profile and guarding against potentially life-threatening drug interactions, allergic reactions, over- and under-doses, addictions, dispensing errors, and decisions about cost effectiveness, all of which the pharmacist accomplishes by exercising his professional judgment, by maintaining accurate patient and physician records and by communicating effectively both with prescribing physicians and their patients.

7. Since passage of the pharmacy practice standards of the Omnibus Budget Reconciliation Act of 1990 (P.L. 101-58, commonly referred to as "OBRA '90"), a measure designed specifically to improve health outcomes and reduce healthcare costs through imposition of national pharmacy practice standards, the critical oversight role of the pharmacist has been enshrined in both federal and state law.  In the words of a leading authority on pharmacy law, "OBRA '90 is perhaps the most important pharmacy-related law of all time."[1]

_____

[1] Richard R. Abood, PHARMACY PRACTICE AND THE LAW (6th Ed., 2011), p. 268.

- 4 -
United States ex rel. Loyd F. Schmuckley Jr. v. Rite Aid Corporation Complaint

8. Rite Aid corporate policies violate both the letter and spirit of OBRA '90, its state-law counterparts, professional standards for pharmacists, and numerous healthcare program statutes, regulations, provider agreements and formularies by denying to pharmacists the time required to properly screen prescriptions for problems, maintain up-to-date physician contact information, maintain accurate patient files, communicate with physicians, counsel patients, obtain pre-authorizations for splitting of prescriptions with formulary quantity limits, verify diagnoses for prescriptions with formulary restrictions on diagnosis, and honestly bill federal and state healthcare programs.

9. Additionally, Rite Aid's computerized system for filling and billing prescriptions causes pharmacy technicians to bill for prescriptions and related services, and to certify compliance with government prerequisites to payment, before the prescriptions have been filled or related services have been performed.  Unlike doctors' offices, hospitals and other healthcare providers who bill government healthcare programs and certify compliance with prerequisites to payment only after the services have been provided, Rite Aid reverses the order and bills first.  The result is that pharmacy technicians falsely certify performance of required services, such as calling physicians to resolve drug interaction warnings or verifying formulary restrictions have been satisfied, before any services have been rendered, whether the services later rendered are in compliance with regulations or not.  Therefore, in the interest of corporate efficiency, Rite Aid's corporate pharmacy management procedures cause the routine filing of false claims.

10. Based upon information, belief and the Relator's experience in Rite Aid stores which he believes to be representative of all stores nationwide because of uniform corporate policies, the following are examples of substandard conduct and violations that routinely occur in Rite Aid stores:

    a.   Improperly using pharmacy technicians and other non-pharmacist personnel to

- 5 -

United States ex rel. Loyd F. Schmuckley Jr. v. Rite Aid Corporation Complaint

perform functions which, by law, must be performed by pharmacists, or under a pharmacist's direct supervision.

b.  Establishing managerial structures and practices which have the foreseeable effect of causing inadequate supervision of pharmacy personnel and interfering with professional pharmacists' ability to exercise independent professional judgment.

c.  Permitting poorly-trained, unsupervised technicians to override DUR warnings about potential drug interactions and other problems issued by the computerized billing systems of government healthcare programs during the point-of-sale billing process by creating false records indicating that physicians have been contacted or that the problems have been otherwise resolved through the professional judgment of a pharmacist.

d.  Requiring technicians to create whatever documentation might be required in point-of-sale computer systems of government healthcare programs to get claims paid, whether the documented actions have been taken or not.

e.  Failing to offer counseling to patients because pharmacists are so time pressured that they do not have the time for counseling.

f.  Permitting poorly-trained, unsupervised technicians, rather than professional pharmacists, to counsel patients.

g.  Failing to obtain prior authorization from physicians before splitting prescriptions that have formulary quantity limitations.

h.  Failing to verify diagnoses for drugs that can be dispensed only to patients with specified diagnoses under applicable healthcare program formulary restrictions.

- 6 -

i.   Failing to maintain adequate patient files with information on patient

diagnoses, allergies and other matters that are required for pharmacists to

perform their professional responsibilities.

11. Rite Aid's  failure to provide proper service to patients has serious public health implications.  Failure to screen for drug interactions and allergies can have life-threatening consequences for patients.  Many drugs with formulary quantity limitations, such as Vicodin, are addictive drugs subject to abuse and often sold on the street by patients seeking cash instead of treatment.  Some formulary restricted drugs, such as Ciprofloxacin (Cipro), are last defense antibiotics, which are restricted because of the public health risks of overuse.  When antibiotics are needlessly used this can cause pathogens to develop resistance to antibiotics, making antibiotic treatments less effective, and causing a public health risk.

12. Rite Aid's failure to verify that conditions have been satisfied for formulary-restricted drugs has serious fiscal implications.  Many drugs on the formularies of state and federal healthcare programs are restricted because of their high cost.  These drugs are permitted to be dispensed only as treatment for certain diseases or conditions for which there is no lower-cost alternative.  The electronic point-of-sale systems that state and federal healthcare programs use to approve payment for prescriptions generate warnings that particular diagnoses are required or that other conditions must be met when a pharmacy attempts to bill for a formulary-restricted drug.  If pharmacy technicians routinely override these warnings about restrictions on dispensing of drugs by indicating that the pharmacy has verified the required diagnosis or condition, when in fact it has not, then the entire system for controlling fiscal costs of expensive drugs is thwarted.

13. Weighing the certain profits resulting from high-speed drug dispensing against the unlikely penalties that might occur should its violations of law be detected, Rite Aid

management has knowingly calculated the odds in favor of violating the law.

## JURISDICTION AND VENUE

14. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.  Under 31 U.S.C. § 3730(e), there has been no relevant public disclosure of the "allegations or transactions" in this Complaint.

15. This Court has supplemental jurisdiction over related state law claims as they are predicated upon the same facts as the federal claims and merely assert separate damages suffered by the various states.

16. This Court has personal jurisdiction over Defendant pursuant to 31 U.S.C. § 3732(a) because Defendant can be found in, resides or transacts, or has transacted business nationally and specifically within the Eastern District of California.

17. Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. §§1391(b) and (c) because Defendant has transacted business in the Eastern District of California. The causes of action alleged herein are timely brought because of, among other things, efforts by the Defendant to conceal from the United States and the states wrongdoing in connection with the allegations made herein.

## PARTIES

**Plaintiff**

18. Relator Loyd F. Schmuckley Jr. is a pharmacist who resides in Ukiah, California.  Mr. Schmuckley graduated from Oregon State University Pharmacy School in 1979 and has over 31 years experience working as a pharmacist in multiple states.  He has been a California licensed pharmacist since 1982.

19. Relator worked as a part time staff pharmacist at Rite Aid from approximately April 2007

to August 2007.  He worked at both the Rite Aid at 680 South State Street, Ukiah, CA 95482 and the Rite Aid at 1730 South Main Street, Willits, CA 95490.  Mr. Schmuckley also worked as a relief pharmacist at Thrifty PayLess Drug Stores in Oregon City and Lake Oswego, Oregon from February 1996-March 1996 and November-December in 1997.  He began working at Thrifty PayLess shortly after it was acquired by Rite Aid and was in the process of coming under the management of Rite Aid.  He observed that as Rite Aid began taking over management responsibilities there was tremendous pressure on pharmacists to fill prescriptions as fast as possible.  When Relator worked at Rite Aid in 1997 and was re-hired at Rite Aid 10 years later, he saw that Rite Aid failed to meet its legal obligations to screen drugs according to the patients' medical history, counsel patients, or ensure that Medi-Cal formulary requirements for restricted drugs were met.

20. There has been no public disclosure of the allegations made in this Complaint.   If there have been any public disclosures of the particular allegations and transactions set forth in this Complaint, Relator is the original source of those disclosures because he discovered the violations through his personal observation while employed at the Rite Aid stores where he worked, and he has voluntarily provided the information to the United States Attorney and various states before the filing of this Complaint.

**Defendant**

21. Defendant Rite Aid has its principal place of business at 30 Hunter Lane, Camp Hill, Pennsylvania.  Rite Aid sells prescription drugs in stores across the United States, including numerous stores in the Eastern District of California.

**LEGAL BACKGROUND ON OBRA '90 AND ITS STATE-LAW COUNTERPARTS, AS WELL AS STATE LAWS REGARDING DUTIES OF PHARMACISTS THAT MAY NOT BE DELEGATED TO TECHNICIANS AND OTHER NON-PHARMACISTS**

22. The federal Omnibus Reconciliation Act of 1990 ("OBRA '90") provides that all states

shall establish standards that require pharmacists to screen prescriptions before dispensing, offer

patient counseling and maintain adequate patient records.  All of these requirements are broadly

described as "drug utilization review" or DUR.  The purpose of these drug utilization review

programs is to "assure that prescriptions (i) are appropriate, (ii) are medically necessary, and (iii)

are not likely to result in adverse medical results."  42 U.S.C.A. § 1396r-8(g)(1)(A).

23. OBRA '90 states:

 (2) Description of program

Each drug use review program shall meet the following requirements for covered outpatient drugs:

(A) Prospective drug review

**(i) *The State plan shall provide for a review of drug therapy before each prescription is filled or delivered to an individual receiving benefits under this subchapter, typically at the point-of-sale or point of distribution. The review shall include screening for potential drug therapy problems due to therapeutic duplication, drug-disease contraindications, drug-drug interactions (including serious interactions with nonprescription or over-the-counter drugs), incorrect drug dosage or duration of drug treatment, drug-allergy interactions, and clinical abuse/misuse.* Each State shall use the compendia and literature referred to in paragraph (1)(B) as its source of standards for such review.**

**(ii)** As part of the State's prospective drug use review program under this subparagraph applicable State law shall establish standards for counseling of individuals receiving benefits under this subchapter by pharmacists which includes at least the following:

**(I)** The pharmacist ***must offer*** to discuss with each individual receiving benefits under this subchapter or caregiver of such individual (***in person, whenever practicable***, or through access to a telephone service which is toll-free for long-distance calls) who presents a prescription, matters which in the ***exercise of the pharmacist's professional judgment*** (consistent with State law respecting the provision of such information), the pharmacist deems significant including the following:

**(aa)** The name and description of the medication.

**(bb)** The route, dosage form, dosage, route of administration, and duration of drug therapy.

United States ex rel. Loyd F. Schmuckley Jr. v. Rite Aid Corporation Complaint

*(cc) Special directions and precautions for preparation, administration and use by the patient.*

*(dd) Common severe side or adverse effects or interactions and therapeutic contraindications that may be encountered, including their avoidance, and the action required if they occur.*

**(ee)** Techniques for self-monitoring drug therapy.

**(ff)** Proper storage.

**(gg)** Prescription refill information.

**(hh)** Action to be taken in the event of a missed dose.

*(II) A reasonable effort must be made by the pharmacist to obtain, record, and maintain at least the following information regarding individuals receiving benefits under this subchapter:*

*(aa) Name, address, telephone number, date of birth (or age) and gender.*

*(bb) Individual history where significant, including disease state or states, known allergies and drug reactions, and a comprehensive list of medications and relevant devices.*

*(cc) Pharmacist comments relevant to the individual's drug therapy.*

Nothing in this clause shall be construed as requiring a pharmacist to provide consultation when an individual receiving benefits under this subchapter or caregiver of such individual refuses such consultation, or to require verification of the offer to provide consultation or a refusal of such offer.

42 U.S.C.A. § 1396r-8(g)(2)(A)(ii) (emphasis added).

24. Federal regulations implementing OBRA '90 state:

(a) General. Except as provided in §§ 456.703 (b) and (c), *the State plan must provide for a review of drug therapy before each prescription is filled or delivered to a recipient*, and applicable State law (including State Board policy incorporated in the State law by reference) must establish standards for counseling of the recipient or the recipient's caregiver. The State must provide pharmacies with detailed information as to what they must do to comply with prospective DUR requirements, including guidelines on counseling, profiling, and documentation of prospective DUR activities by the pharmacists. *The pharmacies, in turn, must provide this information to their pharmacists.* This information is to be based on guidelines provided by this subpart and by other sources that the State may specify.

*(b) Point-of-sale or point-of-distribution review. Except as provided in §
456.703(b) and (c), the State plan must provide for point-of-sale or point-of-
distribution review of drug therapy using predetermined standards before each
prescription is filled or delivered to the recipient or the recipient's caregiver.
The review must include screening to identify potential drug therapy problems
of the following types:*

*(1) Therapeutic duplication, that is, the prescribing and dispensing of two or
more drugs from the same therapeutic class such that the combined daily dose
puts the recipient at risk of an adverse medical result or incurs additional
program costs without additional therapeutic benefit.*

*(2) Drug-disease contraindication, that is, the potential for, or the
occurrence of--*

*(i) An undesirable alteration of the therapeutic effect of a given drug
because of the presence, in the patient for whom it is prescribed, of a disease
condition; or*

*(ii) An adverse effect of the drug on the patient's disease condition.*

*(3) Adverse drug-drug interaction, that is, the potential for, or occurrence
of, a clinically significant adverse medical effect as a result of the recipient
using two or more drugs together.*

*(4) Incorrect drug dosage, that is, the dosage lies outside the daily dosage
specified in predetermined standards as necessary to achieve therapeutic
benefit. Dosage is the strength multiplied by the quantity dispensed divided by
day's supply.*

*(5) Incorrect duration of drug treatment, that is, the number of days of
prescribed therapy exceeds or falls short of the recommendations contained in
the predetermined standards.*

*(6) Drug-allergy interactions, that is, the significant potential for, or the
occurrence of, an allergic reaction as a result of drug therapy.*

*(7) Clinical abuse/misuse, that is, the occurrence of situations referred to in
the definitions of abuse, gross overuse, overutilization, and underutilization, as
defined in § 456.702, and incorrect dosage and incorrect duration, as defined in
paragraphs (b)(4) and (b)(5) of this section, respectively.*

(c) Drug counseling.

(1) *As part of the prospective drug review program, standards for
counseling by pharmacists of recipients or the recipients' caregivers must be
established by State law or other method that is satisfactory to the State agency.*
A State agency's counseling standards must address special situations where the
patient or the patient's representative, is not readily available to receive the offer
to counsel or the actual counseling, for example, prescriptions delivered offsite or

through the mail. The State agency, at a minimum, must also address the following issues in their counseling standards:

(i) Whether the offer to counsel is required for new prescriptions only, or for both new and refill prescriptions;

(ii) Whether pharmacists must make the offer to counsel or auxiliary personnel are authorized to make the offer;

(iii) Whether only a patient's refusal of the offer to counsel must be documented, or whether documentation of all offers is required;

(iv) Whether documentation of counseling is required; and

(v) Whether counseling is required in situations where the patient's representative is not readily available to receive a counseling offer or the counseling itself.

(2) The standards must meet the following requirements:

***(i) They must require pharmacists to offer to counsel (in person, whenever practicable, or through access to a telephone service that is toll-free for long-distance calls) each recipient or recipient's caregiver who presents a prescription.*** A pharmacist whose primary patient population is accessible through a local measured or toll-free exchange need not be required to offer toll-free service. Mail order pharmacies are required to provide toll-free telephone service for long distance calls.

(ii) They need not require a pharmacist to provide consultation when a Medicaid recipient or the recipient's caregiver refuses that consultation.

(iii) They must specify what documentation by the pharmacy of refusal of the offer of counseling is required.

(3) The standards must specify that the counseling include those matters listed in paragraphs (c)(3)(i) through (c)(3)(viii) of this section that, in the exercise of his or her professional judgment (consistent with State law regarding the provision of such information), the pharmacist considers significant as well as other matters the pharmacist considers significant.

(i) The name and description of the medication;

(ii) The dosage form, dosage, route of administration, and duration of drug therapy;

(iii) Special directions and precautions for preparation, administration, and use by the patient;

(iv) Common severe side or adverse effects or interactions and therapeutic contraindications that may be encountered, including their avoidance, and the action required if they occur;

United States ex rel. Loyd F. Schmuckley Jr. v. Rite Aid Corporation Complaint

(v) Techniques for self-monitoring drug therapy;

(vi) Proper storage;

(vii) Prescription refill information; and

(viii) Action to be taken in the event of a missed dose.

***(d) Profiling. The State agency must require that, in the case of Medicaid recipients, the pharmacist make a reasonable effort to obtain, record, and maintain patient profiles containing, at a minimum, the information listed in paragraphs (d)(1) through (d)(3) of this section.***

***(1) Name, address, telephone number, date of birth (or age), and gender of the patient;***

***(2) Individual history, if significant, including disease state or states, known allergies and drug reactions, and a comprehensive list of medications and relevant devices; and***

***(3) Pharmacist's comments relevant to the individual's drug therapy.***

42 C.F.R. § 456.705 (emphasis added).

25. California, like most states, has regulations implementing OBRA '90 that require pharmacists to perform federally-mandated drug utilization reviews.  Rather than comprehensively reproducing the laws of all the states in which there are Rite Aid stores, this Complaint will focus upon the laws of California as a representative example of the laws and regulations adopted in the various states.  California's pharmacy board regulations state: "Prior to consultation as set forth in section 1707.2, a pharmacist shall review a patient's drug therapy and medication record before each prescription drug is delivered. The review shall include screening for severe potential drug therapy problems."   16 CCR § 1707.3.

26. California also has regulations implementing the counseling requirements of OBRA '90 which state:

(a) A pharmacist shall provide oral consultation to his or her patient or the patient's agent in all care settings:

(1) upon request; or

(2) whenever the pharmacist deems it warranted in the exercise of his or her professional judgment.

(b)(1) In addition to the obligation to consult set forth in subsection (a), a *pharmacist shall provide oral consultation to his or her patient or the patient's agent in any care setting in which the patient or agent is present:*

*(A) whenever the prescription drug has not previously been dispensed to a patient; or*

*(B) whenever a prescription drug not previously dispensed to a patient in the same dosage form, strength or with the same written directions, is dispensed by the pharmacy.*

(2) When the patient or agent is not present (including but not limited to a prescription drug that was shipped by mail) a pharmacy shall ensure that the patient receives written notice:

(A) of his or her right to request consultation; and

(B) a telephone number from which the patient may obtain oral consultation from a pharmacist who has ready access to the patient's record…

*(c) When oral consultation is provided, it shall include at least the following:*

*(1) directions for use and storage and the importance of compliance with directions;  and*

*(2) precautions and relevant warnings, including common severe side or adverse effects or interactions that may be encountered.*

(d) Whenever a pharmacist deems it warranted in the exercise of his or her professional judgment, oral consultation shall also include:

(1) the name and description of the medication;

(2) the route of administration, dosage form, dosage, and duration of drug therapy;

(3) any special directions for use and storage;

(4) precautions for preparation and administration by the patient, including techniques for self-monitoring drug therapy;

(5) prescription refill information;

(6) therapeutic contraindications, avoidance of common severe side or adverse effects or known interactions, including serious potential interactions with known nonprescription medications and therapeutic contraindications and the action

- 15 -

required if such side or adverse effects or interactions or therapeutic contraindications are present or occur;

(7) action to be taken in the event of a missed dose.

(e) Notwithstanding the requirements set forth in subsection (a) and (b), a pharmacist is not required to provide oral consultation when a patient or the patient's agent refuses such consultation.

16 CCR § 1707.2. (emphasis added).

27. California also has regulations implementing OBRA '90's requirement to maintain patient profiles. 16 CCR § 1707.1 states:

a) *A pharmacy shall maintain medication profiles on all patients who have prescriptions filled in that pharmacy except when the pharmacist has reasonable belief that the patient will not continue to obtain prescription medications from that pharmacy.*

(1) A patient medication record shall be maintained in an automated data processing or manual record mode such that the following information is readily retrievable during the pharmacy's normal operating hours.

*(A) The patient's full name and address, telephone number, date of birth (or age) and gender;*

*(B) For each prescription dispensed by the pharmacy:*

*1. The name, strength, dosage form, route of administration, if other than oral, quantity and directions for use of any drug dispensed;*

*2. The prescriber's name and where appropriate, license number, DEA registration number or other unique identifier;*

*3. The date on which a drug was dispensed or refilled;*

*4. The prescription number for each prescription; and*

*5. The information required by section 1717. [requirements for maintaining records.]*

*(C) Any of the following which may relate to drug therapy: patient allergies, idiosyncrasies, current medications and relevant prior medications including nonprescription medications and relevant devices, or medical conditions which are communicated by the patient or the patient's agent.*

*(D) Any other information which the pharmacist, in his or her professional judgment, deems appropriate.*

(2) The patient medication record shall be maintained for at least one year from the date when the last prescription was filled.

28. Nearly all states that have Rite Aid stores have passed similar statutes and regulations implementing OBRA '90 and requiring pharmacists to provide prospective drug review. *See* Ala. Admin. Code r. 680-X-2-.21; 12 AK ADC 52.585; 16 CCR § 1707.2; 10 Colo. Code Regs. 2505-10:8.800; C.G.S.A. § 20-620; 24 DE ADC 2500-5.0; 22-B DC ADC § 1919; Ga Comp. R. & Regs. 480-31-.01; 856 IN ADC 1-33-1.5; 856 IN ADC 1-33-2; 46 LA ADC Pt LIII, § 517; 247 MA ADC 9.07; MI ADC R. 338.490; NV ADC 639.707; NV ST 639.266; NV ADC 639.708; NJ ADC 13:39-7.21; 8 NY ADC 63.6; 9 NY ADC 9800.1; 21 NC ADC 46.2504; RI ADC 31-2-8:13.0; TN ADC 1140-03-.01; 12 VA ADC 30-130-310; WA ADC 246-869-220.

29. Although the drug utilization review provisions of OBRA '90 were initially directed at pharmacists serving patients who receive benefits under state- and federally-funded Medicaid plans, the professional standards for pharmacists adopted by most states are not so limited. Rather, they create professional standards broadly applicable to pharmacists serving all patients, and the OBRA '90 standards have become the general standards for pharmacy practice.  As a leading authority on pharmacy law has stated:

> Depending on the way in which the state acts to fulfill the federal requirement, DUR requirements may appear to apply only to Medicaid prescriptions or they may expressly apply to all prescriptions.  Such a distinction is probably meaningless, however.  No profession, including pharmacy, has standards of practice that change according to the person being served at the time.  **The net result of the OBRA '90 mandate is that it elevates the standard of care owed by pharmacists to all patients**.

Richard R. Abood, PHARMACY PRACTICE AND LAW (6th Ed., 2011), p. 269 (emphasis added).

30. Upon information and belief, the OBRA '90 standards now provide the standard of care for pharmacy practice under all state- and federally-funded healthcare plans, including Medicaid, Medicare Part D, Tricare, federal employee health benefit plans, and other government insurance plans.

31. Furthermore, Medicare regulations mandate that Medicare Part D sponsors require pharmacies to represent that they will comply with the minimum standards for pharmacy practice as established by the laws of the various states.  42 C.F.R. § 423.153(c)(1).  Additionally, all drugs dispensed under Medicare Part D must undergo a drug utilization review process.  42 C.F.R. § 423.153 states:

(a) General rule. ***Each Part D sponsor must have established, for covered Part D drugs furnished through a Part D plan, a drug utilization management program, quality assurance measures and systems***, and an MTMP as described in paragraphs (b), (c), and (d) of this section.

(b) Drug utilization management. A Part D sponsor must have established a reasonable and appropriate drug utilization management program that--

(1) Includes incentives ***to reduce costs*** when medically appropriate;

(2) Maintains policies and systems to assist in preventing over-utilization and under-utilization of prescribed medications; and

(3) Provides CMS with information concerning the procedures and performance of its drug utilization management program, according to guidelines specified by CMS.

***(c) Quality assurance. A Part D sponsor must have established quality assurance measures and systems to reduce medication errors and adverse drug interactions and improve medication use that include all of the following--***

***(1) Representation that network providers are required to comply with minimum standards for pharmacy practice as established by the States.***

***(2) Concurrent drug utilization review systems, policies, and procedures designed to ensure that a review of the prescribed drug therapy is performed before each prescription is dispensed to an enrollee in a sponsor's Part D plan, typically at the point-of-sale or point-of-distribution. The review must include, but not be limited to,***

United States ex rel. Loyd F. Schmuckley Jr. v. Rite Aid Corporation Complaint

*(i) Screening for potential drug therapy problems due to therapeutic duplication.*

*(ii) Age/gender-related contraindications.*

*(iii) Over-utilization and under-utilization.*

*(iv) Drug-drug interactions.*

*(v) Incorrect drug dosage or duration of drug therapy.*

*(vi) Drug-allergy contraindications.*

*(vii) Clinical abuse/misuse.*

(3) Retrospective drug utilization review systems, policies, and procedures designed to ensure ongoing periodic examination of claims data and other records, through computerized drug claims processing and information retrieval systems, in order to identify patterns of inappropriate or medically unnecessary care among enrollees in a sponsor's Part D plan, or associated with specific drugs or groups of drugs.

(4) Internal medication error identification and reduction systems.

(5) Provision of information to CMS regarding its quality assurance measures and systems, according to guidelines specified by CMS.

32. The drug utilization review standards established in Medicare regulations are essentially the same as the requirements of OBRA '90. *Compare* 42 C.F.R. § 423.153 (stating that drug utilization review shall include: "(i) Screening for potential drug therapy problems due to therapeutic duplication. (ii) Age/gender-related contraindications. (iii) Over-utilization and under-utilization. (iv) Drug-drug interactions. (v) Incorrect drug dosage or duration of drug therapy. (vi) Drug-allergy contraindications. (vii) Clinical abuse/misuse.") with 42 C.F.R. § 456.705 ("The review shall include screening for potential drug therapy problems due to therapeutic duplication, drug-disease contraindications, drug-drug interactions (including serious interactions with nonprescription or over-the-counter drugs), incorrect drug dosage or duration of drug treatment, drug-allergy interactions, and clinical abuse/misuse.").

33. State regulations limit the OBRA '90 duties that a pharmacist may delegate to a pharmacy technician.  For example, California regulations state:

> *Only a pharmacist, or an intern pharmacist acting under the supervision of a pharmacist, may:*

> (a) Receive a new prescription order orally from a prescriber or other person authorized by law.

> *(b) Consult with a patient or his or her agent regarding a prescription, either prior to or after dispensing, or regarding any medical information contained in a patient medication record system or patient chart.*

> *(c) Identify, evaluate and interpret a prescription.*

> *(d) Interpret the clinical data in a patient medication record system or patient chart.*

> *(e) Consult with any prescriber, nurse or other health care professional or authorized agent thereof.*

> (f) Supervise the packaging of drugs and check the packaging procedure and product upon completion.

> *(g) Perform all functions which require professional judgment.*

16 CCR § 1793.1.  *See also* 16 CCR § 1793.3; 16 CCR § 1793.7; 16 CCR § 1793.2 16 CCR § 1793.1 (California regulations which state that all actions of a technician must be supervised by a pharmacist and define the tasks that must be performed by a pharmacist and which tasks may be performed by a technician).

34. In another example of state regulations regarding the duties that may be performed by pharmacists alone, New York regulations on the practice of pharmacy state:

> (*b*) Unlicensed persons shall not be authorized to:

> (*1*) receive oral prescriptions from prescribers;

> *(2) interpret and evaluate a prescription for conformance with legal requirements, authenticity, accuracy and interaction of the prescribed drug with other known prescribed and over-the-counter drugs;*

(*3*) make determinations of the therapeutic equivalency as such determinations apply to generic substitution;

(*4*) measure, weigh, compound or mix ingredients;

(*5*) sign or initial any record of dispensing required to be maintained by law;

**(6) counsel patients; or**

**(7) perform any other function involving the exercise of professional judgment.**

8 NY ADC 29.7 (emphasis added).

35. According to OBRA '90 regulations, states must provide a drug utilization review. These regulations state:

*…the State plan must provide for a review of drug therapy before each prescription is filled or delivered to a recipient, and applicable State law (including State Board policy incorporated in the State law by reference) must establish standards for counseling of the recipient or the recipient's caregiver. The State must provide pharmacies with detailed information as to what they must do to comply with prospective DUR requirements, including guidelines on counseling, profiling, and documentation of prospective DUR activities by the pharmacists. The pharmacies, in turn, must provide this information to their pharmacists.* This information is to be based on guidelines provided by this subpart and by other sources that the State may specify.*

*(b) Point-of-sale or point-of-distribution review. Except as provided in § 456.703(b) and (c), the State plan must provide for point-of-sale or point-of-distribution review of drug therapy using predetermined standards before each prescription is filled or delivered to the recipient or the recipient's caregiver. The review must include screening to identify potential drug therapy problems of the following types:*

*(1) Therapeutic duplication, that is, the prescribing and dispensing of two or more drugs from the same therapeutic class such that the combined daily dose puts the recipient at risk of an adverse medical result or incurs additional program costs without additional therapeutic benefit.*

*(2) Drug-disease contraindication, that is, the potential for, or the occurrence of--*

*(i) An undesirable alteration of the therapeutic effect of a given drug because of the presence, in the patient for whom it is prescribed, of a disease*

*condition; or*

*(ii) An adverse effect of the drug on the patient's disease condition.*

*(3) Adverse drug-drug interaction, that is, the potential for, or occurrence of, a clinically significant adverse medical effect as a result of the recipient using two or more drugs together.*

*(4) Incorrect drug dosage, that is, the dosage lies outside the daily dosage specified in predetermined standards as necessary to achieve therapeutic benefit. Dosage is the strength multiplied by the quantity dispensed divided by day's supply.*

*(5) Incorrect duration of drug treatment, that is, the number of days of prescribed therapy exceeds or falls short of the recommendations contained in the predetermined standards.*

*(6) Drug-allergy interactions, that is, the significant potential for, or the occurrence of, an allergic reaction as a result of drug therapy.*

*(7) Clinical abuse/misuse, that is, the occurrence of situations referred to in the definitions of abuse, gross overuse, overutilization, and underutilization, as defined in § 456.702, and incorrect dosage and incorrect duration, as defined in paragraphs (b)(4) and (b)(5) of this section, respectively.*

42 C.F.R. § 456.705 (emphasis added).  Federal regulations also provide that states may create electronic systems for drug screening if they so chose.  *See* 42 C.F.R. § 456.722.

36. California state regulations provide: "Prior to consultation as set forth in section 1707.2, a pharmacist shall review a patient's drug therapy and medication record before each prescription drug is delivered. The review shall include screening for severe potential drug therapy problems."  16 CCR § 1707.3.

**RITE AID'S FAILURE TO PEFORM PROSPECTIVE DRUG UTILIZATION REVIEW**

37. OBRA '90 codified the responsibility of pharmacies to protect the health of patients and ensure that public funds are not misused by requiring that pharmacists perform such tasks as screening drugs for potential problems, maintaining patient profiles, and counseling patients on their medication.  However, Rite Aid has corporate policies of pushing pharmacists and technicians to fill prescriptions as fast as possible, without providing pharmacists the time to

- 22 -

United States ex rel. Loyd F. Schmuckley Jr. v. Rite Aid Corporation Complaint

perform their duties to screen drugs, collect patient information, or counsel patients.  To save time and money, Rite Aid has relegated the responsibilities of pharmacists under OBRA '90 to poorly-trained technicians who do not have the authority under law to perform these tasks, all the while certifying that Rite Aid has complied with state and federal regulations.

38. Through failing to perform the duties mandated by OBRA '90 and other state and federal regulations, Rite Aid performs substandard care and violates its Medicaid, Medicare, Tricare, and other government program agreements.

39. The failure of Rite Aid to perform its duties under OBRA '90 and other statutes and regulations continuously puts patients at risk.

40. Rite Aid technicians constantly override DUR alerts without ever informing pharmacists about the alerts that Medi-Cal issues.

41. Relator worked as a pharmacist at the Rite Aid stores in Ukiah, California and in Willits, California and observed that both pharmacies fail to comply with OBRA '90 requirements for DUR alerts.  At the Rite Aid in Ukiah, California Relator was not informed of any of the Medi-Cal DUR alerts on prescriptions he filled.  Instead, technicians would automatically override DUR alerts without contacting the pharmacist for review.  At the Rite Aid in Willits, Relator was informed of a few DUR alerts, but found that for the *vast* majority of prescriptions he was never consulted about the alerts.  Further, it appeared to Relator that the technician had no understanding of the significance of the alerts because the alerts she informed him about involved less serious risk to patient safety than other possible Medi-Cal DUR alerts.

42. Instead of informing pharmacists about DUR alerts so that appropriate action can be taken to protect patient safety, Rite Aid technicians create whatever documentation might be required in point-of-sale computer systems of government healthcare programs to get claims paid, whether the documented actions have been taken or not.

- 23 -
United States ex rel. Loyd F. Schmuckley Jr. v. Rite Aid Corporation Complaint

43. The Medi-Cal point-of-sale system will not allow billing to proceed until pharmacies have stated that they have complied with drug screening problems that Medicaid identifies.  On information and belief, all state and federal programs have such prerequisites to billing and payment.

44. California created an electronic point-of-sale system for DUR alerts, which Rite Aid uses alongside its own screening system.

45. When Medi-Cal's system identifies a drug screening problem, such as a drug-drug interaction, a "conflict code," or "DUR alert" will show up on the pharmacist's screen.  The conflict codes may be any one of the following:

Conflict Codes

| DA | Drug-Allergy Conflict | AT | Additive Toxicity |
|----|-----------------------|----|-------------------|
| PG | Drug-Pregnancy Conflict | ID | Ingredient Duplication |
| MC | Drug-Disease Conflict (Reported Diagnosis from Medical Claim) | PA | Drug-Age Alert (Pediatric or Geriatric) |
| DD | Drug-Drug Interaction | HD | High Dose |
| TD | Therapeutic Duplication | LD | Low Dose |
| ER | Overutilization (Early Refill) | MX | Incorrect Duration of Therapy |
| LR | Underutilization (Late Refill) | SX | Drug-Gender Conflict |

Exhibit G. at 5.

46. Medi-Cal has standard procedures for dealing with DUR alerts.  The Medi-Cal Pharmacy Provider Manual states[2]:

DUR Alert Response Procedures

When the pharmacist sees a code across the screen, the pharmacist is required to take some action to intervene.  The procedure for responding to DUR alerts is as follows:

---

[2] The Medi-Cal provider agreement states: "Compliance with Billing and Claims Requirements: Provider agrees that it shall comply with all of the billing and claims requirements set forth in the Welfare and Institutions Code and Its Implementing regulations, and the provider manual." (Exhibit F. at ¶ 24.).

- Pharmacist receives DUR alert message(s) on the computer screen; the claim is rejected for DUR

- Pharmacist reviews and resolves identified DUR conflict(s) by contacting the prescriber, talking with the patient, and/or using other resources or professional judgment

- Pharmacist resubmits claim with a six-character response in the DUR field:

    –The first two characters identify the DUR conflict selected for response (if multiple alerts occurred for the claim)

    –The second two characters identify the intervention chosen to resolve the DUR conflict selected

    –The third two characters identify the outcome of the intervention; that is, whether the prescription was filled or not filled

- Pharmacist receives a paid response if the prescription was filled or a captured response if the claim was cancelled

Exhibit G. at 5.

47. Every time Medi-Cal identifies a DUR conflict, the pharmacy is required by Medi-Cal to intervene in order for the claim to be processed after it is rejected.

48. The DUR program has the following intervention codes that pharmacies are allowed to use in order to override the DUR alert and get the claim processed:

| | |
|---|---|
| M0 (M zero) | Prescriber Consulted |
| P0 (P zero) | Patient Consulted |
| R0 (R zero) | Pharmacist Consulted Other Source |

Exhibit G. at 6.

49. The DUR program also has the following outcome codes that are submitted with the intervention code:

| | | | |
|---|---|---|---|
| 1A | Filled, false positive | 1F | Filled with different quantity |
| 1B | Filled prescription as is | 1G | Filled with prescriber approval |
| 1C | Filled with different dose | 2A | Prescription not filled |
| 1D | Filled with different direction | 2B | Prescription not filled – directions |
| 1E | Filled with different drug | | clarified |

- 25 -

Exhibit G. at 6.

50. Rite Aid ignores its duty to comply with Medi-Cal drug screening requirements.  Instead of consulting the patient, talking to the prescriber, or consulting other sources, the technicians fill in whatever code it takes to get the claim paid.  Rite Aid technicians would frequently enter the "M0" code for prescriber contacted.  In fact, Rite Aid technicians enter the code "M0" without ever contacting the physician.

51. Furthermore, because Rite Aid's procedures require that a technician bill first, before a pharmacist actually processes and fills the prescription, all DUR overrides are patently false at the time they are submitted, whether a pharmacist subsequently performs DUR functions using Rite Aid's proprietary computer systems or not.  Despite Rite Aid's proprietary DUR system, in nearly all cases when a technician certifies that a prescriber has been contacted about a DUR alert, no one at Rite Aid ever contacts the prescriber.  In fact, during all the months he spent working at Rite Aid, relator never saw any pharmacist or technician contact a prescriber about a DUR alert.

52. After Rite Aid's computer system pulls up DUR alerts in the governmental point-of-sale systems; after those alerts have been overridden by pharmacy technicians; and after the prescription has already been billed to Medi-Cal or the applicable healthcare plan, only then does the prescription get handed off to a pharmacist to deal with Rite Aid's own screening alerts.  However, there are far more Medi-Cal alerts than Rite Aid's internal system recognizes.  Rite Aid DURs do not cover all the same categories that Medi-Cal DURs do.  Rite Aid DURs also are not a substitute for Medi-Cal DURs because Rite Aid DURs do not require that pharmacists contact prescribers about DUR alerts.  Further, by the time a Rite Aid alert shows up, Rite Aid

United States ex rel. Loyd F. Schmuckley Jr. v. Rite Aid Corporation Complaint

technicians have already billed the prescription and falsely stated that they contacted the

physician when they have not in fact done so.

53. It is important and material to the payment decisions of Medi-Cal and other government healthcare systems that pharmacies certify resolution of DUR alerts generated by their point-of-sale systems before being paid because those government-provided alerts are believed to be more comprehensive than any pharmacy company's internal DUR-alert system.  The Medi-Cal database covers pharmacy records for patients for all pharmacies, and since patients shop at different pharmacies, that is one way in which Medi-Cal DUR alerts are more comprehensive. Medi-Cal states the following on its website in answer to a frequently-asked question or "FAQ:"

> **Our pharmacy computer system performs DUR edits. Why should Medi-Cal duplicate this effort?**
>
> A. EDS/Medi-Cal has more interlinked recipient data than any single in-store system. This database allows EDS/Medi-Cal to send drug-disease alerts to pharmacists that link the incoming drug claim to the recipient's history of diagnoses. This database also contains pharmacy records for a recipient from **any** pharmacy that processed paid fee-for-service Medi-Cal claims. As a result, therapeutic duplication, ingredient duplication, drug-pregnancy, drug-allergy, additive toxicity and drug-drug interaction alerts provide more information than an in-store system does.
>
> So, some overlap exists between the EDS/Medi-Cal system and an in-store system. But the EDS/Medi-Cal system offers important features which provides pharmacists with essential information.[3]

54. Rite Aid pharmacists do not fulfill their responsibilities to screen medications under state and federal laws, as well as Medi-Cal regulations.  The Medi-Cal Pharmacists Provider Manual states, "In accordance with the requirements of the California State Board of Pharmacy, *California Code of Regulations* (CCR), Title 16, Section 1707.3, conducting prospective DUR

---

[3] http://files.medi-cal.ca.gov/pubsdoco/dur/dur_faq.asp (last visited September 7, 2011), also attached as Exhibit H.

screening is the sole responsibility of the pharmacist." Exhibit G. at 3. Instead of taking responsibility for drug screening, Rite Aid pharmacists completely rely on software and technicians to fulfill their responsibilities. Almost all of the time technicians enter intervention overrides with no pharmacist input. The Medi-Cal Manual also says, "Note that although automated DUR will be performed on certain targeted drugs, it remains the pharmacist's responsibility to review all prescriptions for potential problems regardless of the prescribed drug's status as a target drug." *Id.* at 4. Despite this rule, pharmacists at Rite Aid almost never provide drug screening and intervention outside of the computer software prompts generated by Rite Aid's proprietary system. Rite Aid pharmacists are completely reliant on DUR software and provide no independent analysis of the appropriateness of a drug for a particular patient.

55. DUR conflict codes occur on a large majority of prescriptions. So many patients are on multiple medications that there are very frequently potential drug conflicts and other issues to consider. Resolving these conflicts does not take a large amount of time on the part of pharmacists. For instance, if a pharmacist talks to a patient and finds out that the patient has taken the medication before and had no adverse effects, then there would be a good reason to override the code. However, Rite Aid does not take the time to comply with this important billing requirement because of its desire to fill prescriptions as fast as possible without having to interact with physicians or patients. If Medi-Cal and other state or federal programs knew that Rite Aid is submitting false intervention codes, they would not provide payment for these claims. On information and belief, all state and federal healthcare programs have drug utilization review programs that require that pharmacists state that they comply with drug screening requirements in order for pharmacies to receive reimbursements.

56. Upon information and belief, other Medicaid, Medicare, Tricare, and other government programs have created programs with substantially similar DUR alerts. Medi-Cal uses

United States ex rel. Loyd F. Schmuckley Jr. v. Rite Aid Corporation Complaint

standardized DUR codes that were created by the National Council for Prescription Drug Programs (NCPDP).  *See* Exhibit G at 4.  Medicaid DUR systems in other states, such as New York and Tennessee, are very similar to California's DUR system, as can be seen in Exhibits I and J to this complaint.  Further, upon information and belief, Rite Aid's creation of false documents and false claims regarding these DUR alerts applies to all DUR programs including Medicare, Tricare, and Medicaid programs in other states—not just Medi-Cal.

57. Rite Aid also fails to comply with OBRA '90 and state regulations to maintain patient profiles; further, because Rite Aid's proprietary DURs are based on patient profiles, all of Rite Aid's proprietary DURs are inadequate under OBRA '90 because they are not based on accurate information about the patient's profile, such as allergies and diagnoses.  Rite Aid very rarely identifies patient diagnoses.   Diagnoses are extremely important in order for pharmacists to be aware of any negative drug effects a patient may experience.  Diagnoses also help pharmacists verify that patients are receiving the correct information.  Rite Aid also frequently fails to maintain records on patient allergies.  Keeping track of such information is critical to ensure that patients do not have adverse reactions.  Further, there are often incorrect addresses, telephone numbers, date of births, and other information in the patient records.

58. Medi-Cal drug screening includes searches for possible bad interactions with medication related to allergies and diseases.  Exhibit G. at 5.  Further, the Medi-Cal drug utilization review manual explicitly states that "It is not expected that commercial databases will contain patient-specific diagnosis or allergy information.  When, in the pharmacist's professional judgment, obtaining such information is essential, he or she should consult the patient or the patient's health care provider." *(Exhibit G*. at 3.).  Without keeping this information on patient allergies and diagnoses, there is no way for Rite Aid to accurately use the drug screening program that is mandatory for Medi-Cal submissions for payment.

59. Generally, technicians input patient information.  Rite Aid pharmacists, however, fail to ensure that this information is correct and accurate, thereby failing to comply with state and federal OBRA regulations.  Medi-Cal instructions state, "The pharmacist is responsible for collecting, recording and maintaining the above patient medication record information in accordance with the requirements of the California State Board of Pharmacy, CCR, Title 16, Section 1707.1." (Exhibit G. at 10.).  Further, Medi-Cal states, "The pharmacist may rely upon ancillary personnel to collect, record and obtain patient information for his/her medication record, but the pharmacist must review and interpret that information and clarify confusing or conflicting information." (Exhibit G. at 10.).  In failing to ensure that patient profile information is accurate, Rite Aid fails to comply with Medi-Cal requirements.

60. One of the most basic requirements under federal and state Medicaid laws is that pharmacies maintain patient profiles with information such as patient contact information, date of birth and significant information such as allergies, diseases, and medications.  OBRA '90 states:

> *(II) A reasonable effort must be made by the pharmacist to obtain, record, and maintain at least the following information regarding individuals receiving benefits under this subchapter:*
>
> *(aa) Name, address, telephone number, date of birth (or age) and gender.*
>
> *(bb) Individual history where significant, including disease state or states, known allergies and drug reactions, and a comprehensive list of medications and relevant devices.*
>
> *(cc) Pharmacist comments relevant to the individual's drug therapy.*

42 U.S.C.A. § 1396r-8(g)(2)(A)(ii)..

61. Furthermore, California regulations state:

> a) A pharmacy shall maintain medication profiles on all patients who have prescriptions filled in that pharmacy except when the pharmacist has reasonable belief that the patient will not continue to obtain prescription medications from that pharmacy.

*(1) A patient medication record shall be maintained in an automated data processing or manual record mode such that the following information is readily retrievable during the pharmacy's normal operating hours.*

*(A) The patient's full name and address, telephone number, date of birth (or age) and gender;*

*(B) For each prescription dispensed by the pharmacy:*

*1. The name, strength, dosage form, route of administration, if other than oral, quantity and directions for use of any drug dispensed;*

*2. The prescriber's name and where appropriate, license number, DEA registration number or other unique identifier;*

*3. The date on which a drug was dispensed or refilled;*

*4. The prescription number for each prescription; and*

*5. The information required by section 1717.  [requirements for maintaining records.]*

*(C) Any of the following which may relate to drug therapy: patient allergies, idiosyncrasies, current medications and relevant prior medications including nonprescription medications and relevant devices, or medical conditions which are communicated by the patient or the patient's agent.*

*(D) Any other information which the pharmacist, in his or her professional judgment, deems appropriate.*

(2) The patient medication record shall be maintained for at least one year from the date when the last prescription was filled.

16 CCR § 1707.1.

62. Frequently, Rite Aid pharmacists do not offer to counsel patients.  On the rare occasions when licensed pharmacists found the time to counsel patients, the counseling they provided was perfunctory and inadequate.

63. According to California regulations, patient counseling "…*shall* include *at least* the following: (1) directions for use and storage and the importance of compliance with directions;

United States ex rel. Loyd F. Schmuckley Jr. v. Rite Aid Corporation Complaint

and (2) precautions and relevant warnings, including common severe side or adverse effects or interactions that may be encountered." 16 CCR § 1707.2(c) (emphasis added).   Further, OBRA '90 states that the pharmacist shall discuss information "the pharmacist deems significant *including*. . . . (dd) Common severe side or adverse effects or interactions and therapeutic contraindications that may be encountered, including their avoidance, and the action required if they occur." 42 U.S.C.A. § 1396r-8(g)(2)(A)(ii) (emphasis added).  OBRA '90 also says that pharmacists shall discuss matters which in the "exercise of the pharmacist's professional judgment" the pharmacists deems significant. 42 U.S.C.A. § 1396r-8(g)(2)(A)(ii).  However, Rite Aid pharmacists very frequently fail to counsel patients on common severe side or adverse effects or interactions, which is some of the most important information that should be conveyed to patients.  Exercising professional judgment in counseling does not mean that a pharmacist should omit information about potential common adverse side effects in order to save time.

64. Rite Aid has leaflets to provide patients with some general information and an instruction to contact their physician or pharmacist if they have questions.  However, the leaflet is not a substitute for counseling because federal and state laws require that pharmacists counsel patients or their agents in person when they come into the store.  Under OBRA '90 pharmacists must counsel patients or their agents "in person, whenever practicable." 42 U.S.C.A. § 1396r-8(g)(2)(A)(ii).   Congress, in passing OBRA '90, intended to require pharmacists to counsel patients on their medications in order to reduce the great cost to Medicaid when patients have adverse results from medications.  It did not intend, in requiring that pharmacists counsel patients "in person, whenever practicable," that pharmacists would shirk their duty to offer counseling in order to increase profits.  *Id*.  Furthermore, the language in the statute says that the pharmacist "must offer" patient counseling—this language is mandatory, not permissive.  *Id*.

65. California regulations similarly require that pharmacists counsel patients orally when the

- 32 -

patient or agent is present. 16 CCR § 1707.2(b)(1). Although California regulations state that a pharmacist shall provide a written notice of the right to counsel with a phone number of a pharmacist, these regulations do not apply when a patient or patient's agent is actually present. 16 CCR § 1707.2(b)(2).

66. Furthermore, the leaflet that Rite Aid provided its patients was filled with inadequate and sometimes incorrect information about the potential side effects of their prescriptions. Rite Aid's leaflets had potential side effects listed by category of drug. The side effects of particular drugs within a category may differ, so by not listing potential side effects by each specific drug Rite Aid often provided patients with inaccurate information. Further, a leaflet cannot substitute for the professional judgment of the pharmacist.

67. Rite Aid's failure to maintain patient profiles, perform prospective drug review, and counsel patients were in violation of the Medi-Cal provider agreement. The Medi-Cal Provider Agreement, attached as Exhibit F, states in paragraph 2 on page 1 that "[p]rovider agrees to comply with all applicable provisions of Chapters 7 and 8 of the Welfare and Institutions Code (commencing with Sections 14000 and 14200), and any applicable rules or regulations promulgated by DHCS pursuant to these Chapters." On page 8 that agreement also states that "**[p]rovider agrees that compliance with the provisions of this agreement is a condition precedent to payment to provider**."

68. Further the Medi-Cal provider agreement states that the provider must not commit fraud and abuse. Ex. F. at ¶ 15. One of the definitions of abuse set forth in that paragraph is,

> practices that are inconsistent with sound medical practices and result in reimbursement by the Medi-Cal program or other health care programs operated, or financed in whole or in part, by the Federal Government or any state or local agency in this state or any other state, for services that are unnecessary or for substandard items or services that fail to meet professionally recognized standards for health care.

*Id*.  By failing to follow important state and federal drug utilization review laws and regulations, Rite Aid pharmacists engaged in substandard care that was inconsistent with sound medical practices.

69. On information and belief, compliance with federal and state law, as well as sound medical practices, is a condition of every state and federal healthcare program's provider agreement.  On information and belief, Rite Aid's  policy of encouraging pharmacists to fill prescriptions as fast as possible without regard for the need to comply with drug utilization review laws and regulations was nationwide and a product of companywide decisions to put profits over safety and compliance with applicable laws and professional standards.  By failing to perform proper prospective drug utilization review, Rite Aid has violated both state and federal laws and regulations and submitted false claims for substandard pharmacy services.

**FACTUAL AND LEGAL BACKGROUND ON FORMULARY RESTRICTIONS FOR CERTAIN DRUGS**

70. Medi-Cal publishes a formulary called the "Contract Drugs List" that lists all of the drugs that Medi-Cal may reimburse.  On information and belief, other state and federal healthcare programs publish similar formularies.  Formulary restrictions are authorized by 42 U.S.C. § 1396r-8(d)(6), which states that, "[a] State may impose limitations, with respect to all such drugs in a therapeutic class, on the minimum or maximum quantities per prescription or on the number of refills, if such limitations are necessary to discourage waste, and may address instances of fraud or abuse by individuals in any manner authorized under this chapter."   According to Cal. Code Regs. 22 § 51313.3(b), drugs marked with an "*" on the Medi-Cal contract drug list are called "Code I" drugs, and may not be reimbursed unless the conditions in the Medi-Cal formulary are met.  (Cal. Code Regs. 22 § 51313.3(b) states: "Code I drugs on the List of Contract Drugs marked "*", require prior authorization in accordance with Section 51003 [the

Treatment Authorization Request regulation] unless used under the conditions specified on the Medi-Cal List of Contract Drugs, and are subject to the prescription documentation requirements of Section 51476(c).").

71. Vicodin, Tylenol with Codeine ("Tylenol No. 3"), Cipro, Levaquin and Zithromax are all examples of drugs marked with an "*" on the Medi-Cal contract drugs list. A recent version of the Medi-Cal formulary, including the introduction, is attached as Exhibits A-E to this Complaint.

72. Some Code I medications on the Medi-Cal formulary have restrictions on how many pills can be dispensed by a pharmacist at one time. For example, Azithromycin 250 mg tablets are "[r]estricted to a maximum quantity per dispensing of eight (8) tablets. . . ." Ex. B. at 13. In another example, Azithromycin 500 mg tablets are restricted to a maximum quantity of four tablets per dispensing. *Id*. In a further example, 5mg/500 mg tablets with hydrocodone and acetaminophen (generic Vicodin) are "[r]estricted to a maximum quantity per dispensing of 30 tablets and a maximum of three (3) dispensings within any 75-day period." Ex. C. at 24. Other examples of prescriptions with restrictions on how many pills can be dispensed at one time include Ciprofloxacin, Hydrocodone, and Levofloxacin. Ex. B. at 28; Ex. C. at 24, 40.

73. If a prescriber writes a prescription for a greater quantity than can be dispensed at one time, the pharmacist must receive physician authorization to split the prescription into smaller quantities. Under California regulations, "No provider shall dispense prescription drugs or devices in an amount different from that prescribed without the prescriber's authorization. . . ." 22 CCR § 51479.[4]

---

[4] The regulation has certain exceptions for when a prescriber is unavailable and the patient would be in immediate danger, but the pharmacist must note that the prescriber was unavailable. *See* CA HLTH & S § 11201.

74. Some Code I medications, marked with an "*" on the Medi-Cal formulary, have restrictions based on patient age or diagnosis in order for Medi-Cal to reimburse for these medications. For example, Ciprofloxacin HCl tablets 250mg -750 mg may only be reimbursed by Medi-Cal if the prescription is used to treat 1) lower respiratory tract infections in persons aged 50 years and older; 2) osteomyelitis; or 3) pulmonary exacerbation of cystic fibrosis. Ex. B. at 29. In another example, Dronabinol capsules are indication restricted for the treatment of anorexia associated with weight loss in patients with AIDS. Ex. B. at 46.

75. For prescriptions that are marked as "Code I" drugs, California regulations explicitly state that the pharmacist must have documentation of the patient's diagnosis, in order for Medi-Cal to reimburse the prescription. 22 CCR § 51476(c) states:

> Records of providers shall document the meeting of Code I restrictions for medical supplies in the list established by the Department and for drugs listed in the Medi-Cal List of Contract Drugs as follows: (1) The practitioner who issues a prescription for a Code I supply or drug shall document, in the patient's chart, the patient's diagnostic or clinical condition that fulfills the Code I restriction. (2) The dispenser shall maintain readily retrievable documentation of the patient's diagnostic or clinical condition information that fulfills the Code I restriction. If this Code I diagnostic or clinical condition information is transmitted to the dispenser other than by personal handwritten order from the prescriber, the dispenser shall document the transmittal date and the name of prescriber or the employee or agent who is legally authorized to transmit such information. The documentation shall be personally signed by the dispenser.

76. According to Medi-Cal regulations, "Code I" drugs require that pharmacists fill out a Treatment Authorization Request ("TAR") unless the prescription meets the exact requirements of the Medi-Cal Formulary. 22 CCR § 51313.3(b) states, "Code 1 drugs on the List of Contract Drugs marked "*", require prior authorization in accordance with Section 51003[the Treatment Authorization Request regulation] unless used under the conditions specified on the Medi-Cal List of Contract Drugs, and are subject to the prescription documentation requirements of Section 51476(c)."

- 36 -

United States ex rel. Loyd F. Schmuckley Jr. v. Rite Aid Corporation Complaint

77. Furthermore, according to Medi-Cal regulations, "Unless prior authorization was obtained, 100% of the ingredient cost and professional fee, if any, paid shall be recovered where the drug dispensed is not in compliance with the Code I restrictions in Medi-Cal regulations." 22 CCR § 51488.1(a)(15).

78. Compliance with the above Medi-Cal rules is a condition for payment of claims submitted to the State of California under the Medi-Cal program.  The Medi-Cal Provider Agreement, attached as Exhibit F, states in paragraph 2 on page 1 that "[p]rovider agrees to comply with all applicable provisions of Chapters 7 and 8 of the Welfare and Institutions Code (commencing with Sections 14000 and 14200), and any applicable rules or regulations promulgated by DHCS pursuant to these Chapters." On page 8 that agreement states that "**[p]rovider agrees that compliance with the provisions of this agreement is a condition precedent to payment to provider**."

79. Upon information and belief, the formularies of other state and federal healthcare programs contain similar restrictions on certain drugs for the purpose of controlling fiscal costs. Many of the restricted drugs are permitted to be dispensed only as treatment for certain diseases or conditions for which there is no lower-cost alternative.  The electronic point-of-sale systems that state and federal healthcare programs use to approve payment for prescriptions generate warnings that particular diagnoses are required or that other conditions must be met when a pharmacy attempts to bill for a formulary-restricted drug.  If pharmacy technicians routinely override these warnings about restrictions on dispensing of drugs by indicating that the pharmacy has verified the required diagnosis or condition, when in fact it has not, then the entire system for controlling fiscal costs of expensive drugs is thwarted.

**RITE AID'S KNOWING SUBMISSION OF FALSE CLAIMS AND KNOWING USE OF FALSE RECORDS IN VIOLATION OF FORMULARY RESTRICTIONS**

80. Rite Aid has knowingly submitted claims for Code I drugs in violation of the above rules and has knowingly created false records for use in submitting such claims, having made a calculated decision that the benefits of quickly filling prescriptions in its stores greatly outweighs the risks of being caught in the submission of false claims.

81. Frequently, Rite Aid has received prescriptions for Code I drugs for Medi-Cal patients with no diagnosis indicated. Under 22 CCR § 51476(c) and 22 CCR § 51313.3(b), pharmacists are required to verify that Code I prescriptions submitted to Medicaid have a patient diagnosis that matches the Medi-Cal formulary. If the pharmacist does not have documentation of the patient's diagnosis, then the pharmacist may not submit reimbursement for that medication to Medi-Cal. 22 CCR § 51476(c); 22 CCR § 51313.3(b).

82. Instead of following the documentation requirements of 22 CCR § 51476(c), Rite Aid technicians routinely submit Code I prescriptions to be reimbursed by Medi-Cal without actually verifying with the physician that the patient has a diagnosis that matches the Code I restriction. Rite Aid also falsely certifies that Code I restrictions other than diagnosis, such as age, are met without properly verifying whether these restrictions are actually met.

83. By failing to verify that Code I diagnosis restrictions are met, Rite Aid creates false records and submits false statements to Medi-Cal. Furthermore, according to Medi-Cal regulations, "Unless prior authorization was obtained, 100% of the ingredient cost and professional fee, if any, paid shall be recovered where the drug dispensed is not in compliance with the Code I restrictions in Medi-Cal regulations." 22 CCR § 51488.1(a)(15). Therefore, all claims that Rite Aid submitted that did comply with Code I restrictions were false claims.

84. Sometimes Rite Aid has failed to certify that Code I restrictions have been met, and

receives a rejection from Medi-Cal.  When Rite Aid receives rejections for not certifying that a Code I restriction has been met, Rite Aid technicians routinely enter an "override" or certify that the Code I restriction was met without actually obtaining physician authorization.

85. In a very large amount of Code I restrictions, technicians certify that the Code I restriction was met without any pharmacist supervision at all.  These claims are false and contain false statements because by California law only pharmacists can determine whether Code I restrictions are met.   California regulations state:

> *Only a pharmacist, or an intern pharmacist acting under the supervision of a pharmacist, may:*
>
> (a) Receive a new prescription order orally from a prescriber or other person authorized by law.
>
> *(b) Consult with a patient or his or her agent regarding a prescription, either prior to or after dispensing, or regarding any medical information contained in a patient medication record system or patient chart.*
>
> *(c) Identify, evaluate and interpret a prescription.*
>
> *(d) Interpret the clinical data in a patient medication record system or patient chart.*
>
> *(e) Consult with any prescriber, nurse or other health care professional or authorized agent thereof.*
>
> (f) Supervise the packaging of drugs and check the packaging procedure and product upon completion.
>
> *(g) Perform all functions which require professional judgment.*

16 CCR § 1793.1.  *See also* 16 CCR § 1793.3; 16 CCR § 1793.7; 16 CCR § 1793.2 16 CCR § 1793.1 (California regulations which state that all actions of a technician must be supervised by a pharmacist and define the tasks that must be performed by a pharmacist and which tasks may be performed by a technician).

86. Rite Aid also violates Medi-Cal's Code I quantity dispensing restrictions.  Rite Aid

- 39 -

United States ex rel. Loyd F. Schmuckley Jr. v. Rite Aid Corporation Complaint

frequently, routinely and daily receives prescriptions for quantities that are too large to dispense at one time under Code I restrictions.  For example, Hydrocodone/APAP (Vicodin) has a maximum dispensing quantity of 30 tablets.  Ex. C. at 24.  Rite Aid frequently receives Medi-Cal prescriptions for 60 tablets, which is more than can be dispensed at one time under the formulary.  Rite Aid will generate additional illegal dispensing fee(s) instead of charging the patient cash, or generating a Treatment Authorization Request (TAR).

87. When Rite Aid encounters a prescription that is larger than it can dispense at one time, Rite Aid should submit a TAR to Medicaid requesting to dispense a larger quantity at one time than the formulary allows or permission from the physician to split the prescription into two smaller ones.

88. However, Rite Aid instead chooses unilaterally to split such prescriptions into two or more orders, such as splitting a 60 pill Vicodin into two orders of 30 Vicodin.  Rite Aid rarely obtains physician approval to split prescriptions and frequently does not document that they split a prescription.  To actually call physicians for authorization to split prescriptions would slow down the time that Rite Aid needs to fill prescriptions, so to avoid losing profits Rite Aid does not comply with Code I restrictions.  However, California regulations state: "No provider shall dispense prescription drugs or devices in an amount different from that prescribed without the prescriber's authorization. . . ." 22 CCR § 51479.[5]  Clearly, pharmacists and technicians do not have authority to split prescriptions without prior physician authorization.

89. By splitting prescriptions into smaller quantities, Rite Aid creates unauthorized refills. Medi-Cal will not pay these if it knows that Rite Aid does not have authorization to split the

---

[5] The regulation has certain exceptions for when a prescriber is unavailable and the patient would be in immediate danger of intense suffering, but the pharmacist must note that the prescriber was unavailable.  *See* CA HLTH & S § 11201.

prescriptions.  According to Medi-Cal Regulation 22 CCR § 51488.1(a)(4): "Excessive refills. Where the refills dispensed exceed the directions for use of the original prescription, 100% of the ingredient cost and professional fee, if any, paid for each refill shall be recovered."

90.  By splitting prescriptions, Rite Aid also violates Medi-Cal regulations which are meant to prevent fraud and waste.  Pharmacists are limited in the quantities that they can dispense at one time to ensure that patients are given only the amount of medication that they truly need.  If a patient needs more medication than the Medi-Cal quantity limitation for dispensing, a patient should have to request another prescription from a physician.  This request for authorization gives the physician an opportunity to assess whether the patient really needs more medication. Instead of following these rules, Rite Aid bypasses physician approval and splits prescriptions without physician authorization.  These rules are important for controlling drug abuse and addiction as many of the Code I drugs, like hydrocodone and codeine, are addictive pain killers that are frequently sold on the street for cash.

91. Rite Aid also creates false claims and false documents in that it is very often technicians that are splitting Code I prescriptions into multiple prescriptions.  Under California regulations, only a pharmacist may consult with a prescriber—not a technician.  *See* 16 CCR § 1793.1(e). Therefore, even if Rite Aid did obtain approval to split prescriptions (which it does *not* regularly do), such approval would not be valid if obtained by a technician instead of a pharmacist.  Since technicians bill Code I prescriptions most times before a pharmacist ever reviews the prescriptions, almost all Code I prescriptions are false for this reason alone.

92. Upon information and belief, every state and federal healthcare program or plan has formulary restrictions similar to the Medi-Cal Code I restrictions.  By requiring pharmacy technicians to split prescriptions and bill these state and federal programs before enlisting the intervention of a pharmacist, Rite Aid consistently submits false claims.

- 41 -

93. Rite Aid's refusal to comply with formulary restrictions is due to its relentless motivation to process as many prescriptions as possible in as little time as possible. There is little regard for patient safety or the interest of government programs in preventing waste, fraud and abuse.

94. Staff pharmacists and technicians have enormous pressure to comply with Rite Aid's goals for filling prescriptions as fast as possible. Calling doctors to confirm diagnoses, consult, intervene or get authorization to split prescriptions elevates the average time to fill a prescription and negatively affects Rite Aid's profits.

95. Rite Aid profits by its failure to comply with formulary restrictions because it increases its dispensing fees. Rite Aid could submit a Treatment Authorization Request (TAR) when it receives a prescription that is over the formulary quantity limit. Instead, Rite Aid splits over-limit prescriptions into smaller prescriptions. Rite Aid's reason for splitting prescriptions is that it can process up to five prescriptions in the time it takes to create one TAR. Under Medi-Cal regulations and similar regulations of other healthcare programs, pharmacists are not authorized to receive multiple dispensing fees under one prescription. 22 CCR § 51488.1(a)(3) states: "Where the pharmacist, without authorization from the prescriber, dispensed a smaller quantity than prescribed or subsequently authorized which resulted in dispensing one or more refills to provide the beneficiary with an equivalent or nearly equivalent quantity as originally prescribed or subsequently authorized, 100% of the professional fee paid for each such refill shall be recovered." Therefore, any multiple dispensing fees that Rite Aid collected under one prescription were false claims.

## COUNT ONE
### FEDERAL FALSE CLAIMS ACT VIOLATIONS FOR FALSE OR FRAUDULENT CLAIMS SUBMITTED DUE TO FAILURE TO PERFORM DRUG UTILIZATION REVIEW (31 U.S.C. §3729(a)(1)(A))

96. Plaintiff re-alleges and incorporates by reference the allegations in paragraphs 1-95

- 42 -

above.

97. Through the acts described above, Defendant knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval by the United States, in violation of 31 U.S. C. §3729(a)(1)(A).

98. As a result of these false claims, the United States has been damaged and continues to be damaged in an amount yet to be determined.

## COUNT TWO
### FEDERAL FALSE CLAIMS ACT VIOLATIONS FOR FALSE RECORDS & STATEMENTS REGARDING COMPLIANCE WITH DRUG UTILIAZATION REVIEW REGULATIONS (31 U.S.C. §3729(a)(1)(B))

99. Relator re-alleges and incorporates the allegations in paragraphs 1-95 as if fully set forth herein.

100. Through the acts described above, Defendant knowingly made, used or caused to be made or used false records or statements material to false or fraudulent claims for payment or approval by the United States, in violation of 31 U.S. C. §3729(a)(1)(B).

101. As a result of these false claims, the United States has been damaged and continues to be damaged in an amount yet to be determined.

## COUNT THREE
### FEDERAL FALSE CLAIMS ACT VIOLATIONS FOR FALSE OR FRAUDULENT CLAIMS SUBMITTED DUE TO FAILURE TO FOLLOW FORMULARY RESTRICTIONS (31 U.S.C. §3729(a)(1)(A))

102. Plaintiff re-alleges and incorporates by reference the allegations in paragraphs 1-95 above.

103. Through the acts described above, Defendant knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval by the United States, in violation of 31 U.S. C. §3729(a)(1)(A).

- 43 -

United States ex rel. Loyd F. Schmuckley Jr. v. Rite Aid Corporation Complaint

104. As a result of these false claims, the United States has been damaged and continues to be damaged in an amount yet to be determined.

### COUNT FOUR
### FEDERAL FALSE CLAIMS ACT VIOLATIONS FOR FALSE RECORDS & STATEMENTS REGARDING COMPLIANCE WITH FORMULARY RESTRICTIONS (31 U.S.C. §3729(a)(1)(B))

105. Relator re-alleges and incorporates the allegations in paragraphs 1-95 as if fully set forth herein.

106. Through the acts described above, Defendant knowingly made, used or caused to be made or used false records or statements material to false or fraudulent claims for payment or approval by the United States, in violation of 31 U. S. C. §3729(a)(1)(B).

107. As a result of these false claims, the United States has been damaged and continues to be damaged in an amount yet to be determined.

### COUNT FIVE
### FEDERAL FALSE CLAIMS ACT VIOLATIONS FOR CONCEALING OR AVOIDING AN OBLIGATION TO PAY THE GOVERNMENT DUE TO ITS FAILURE TO PERFORM DRUG UTILIZATION REVIEW (31 U.S.C. §3729(a)(1)(G))

108. Relator re-alleges and incorporates the allegations in paragraphs 1-95 as if fully set forth herein.

109. Defendant knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government.  Specifically, defendant was aware that its pharmacists were not complying with the requirements of federal and state laws and regulations. Nevertheless, Rite Aid concealed this information or provided false information to the Government and/or accreditation agencies in order to obtain and keep payments made by Medicaid for Code I prescriptions.

- 44 -

110. The United States, unaware of the falsity of the claims, and in reliance on the accuracy thereof, made payment upon the false or fraudulent claims and was therefore damaged.

**COUNT SIX**
**FEDERAL FALSE CLAIMS ACT VIOLATIONS FOR CONCEALING OR AVOIDING AN OBLIGATION TO PAY THE GOVERNMENT DUE TO ITS FAILURE TO FOLLOW FORMULARY RESTRICTIONS (31 U.S.C. §3729(a)(1)(G))**

111. Relator re-alleges and incorporates the allegations in paragraphs 1-95 as if fully set forth herein.

112. Defendant knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government.  Specifically, defendant was aware that its pharmacists were not complying with the requirements of federal and state laws and regulations. Nevertheless, Rite Aid concealed this information or provided false information to the Government and/or accreditation agencies in order to obtain and keep payments made by Medicaid for Code I prescriptions.

113. The United States, unaware of the falsity of the claims, and in reliance on the accuracy thereof, made payment upon the false or fraudulent claims and was therefore damaged.

**PRAYER FOR RELIEF UNDER THE FEDERAL FALSE CLAIMS ACT**

114. Relator respectfully requests this Court to enter judgment against Defendant, as follows:

(a)    That the United States be awarded damages in the amount of three times the damages sustained by the United States because of the false claims and fraud alleged within this Complaint, as the Civil False Claims Act, 31 U.S.C. §§ 3729 *et seq.* provides;

(b)    That civil penalties of $11,000 be imposed for each and every false claim that defendant presented to the United States;

- 45 -

(c)     That pre- and post-judgment interest be awarded, along with reasonable Attorneys' fees, costs, and expenses which the Relator necessarily incurred in bringing and pressing this case;

(d)     That the Relator be awarded the maximum percentage of any recovery allowed to him pursuant the False Claims Act, 31 U.S.C. §3730(d)(1),(2);

(e)     That this Court award such other and further relief as it deems proper.

**COUNT SEVEN**
**CALIFORNIA FALSE CLAIMS ACT VIOLATIONS FOR FALSE OR FRAUDULENT CLAIMS (Ca. Gov't Code § 12651 (a)(1))**

115. Relator re-alleges and incorporates the allegations in paragraphs 1-95 as if fully set forth herein.

116. Through the acts described above, Defendant knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval by the State of California in violation of Ca. Gov't Code § 12651 (a)(1).

117. As a result of these false claims, the State of California has been damaged and continues to be damaged in an amount yet to be determined.

**COUNT EIGHT**
**CALIFORNIA FALSE CLAIMS ACT VIOLATIONS FOR FALSE RECORDS & STATEMENTS (Ca. Gov't Code §§ 12651 (a)(2))**

118. Relator re-alleges and incorporates the allegations in paragraphs 1-95 as if fully set forth herein.

119. Through the acts described above, Defendant knowingly made, used, or caused to be made or used a false record or statement material to a false or fraudulent claim for payment or approval by the State of California in violation of Ca. Gov't Code § 12651 (a)(2).

120. As a result of these false claims, the State of California has been damaged and continues to be damaged in an amount yet to be determined.

- 46 -
United States ex rel. Loyd F. Schmuckley Jr. v. Rite Aid Corporation Complaint

**PRAYER FOR RELIEF UNDER THE CALIFORNIA FALSE CLAIMS ACT**

121. WHERFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendant:

To the STATE OF CALIFORNIA:

Three times the amount of actual damages which the State of California has sustained as a result of Defendant's fraudulent and illegal conduct;

A civil penalty of up to $10,000 for each false claim which Defendant presented or caused to be presented to the State of California;

Prejudgment interest; and

All costs incurred in bringing this action.

To RELATOR:

The maximum amount allowed pursuant to Cal. Gov't Code § 12652 and/or any other applicable provision of law;

Reimbursement for reasonable expenses which Relator incurred in connection with this action;

Litigation costs and reasonable attorney's fees;

Such further relief as this Court deems equitable and just.

<u>**COUNT NINE**</u>
**VIOLATION OF THE COLORADO MEDICAID FALSE CLAIMS ACT**

122. Relator re-alleges and incorporates the allegations in paragraphs 1-95 as if fully set forth herein.  Additionally, Relator states that the course of conduct described in this Complaint was a nationwide, continuous practice of Rite Aid.  Rite Aid conducts business in the State of Colorado.  Upon information and belief, Defendant's actions described herein occurred in Colorado as well.

123. This is a qui tam action brought by Relator and the State of Colorado to recover treble damages and civil penalties under the Colorado Act, Co. St. §§ 25.5-4-304 to 25.5-4-310 *et seq*.

- 47 -

124. Co. St. § 25.5-4-305 provides liability in relevant part, to any person who:

(a) Knowingly presents, or causes to be presented, to an officer or employee of the state a false or fraudulent claim for payment or approval;

(b) Knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim;

***

(f) Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state in connection with the "Colorado Medical Assistance Act," or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state in connection with the "Colorado Medical Assistance Act;"

125. Defendant violated Co. St. § 25.5-4-305 by continuously engaging in the fraudulent and illegal conduct described herein.

126. Defendant furthermore violated Co. St. § 25.5-4-305 and knowingly caused hundreds of thousands of false claims to be made, used, and presented to the State of Colorado by its continuous violation of federal and state laws, as described herein.

127. The State of Colorado, by and through the Colorado Medicaid Program and other state health care programs, and unaware of Defendant's fraudulent and illegal conduct, paid the claims of Rite Aid.

128. Compliance with applicable Medicaid laws and regulations, and the various other federal and state laws cited herein was implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Colorado in connection with Defendant's fraudulent and illegal conduct.

129. Had the State of Colorado known that Defendant was violating the federal and state

laws cited herein, the State of Colorado would not have paid such claims.

130. As a result of Defendant's continuous violations of Co. St. §§ 25.5-4-304 to 25.5-4-310 *et seq.*, the State of Colorado has been damaged in an amount far in excess of millions of dollars exclusive of interest.

131. Defendant did not, within thirty days after they first obtained information as to such violations, furnish such information to officials of the State responsible for investigating false claims violations, did not otherwise fully cooperate with any investigation of the violations, and have not otherwise furnished information to the State regarding the claims for reimbursement at issue.

132. Relator is a private person with direct and independent knowledge of the allegations in this Complaint, who has brought this action pursuant to Co. St. § 25.5-4-306 on behalf of himself and the State of Colorado.

133. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Colorado in the operation of its Medicaid program.

134. WHERFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendant:

To the STATE OF COLORADO:

Three times the amount of actual damages which the State of Colorado has sustained as a result of Defendant's fraudulent and illegal conduct;

A civil penalty of up to $10,000 for each false claim which Defendant presented or caused to be presented to the State of Colorado;

Prejudgment interest; and

All costs incurred in bringing this action.

To RELATOR:

The maximum amount allowed pursuant to Co. St. § 25.5-4-305 and/or any other applicable provision of law;

Reimbursement for reasonable expenses which Relator incurred in connection with this action;

An award of reasonable attorneys' fees and costs; and

Such further relief as this Court deems equitable and just.

## COUNT TEN
### VIOLATION OF THE CONNECTICUT FALSE CLAIMS ACT

135. Relator re-alleges and incorporates the allegations in paragraphs 1 - 95 as if fully set forth herein.  Additionally, Relator states that the course of conduct described in this Complaint was a nationwide, continuous practice of Rite Aid.  Rite Aid conducts business in the State of Connecticut.  Upon information and belief, Defendant's actions described herein occurred in Connecticut as well.

136. This is a qui tam action brought by Relator and the State of Connecticut to recover treble damages and civil penalties under the Connecticut False Claims Act, C.G.S.A. §§ 17b-301 et seq.

137. C.G.S.A. § 17b-301a provides for liability for any persons who:

(1)  Knowingly present, or cause to be presented, to an officer or employee of the state a false or fraudulent claim for payment or approval under a medical assistance program administered by the Department of Social Services;

(2)  Knowingly make, use or cause to be made or used, a false record or statement to secure the payment or approval by the state of a false or fraudulent claim under a medical assistance program administered by the Department of Social Services;

* * *

(7)  Knowingly make, use or cause to be made or used, a false record or statement to

- 50 -
United States ex rel. Loyd F. Schmuckley Jr. v. Rite Aid Corporation Complaint

conceal, avoid or decrease an obligation to pay or transmit money or property to the state under a medical assistance program administered by the Department of Social Services.

138. Defendant violated C.G.S.A. § 17b-301a by continuously engaging in the fraudulent and illegal conduct described herein.

139. Defendant furthermore violated C.G.S.A. § 17b-301a and knowingly caused hundreds of thousands of false claims to be made, used, and presented to the State of Connecticut in continuous violation of federal and state laws, as described herein.

140. The State of Connecticut, by and through the Connecticut Medicaid Program and other state health care programs, and unaware of Defendant's fraudulent and illegal conduct, paid the claims of Rite Aid.

141. Compliance with applicable Medicaid laws and regulations, and the various other federal and state laws cited herein was implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Connecticut in connection with Defendant's fraudulent and illegal conduct.

142. Had the State of Connecticut known that Defendant was violating the federal and state laws cited herein, the State of Connecticut would not have paid such claims.

143. As a result of Defendant's violations of C.G.S.A. § 17b-301, the State of Connecticut has been damaged in an amount far in excess of millions of dollars exclusive of interest.

144. Defendant did not, within thirty days after they first obtained information as to such violations, furnish such information to officials of the State responsible for investigating false claims violations, did not otherwise fully cooperate with any investigation of the violations, and have not otherwise furnished information to the State regarding the claims for reimbursement at issue.

145. Relator is a private person with direct and independent knowledge of the allegations in

- 51 -

this Complaint, who has brought this action pursuant to C.G.S.A. § 17b-301 on behalf of himself and the State of Connecticut.

146. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Connecticut in the operation of its Medicaid program.

147. WHERFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendant:

To the STATE OF CONNECTICUT:

Three times the amount of actual damages which the State of Connecticut has sustained as a result of Defendant's fraudulent and illegal conduct;

A civil penalty of up to $10,000 for each false claim which Defendant presented or caused to be presented to the State of Connecticut;

Prejudgment interest; and

All costs incurred in bringing this action.

To RELATOR:

The maximum amount allowed pursuant to C.G.S.A. 17b-301b and/or any other applicable provision of law;

Reimbursement for reasonable expenses which Relator incurred in connection with this action;

An award of reasonable attorneys' fees and costs; and

Such further relief as this Court deems equitable and just.

## COUNT ELEVEN
## VIOLATION OF THE DELAWARE FALSE CLAIMS ACT

148. Relator re-alleges and incorporates the allegations in paragraphs 1-95 as if fully set forth herein.  Additionally, Relator states that the course of conduct described in this Complaint was a nationwide, continuous practice of Rite Aid.  Rite Aid conducts business in the State of

Delaware.  Upon information and belief, Rite Aid's actions described herein occurred in Delaware as well.

149. This is a qui tam action brought by Relator and the State of Delaware to recover treble damages and civil penalties under the Delaware Medicaid False Claims Act, 6 Del. C. §§ 1201 *et seq*.

150. 6 Del. C. § 1201 provides liability for any person who:

(1) Knowingly presents, or causes to be presented, directly or indirectly, to an officer or employee of the Government a false or fraudulent claim for payment or approval;

(2) Knowingly makes, uses or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the Government;

* * *

(7) Knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government. . . .

151. Defendant violated 6 Del. C. § 1201 by continuously engaging in the fraudulent and illegal conduct described herein.

152. Defendant furthermore violated 6 Del. C. § 1201 and knowingly caused hundreds of thousands of false claims to be made, used, and presented to the State of Delaware by their continuous violation of federal and state laws, as described herein.

153. The State of Delaware, by and through the Delaware Medicaid program and other state health care programs, and unaware of Defendant's fraudulent and illegal conduct, paid the claims of Rite Aid.

154. Compliance with applicable Medicaid laws and regulations, and the various other federal and state laws cited herein was an implied, and upon information and belief, also an

express condition of payment of claims submitted to the State of Delaware in connection with Defendant's fraudulent and illegal conduct.

155. Had the State of Delaware known that Defendant was violating the federal and state laws cited herein, the State of Delaware would not have paid such claims.

156. As a result of Defendant continuing violations of 6 Del C. § 1201(a), the State of Delaware has been damaged in an amount far in excess of millions of dollars exclusive of interest.

157. Defendant did not, within 30 days after they first obtained information as to such violations, furnish such information to officials of the State responsible for investigating false claims violations, did not otherwise fully cooperate with any investigation of the violations, and have not otherwise furnished information to the State regarding the claims for reimbursement at issue.

158. Relator is a private person with direct and independent knowledge of the allegations in this Complaint, who has brought this action pursuant to 6 Del. C. § 1203(b) on behalf of himself and the State of Delaware.

159. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Delaware in the operation of its Medicaid program.

160. WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties against Defendant:

To the STATE OF DELAWARE:

Three times the amount of actual damages which the State of Delaware has sustained as a result of Defendant's fraudulent and illegal conduct;

A civil penalty on not less than $5,500 and not more than $11,000 for each false claim which Defendant caused to be presented to the State of Delaware;

Prejudgment interest; and

All costs incurred in bringing this action.

To RELATOR:

The maximum amount allowed pursuant to 6 Del C. § 1205, and/or any other applicable provision of law;

Reimbursement for reasonable expenses which Relator incurred in connection with this action;

An award of reasonable attorneys' fees and costs; and

Such further relief as this Court deems equitable and just.

## COUNT TWELVE
### VIOLATION OF THE DISTRICT OF COLUMBIA PROCUREMENT REFORM AMENDMENT ACT

161. Relator re-alleges and incorporates the allegations in paragraphs 1-95 as if fully set forth herein.  Additionally, Relator states that the course of conduct described in this Complaint was a nationwide, continuous practice of Rite Aid.  Rite Aid conducts business in the District of Columbia.  Upon information and belief, Defendant's actions described herein occurred in the District of Columbia as well.

162. This is a qui tam action brought by Relator and the District of Columbia to recover treble damages and civil penalties under the District of Columbia Procurement Reform Amendment Act, D.C. Code §§ 2-381.01 *et seq*.

163. D.C. Code § 2-381.02(a) provides liability for any person who:

(1) Knowingly presents, or causes to be presented, to an officer or employee of the District a false claim for payment or approval;

(2) Knowingly makes, uses or causes to be made or used, a false record or statement to get a false claim paid or approved by the District;

- 55 -

United States ex rel. Loyd F. Schmuckley Jr. v. Rite Aid Corporation Complaint

* * *

(8) Is the beneficiary of an inadvertent submission of a false claim to the District, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the District.

164. Defendant violated D.C. Code §§ 2-381.02(a) by continuously engaging in the fraudulent and illegal conduct described herein.

165. Defendant furthermore violated D. C. Code § 2-381.02(a) and knowingly caused thousands of false claims to be made, used, and presented to the District of Columbia by their continuing violation of federal and state laws as described herein.

166. The District of Columbia, by and through the District of Columbia Medicaid program and other state health care programs, and unaware of Defendant's fraudulent and illegal conduct, paid the claims of Rite Aid.

167. Compliance with applicable Medicaid laws and regulations, and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the District of Columbia is connection with Defendant's fraudulent and illegal conduct.

168. Had the District of Columbia known that Defendant was violating the federal and state laws cited herein, the District of Columbia would not have paid such claims.

169. As a result of Defendant's violations of D.C. Code § 2-381.02(a), the District of Columbia has been damaged in an amount far in excess of millions of dollars exclusive of interest.

170. Relator is a private person with direct and independent knowledge of the allegations in this Complaint, who has brought this action pursuant to D.C. Code § 2-381.03(b) on behalf of himself and the District of Columbia.

171. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the District of Columbia in the operation of its Medicaid program.

172. WHEREFORE, Relator respectfully request this Court to award the following damages to the following parties and against Defendant:

To the DISTRICT OF COLUMBIA:

Three times the amount of actual damages which the District of Columbia has sustained as a result of Defendant's fraudulent and illegal conduct;

A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendant caused to be presented to the District of Columbia;

Prejudgment interest; and

All costs incurred in bringing this action.

To RELATOR:

The maximum amount allowed pursuant to D. C. Code § 2-381.03(f) and/or any other applicable provision of law;

Reimbursement for reasonable expenses which Relator incurred in connection with this action;

An award of reasonable attorneys' fees and costs; and

Such further relief as this court deems equitable and just.

## COUNT THIRTEEN
### VIOLATION OF THE GEORGIA STATE FALSE MEDICAID CLAIMS ACT

173. Relator re-alleges and incorporates the allegations in paragraphs 1-95 as if fully set forth herein. Additionally, Relator states that the course of conduct described in this Complaint was a nationwide, continuous practice of Rite Aid. Rite Aid conducts business in the State of Georgia. Upon information and belief, Defendant's actions described herein occurred in Georgia as well.

174. This is a qui tam action brought by Relator and the State of Georgia to recover treble

damages and civil penalties under the Georgia State False Medicaid Claims Act, Ga. Code Ann. §§ 49-4-168 *et seq.*

175. Ga. Code Ann. §§ 49-4-168.1(a) provides liability for any person who:

(1) Knowingly presents or causes to be presented to the Georgia Medicaid program a false or fraudulent claim for payment or approval;

(2) Knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the Georgia Medicaid program;

* * *

(7) Knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay, repay or transmit money or property to the State of Georgia.

176. Defendant violated Ga. Code Ann. § 49-4-168.1 by continuously engaging in the fraudulent and illegal conduct described herein.

177. Defendant furthermore violated Ga. Code  Ann. § 49-4-168.1 and knowingly caused hundreds of thousands of false claims to be made, used, and presented to the State of Georgia by its continuous violation of federal and state laws, as described herein.

178. The State of Georgia, by and through the Georgia Medicaid program and other state health care programs, and unaware of Defendant's fraudulent and illegal conduct, paid the claims of Rite Aid in connection therewith.

179. Compliance with applicable Medicaid laws and regulations, and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Georgia in connection with Defendant's fraudulent and illegal conduct.

180. Had the State of Georgia known that Defendant was violating the federal and state laws

- 58 -

cited herein, it would not have paid the claims submitted by Rite Aid.

181. As a result of Defendant's violations of Ga. Code Ann. § 49-4-168.1, the State of Georgia has been damaged in an amount far in excess of millions of dollars exclusive of interest.

182. Defendant did not, within 30 days after first obtaining information as to such violations, furnish such information to officials of the State responsible for investigating false claims violations, did not otherwise fully cooperate with any investigation of the violations, and have not otherwise furnished information to the State regarding the claims for reimbursement at issue.

183. Relator is a private person with direct and independent knowledge of the allegations in this Complaint, who has brought this action pursuant to Ga. Code Ann. § 49-4-168.2(b) on behalf of himself and the State of Georgia.

184. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Georgia in the operation of its Medicaid program.

185. WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties against Defendant:

To the STATE OF GEORGIA:

Three times the amount of actual damages which the State of Georgia has sustained as a result of Defendant's fraudulent and illegal conduct;

A civil penalty on not less than $5,500 and not more than $11,000 for each false claim which Defendant caused to be presented to the State of Georgia;

Prejudgment interest; and

All costs incurred in bringing this action.

To RELATOR:

The maximum amount allowed pursuant to Ga. Code Ann. § 49-4-168.2(i), and/or any other applicable provision of law;

Reimbursement for reasonable expenses which Relator incurred in connection with this action;

An award of reasonable attorneys' fees and costs; and

Such further relief as this Court deems equitable and just.

## COUNT FOURTEEN
### VIOLATION OF THE INDIANA FALSE CLAIMS AND WHISTLEBLOWER PROTECTION ACT

186. Relator re-alleges and incorporates the allegations in paragraphs 1-95 as if fully set forth herein. Additionally, Relator states that the course of conduct described in this Complaint was a nationwide, continuous practice of Rite Aid. Rite Aid conducts business in the State of Indiana. Upon information and belief, Defendant's actions described herein occurred in Indiana as well.

187. This is a qui tam action brought by Relator and the State of Indiana to recover treble damages and civil penalties under the Indiana False Claims and Whistleblower Protection Act, IC 5-11-5.5 *et seq*.

188. IC 5-11-5.5-2(b) provides liability for any person who:

(1) Presents a false claim to the state for payment or approval;

(2) Makes or uses a false record or statement to obtain payment or approval of a false claim from the state;

* * *

(6) Makes or uses a false record or statement to avoid an obligation to pay or transmit property to the state;

* * *

(8) Causes or induces another person to perform an act described in subdivisions (1) through (6).

189. Defendant violated IC 5-11-5.5-2 by continuously engaging in the fraudulent and illegal conduct described herein.

190. Defendant furthermore violated IC 5-11-5.5-2 and knowingly caused hundreds of thousands of false claims to be made, used, and presented to the State of Indiana by their continuous violation of federal and state laws, as described herein.

191. The State of Indiana, by and through the Indiana Medicaid program and other state health care programs, and unaware of Defendant's fraudulent and illegal conduct, paid the claims submitted by Rite Aid in connection therewith.

192. Compliance with applicable Medicaid laws and regulations, and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Indiana in connection with Defendant's fraudulent and illegal conduct.

193. Had the State of Indiana known that Defendant was violating the federal and state laws cited herein, the State of Indiana would not have paid such claims.

194. As a result of Defendant's violations of IC 5-11-5.5-2, the State of Indiana has been damaged in an amount far in excess of millions of dollars exclusive of interest.

195. Relator is a private person with direct and independent knowledge of the allegation in this Complaint, who has brought this action pursuant to IC 5-11-5.5-4 on behalf of himself and the State of Indiana.

196. This court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Indiana in the operation of its Medicaid program.

197. WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendant:

To the STATE OF INDIANA:

Three times the amount of actual damages which the State of Indiana has

1   sustained as a result of Defendant's fraudulent and illegal conduct;

2   Prejudgment interest; and

3   All costs incurred in bringing this action.

4   To RELATOR:

5   The maximum amount allowed pursuant to IC 5-11-5.5-6 and/or any other
6   applicable provision of law;

7   Reimbursement for reasonable expenses which Relator incurred in connection
    with this action;
8
9   An award of reasonable attorneys' fees and costs; and

10  Such further relief as this Court deems equitable and just.

11  **COUNT FIFTEEN**
    **VIOLATION OF THE LOUISIANA MEDICAL ASSISTANCE PROGRAMS**
12  **INTEGRITY LAW**

13  198. Relator re-alleges and incorporates the allegations in paragraphs 1-95 as if fully set forth

14  herein.  Additionally, Relator states that the course of conduct described in this Complaint was a

15  nationwide, continuous practice of Rite Aid.  Rite Aid conducts business in the State of

16  Louisiana.  Upon information and belief, Defendant's actions described herein occurred in

17  Louisiana as well.

18

19  199. This is a qui tam action brought by Relator and the State of Louisiana to recover treble

20  damages and civil penalties under the Louisiana medical Assistance Programs Integrity Law, La

21  Rev. Stat. Ann §§ 46:437.1 *et seq.*

22
    200. La. Rev. Stat. Ann. § 46:438.3 provides:
23
24  A. No person shall knowingly present or cause to be presented a false or fraudulent

25  claim;

26  B. No person shall knowingly engage in misrepresentation or make, use, or cause to

27  made or used, a false record or statement material to a false or fraudulent claim.

28  - 62 -

201. Defendant violated La. Rev. Stat. Ann. § 46:438.3 by continuously engaging in the fraudulent and illegal conduct described herein.

202. Defendant furthermore violated La. Rev. Stat. Ann. § 46:438.3 and knowingly caused hundreds of thousands of false claims to be made, used, and presented to the State of Louisiana by their continuous violation of federal and state laws, including La. Rev. Stat. Ann. § 46:438.2(A), as described herein.

203. The State of Louisiana, by and through the Louisiana Medicaid program and other state health care programs, and unaware of Defendant's fraudulent and illegal conduct, paid the claims submitted by Rite Aid in connection therewith.

204. Compliance with applicable Medicaid laws and regulations, and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Louisiana in connection with Defendant's fraudulent and illegal conduct.

205. Had the State of Louisiana known that Defendant was violating the federal and state laws cited herein, the State of Louisiana would not have paid such claims.

206. As a result of Defendant's violations of La. Rev. Stat. Ann. § 46:438.3, the State of Louisiana has been damaged in an amount far in excess of millions of dollars exclusive of interest.

207. Relator is a private person with direct and independent knowledge of the allegations in this Complaint, who has brought this action pursuant to La. Rev. Stat. Ann. § 46:439.1(A) on behalf of himself and the State of Louisiana.

208. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Louisiana in the operation of its Medicaid program.

209. WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendant:

To the STATE OF LOUISIANA:

> Three times the amount of actual damages which the State of Louisiana has sustained as a result of Defendant's fraudulent and illegal conduct;

> A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendant caused to be presented to the State of Louisiana;

> Prejudgment interest; and

> All costs incurred in bringing this action.

To RELATOR:

> The maximum amount allowed pursuant to La. Rev. Stat. § 46:439.4(A) and/or any other applicable provision of law;

> Reimbursement for reasonable expenses which Relator incurred in connection with this action;

> An award or reasonable attorneys' fees and costs; and

> Such further relief as this Court deems equitable and just.

## COUNT SIXTEEN:
## VIOLATION OF THE MARYLAND FALSE HEALTH CLAIMS ACT

210. Relator re-alleges and incorporates the allegations in paragraphs 1-95 as if fully set forth herein. Additionally, Relator states that the course of conduct described in this Complaint was a nationwide, continuous practice of Rite Aid. Rite Aid conducts business in the State of Maryland. Upon information and belief, Defendant's actions described herein occurred in Maryland as well.

211. This is a qui tam action brought by Relator and the State of Maryland to recover treble damages and civil penalties under the Maryland Act, MD HEALTH GEN § 2-601 *et seq*.

212. MD HEALTH GEN § 2-602 provides liability in relevant part, to any person who:

(1) Knowingly present or cause to be presented a false or fraudulent claim for payment or approval;

(2) Knowingly make, use, or cause to be made or used a false record or statement material to a false or fraudulent claim;

* * *

(7) Knowingly make, use, or cause to be made or used, a false record or statement material to an obligation to pay or transmit money or other property to the State;

(8) Knowingly conceal, or knowingly and improperly avoid or decrease, an obligation to pay or transmit money or other property to the State; or

(9) Knowingly make any other false or fraudulent claim against a State health plan or a State health program.

213. Defendant violated MD HEALTH GEN § 2-602 by continuously engaging in the fraudulent and illegal conduct described herein.

214. Defendant furthermore violated MD HEALTH GEN § 2-602 and knowingly caused hundreds of thousands of false claims to be made, used, and presented to the State of Maryland by its continuous violation of federal and state laws, as described herein.

215. The State of Maryland, by and through the Maryland Medicaid Program and other state health care programs, and unaware of Defendant's fraudulent and illegal conduct, paid the claims of Rite Aid.

216. Compliance with applicable Medicaid laws and regulations, and the various other federal and state laws cited herein was implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Maryland in connection with Defendant's fraudulent and illegal conduct.

217. Had the State of Maryland known that Defendant was violating the federal and state

United States ex rel. Loyd F. Schmuckley Jr. v. Rite Aid Corporation Complaint

laws cited herein, the State of Maryland would not have paid such claims.

218. As a result of Defendant's continuous violations of MD HEALTH GEN § 2-601 *et seq*., the State of Maryland has been damaged in an amount far in excess of millions of dollars exclusive of interest.

219. Relator is a private person with direct and independent knowledge of the allegations in this Complaint, who has brought this action pursuant to MD HEALTH GEN § 2-604 on behalf of himself and the State of Maryland.

220. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Maryland in the operation of its Medicaid program.

221. WHERFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendant:

To the STATE OF MARYLAND:

Three times the amount of actual damages which the State of Maryland has sustained as a result of Defendant's fraudulent and illegal conduct;

A civil penalty of up to $10,000 for each false claim which Defendant presented or caused to be presented to the State of Maryland;

Prejudgment interest; and

All costs incurred in bringing this action.

To RELATOR:

The maximum amount allowed pursuant to MD HEALTH GEN § 2-605 and/or any other applicable provision of law;

Reimbursement for reasonable expenses which Relator incurred in connection with this action;

An award of reasonable attorneys' fees and costs; and

Such further relief as this Court deems equitable and just.

- 66 -

**COUNT SEVENTEEN**
**VIOLATION OF THE MASSACHUSETTS FALSE CLAIMS ACT**

222. Relator re-alleges and incorporates the allegations in paragraphs 1-95 as if fully set forth herein.  Additionally, Relator states that the course of conduct described in this Complaint was a nationwide, continuous practice of Rite Aid.  Rite Aid conducts business in the Commonwealth of Massachusetts.  Defendant's actions described herein occurred in Massachusetts as well.

223. This is a qui tam action brought by Relator and State of Massachusetts for treble damages and penalties under Massachusetts False Claims Act, Mass. Gen. Laws Ann. Ch. 12 §§ 5(A) *et seq.*

224. Mass. Gen. Laws Ann. Ch. 12 § 5B provides liability for any person who:

(1) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(2) Knowingly makes, uses, or causes to be made or used, a false record or statement to obtain payment or approval of a claim by the commonwealth or any political subdivision thereof;

* * *

(9) Is a beneficiary of an inadvertent submission of a false claim to the commonwealth or political subdivision thereof, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the commonwealth or political subdivision within a reasonable time after discovery of the false claim. . . .

225. Defendant violated Mass. Gen. Laws Ann. Ch. 12 § 5B by continuously engaging in the fraudulent and illegal conduct described herein.

226. Defendant furthermore violated Mass. Gen. Laws Ann. Ch. 12 § 5B and knowingly caused hundreds of thousands of false claims to be made, used, and presented to the State of Massachusetts by their continuous violation of federal and state laws as described herein.

227. The State of Massachusetts, by and through the Massachusetts Medicaid program and other state health care programs, and unaware of Defendant's fraudulent and illegal conduct, paid the claims of Rite Aid in connection therewith.

228. Compliance with applicable Medicaid laws and regulations, and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Massachusetts in connection with Rite Aid's fraudulent and illegal conduct.

229. Had the State of Massachusetts known that Defendant was violating the federal and state laws cited herein, the State of Massachusetts would not have paid such claims.

230. As a result of Defendant's violations of Mass. Gen. Laws Ann. Ch. 12 § 5B, the State of Massachusetts has been damaged in an amount far in excess of millions of dollars exclusive of interest.

231. Relator is a private person with direct and independent knowledge of the allegations in this Compliant, who has brought this action pursuant to Mass. Gen. Laws Ann Ch. 12 § 5(C)(2) on behalf of himself and the State of Massachusetts.

232. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon that exact same facts as the federal claim, and merely asserts separate damage to the State of Massachusetts in the operation of its Medicaid program.

233. WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendant:

To the STATE OF MASSACHUSETTS:

Three times the amount of actual damages which that State of Massachusetts has sustained as a result of Defendant's fraudulent and illegal conduct;

A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendant caused to be presented to the State of Massachusetts;

Prejudgment interest; and

All costs incurred in bringing this action.

To RELATOR:

The maximum amount allowed pursuant to Mass. Gen. Laws Ann. Ch. 12 § 5F and/or any other applicable provision of law;

Reimbursement for reasonable expenses which Relator incurred in connection with this action;

An award of reasonable attorneys' fees and costs; and

Such further relief as this Court deems equitable and just.

## COUNT EIGHTEEN
### VIOLATION OF THE MICHIGAN MEDICAID FALSE CLAIMS ACT

234. Relator re-alleges and incorporates the allegations in paragraphs 1-95 as if fully set forth herein.  Additionally, Relator states that the course of conduct described in this Complaint was a nationwide, continuous practice of Rite Aid.  Rite Aid conducts business in Michigan.  Upon information and belief, Defendant's actions described herein occurred in Michigan as well.

235. This is a qui tam action brought by Relator and State of Michigan for treble damages and penalties under Michigan Medicaid False Claim Act, M.C.L.A. 400.601 *et seq*.

236. M.C.L.A. 400.607 provides liability for any person who, among other things:

Causes to be made or presented to an employee or officer of this state a claim under the social welfare act, Act No. 280 of the Public Acts of 1939, as amended, being sections 400.1 to 400.121 of the Michigan Compiled Laws, upon or against the state, knowing the claim to be false;

Presents or causes to be made or presented a claim under the social welfare act, Act No. 280 of the Public Acts of 1939, which he or she knows falsely represents that the goods or services for which the claim is made were medically necessary in accordance with professionally

- 69 -

United States ex rel. Loyd F. Schmuckley Jr. v. Rite Aid Corporation Complaint

accepted standards.

237. Defendant violated M.C.L.A. 400.607 by continuously engaging in the fraudulent and illegal conduct described herein.

238. Defendant furthermore violated M.C.L.A. 400.607 and knowingly caused hundreds of thousands of false claims to be made, used, and presented to the State of Michigan by their continuous violation of federal and state laws, as described herein.

239. The State of Michigan, by and through the Michigan Medicaid program and other state health care programs, and unaware of Defendant's fraudulent and illegal conduct, paid the claims of Rite Aid in connection therewith.

240. Compliance with applicable Medicaid laws and regulations, and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Michigan in connection with Defendant's fraudulent and illegal conduct.

241. Had the State of Michigan known that Defendant was violating the federal and state laws cited herein, it would not have paid the claims submitted by Rite Aid in connection with such fraudulent and illegal conduct.

242. As a result of Rite Aid's violations of M.C.L.A. 400.607, the State of Michigan has been damaged in an amount far in excess of millions of dollars exclusive of interest.

243. Relator is a private person with direct and independent knowledge of the allegations in this Compliant, who has brought this action pursuant to M.C.L.A. 400.610a on behalf of himself and the State of Michigan.

244. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon that exact same facts as the federal claim, and merely asserts separate damage to the State of Michigan in the operation of its Medicaid program.

245. WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendant:

To the STATE OF MICHIGAN:

All damages to which the State of Michigan is entitled pursuant to M.C.L.A. 400.612;

Civil penalties for each false claim which Defendant caused to be presented to the State of Michigan;

Prejudgment interest; and

All costs incurred in bringing this action.

To RELATOR:

The maximum amount allowed pursuant to M.C.L.A. 400.610a(9) and/or any other applicable provision of law;

Reimbursement for reasonable expenses which Relator incurred in connection with this action;

An award of reasonable attorneys' fees and costs; and

Such further relief as this Court deems equitable and just.

**COUNT NINETEEN**
**VIOLATION OF THE NEVADA FALSE CLAIMS ACT**

246. Relator re-alleges and incorporates the allegations in paragraphs 1-95 as if fully set forth herein.  Additionally, Relator states that the course of conduct described in this Complaint was a nationwide, continuous practice of Defendant.  Rite Aid conducts business in the State of Nevada.  As set forth above, Defendant's actions described herein occurred in Nevada as well.

247. This is a qui tam action brought by Relator and the State of Nevada to recover treble damages and civil penalties under the Nevada False Claims Act, N.R.S. §§ 357.010 *et seq*.

248. N.R.S. § 357.040(1) provides liability for any person who:

(a) Knowingly presents or causes to be presented a false claim for payment or approval;

- 71 -

United States ex rel. Loyd F. Schmuckley Jr. v. Rite Aid Corporation Complaint

(b) Knowingly makes or uses, or causes to be made or used, a false record or statement to obtain payment or approval of a false claim;

* * *

(h) Is a beneficiary of an inadvertent submission of a false claim and, after discovering the falsity of the claim, fails to disclose the falsity to the state or political subdivision within a reasonable time.

249. Defendant violated N.R.S. §§ 357.040(1) by continuously engaging in the fraudulent and illegal conduct described herein.

250. Defendant furthermore violated N.R.S. § 357.040(1) and knowingly caused hundreds of thousands of false claims to be made, used, and presented to the State of Nevada by their continuous violation of federal and state laws, as described herein.

251. The State of Nevada, by and through the Nevada Medicaid program and other health care programs, and unaware of Defendant's fraudulent and illegal conduct, paid the claims submitted by Rite Aid in connection therewith.

252. Compliance with applicable Medicaid laws and regulations, and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Nevada in connection with Defendant's fraudulent and illegal conduct.

253. Had the State of Nevada known that Defendant was violating the federal and state laws cited herein, the State of Nevada would not have paid such claims.

254. As a result of Defendant's violations of N.R.S. § 357.040(1), the State of Nevada has been damaged in an amount far in excess or millions of dollars exclusive of interest.

255. Relator is a private person with direct and independent knowledge of the allegations in this Complaint, who has brought this action pursuant to N.R.S. § 357.080(1) on behalf of himself

- 72 -

and the State of Nevada.

256. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Nevada in the operation of its Medicaid program.

257. WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendant:

To the STATE OF NEVADA:

> Three times the amount of actual damages which the State of Nevada has sustained as a result of Defendant's fraudulent and illegal conduct;

> A civil penalty of not less than $2,000 and not more than $10,000 for each false claim which Defendant caused to be presented to the State of Nevada;

> Prejudgment interest; and

> All costs incurred in bringing this action.

To RELATOR:

> The maximum amount allowed pursuant to N.R.S § 357.210 and/or any other applicable provision of law;

> Reimbursement for reasonable expenses which Relator incurred in connection with this action;

> An award of reasonable attorneys' fees and costs; and

> Such further relief as this Court deems equitable and just.

### COUNT TWENTY
### VIOLATION OF THE NEW JERSEY FALSE CLAIMS ACT

258. Relator re-alleges and incorporates the allegations in paragraphs 1-95 as if fully set forth herein.  Additionally, Relator states that the course of conduct described in this Complaint was a nationwide, continuous practice of Defendant.  Rite Aid conducts business in New Jersey.  Upon information and belief, Rite Aid's actions described herein occurred in New Jersey as well.

- 73 -

259. This is a qui tam action brought by Relator and the State of New Jersey for treble damages and penalties under New Jersey False Claims Act, N.J.S.A. 2A:32C-1 *et seq.*

260. N.J.S.A. 2A:32C-3 provides liability for any person who:

(a) Knowingly presents or causes to be presented to an employee, officer or agent of the State, or to any contractor, grantee, or other recipient of State funds, a false or fraudulent claim for payment or approval;

(b) Knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the State;

261. Defendant violated N.J.S.A. 2A:32C-3 by continuously engaging in the fraudulent and illegal conduct described herein.

262. Defendant furthermore violated N.J.S.A. 2A:32C-3 and knowingly caused hundreds of thousands of false claims to be made, used, and presented to the State of New Jersey by their continuous violation of federal and state laws, including N.J.S.A. 2A:32C-3, as described herein.

263. The State of New Jersey, by and through the New Jersey Medicaid program and other state health care programs, and unaware of Defendant's fraudulent and illegal conduct, paid the claims of Rite Aid in connection therewith.

264. Compliance with applicable Medicaid laws and regulations, and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of New Jersey in connection with Defendant's fraudulent and illegal conduct.

265. Had the State of New Jersey known that Defendant was violating the federal and state laws cited herein, the State of New Jersey would not have paid such claims.

266. As a result of Defendant's violations of N.J.S.A. 2A:32C-3, the State of New Jersey has been damaged in an amount far in excess of millions of dollars exclusive of interest.

267. Relator is a private person with direct and independent knowledge of the allegations in this Compliant, who has brought this action pursuant to N.J.S.A. 2A:32C-5 on behalf of himself and the State of New Jersey.

268. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of New Jersey in the operation of its Medicaid program.

269. WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendant:

To the STATE OF NEW JERSEY:

    Three times the amount of actual damages which the State of New Jersey has sustained as a result of Defendant's fraudulent and illegal conduct;

    A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendant caused to be presented to the State of New Jersey;

    Prejudgment interest; and

    All costs incurred in bringing this action.

To RELATOR:

    The maximum amount allowed pursuant to N.J.S.A. 2A:32C-7and/or any other applicable provision of law;

    Reimbursement for reasonable expenses which Relator incurred in connection with this action;

    An award of reasonable attorneys' fees and costs; and

    Such further relief as this Court deems equitable and just.

## COUNT TWENTY-ONE
## VIOLATION OF THE NEW YORK FALSE CLAIMS ACT

270. Relator re-alleges and incorporates the allegations in paragraphs 1-95 as if fully set forth herein.  Additionally, Relator states that the course of conduct described in this Complaint was a

- 75 -

United States ex rel. Loyd F. Schmuckley Jr. v. Rite Aid Corporation Complaint

nationwide, continuous practice of Defendant.  Rite Aid conducts business in the New York.  As set forth above, Defendant's actions described herein occurred in New York as well.

271. This is a qui tam action brought by Relator and State of New York for treble damages and penalties under New York False Claims Act, McKinney's State Finance Law § 187 *et seq*.

272. McKinney's State Finance Law § 189 provides liability for any person who:

(a) Knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval;

(b) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

\* \* \*

(g) Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state or a local government. . . .

273. Defendant violated McKinney's State Finance Law § 189 continuously engaging in the fraudulent and illegal conduct described herein.

274. Defendant furthermore violated McKinney's State Finance Law § 189 and knowingly caused hundreds of thousands of false claims to be made, used, and presented to the State of New York by their continuous violation of federal and state laws, as described herein.

275. The State of New York, by and through the New York Medicaid program and other state health care programs, and unaware of Defendant's fraudulent and illegal conduct, paid the claims of Rite Aid in connection therewith.

276. Compliance with applicable Medicaid laws and regulations, and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of New York in connection with

- 76 -

Defendant's fraudulent and illegal conduct.

277. Had the State of New York known that Defendant was violating the federal and state laws cited herein, the State of New York would not have paid such claims.

278. As a result of Defendant's violations of McKinney's State Finance Law § 189, the State of New York has been damaged in an amount far in excess of millions of dollars exclusive of interest.

279. Relator is a private person with direct and independent knowledge of the allegations in this Compliant, who has brought this action pursuant to McKinney's State Finance Law § 190(2) on behalf of himself and the State of New York.

280. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon that exact same facts as the federal claim, and merely asserts separate damage to the State of New York in the operation of its Medicaid program.

281. WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Rite Aid:

To the STATE OF NEW YORK:

Three times the amount of actual damages which that State of New York has sustained as a result of Defendant's fraudulent and illegal conduct;

A civil penalty of not less than $6,000 and not more than $12,000 for each false claim which Defendant caused to be presented to the State of New York;

Prejudgment interest; and

All costs incurred in bringing this action.

To RELATOR:

The maximum amount allowed pursuant to McKinney's State Finance Law § 190(6) and/or any other applicable provision of law;

Reimbursement for reasonable expenses which Relator incurred in connection with this action;

- 77 -

An award of reasonable attorneys' fees and costs; and

Such further relief as this Court deems equitable and just.

### COUNT TWENTY-TWO
### VIOLATION OF THE NORTH CAROLINA FALSE CLAIMS ACT

282. Relator re-alleges and incorporates the allegations in paragraphs 1-95 as if fully set forth herein. Additionally, Relator states that the course of conduct described in this Complaint was a nationwide, continuous practice of Rite Aid. Rite Aid conducts business in the State of North Carolina. Upon information and belief, Defendant's actions described herein occurred in the State of North Carolina as well.

283. This is a qui tam action brought by Relator and the State of North Carolina to recover treble damages and civil penalties under the North Carolina False Claims Act, NC ST §§ 1-605 *et seq*.

284. NC ST § 1-607(a) provides liability in relevant part, for any person who:

(1) Knowingly presents or causes to be presented a false or fraudulent claim for payment or approval;

(2) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

* * *

(7) Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the State.

285. Defendant violated NC ST § 1-607(a) by continuously engaging in the fraudulent and illegal conduct described herein.

286. Defendant furthermore violated NC ST § 1-607(a) and knowingly caused hundreds of thousands of false claims to be made, used, and presented to the State of North Carolina by their continuous violation of federal and state laws, including NC ST § 1-607(a) , as described herein.

287. The State of North Carolina, by and through the State of North Carolina Medicaid program and other state health care programs, and unaware of Defendant's fraudulent and illegal conduct, paid the claims submitted by Rite Aid in connection therewith.

288. Compliance with applicable Medicaid laws and regulations, and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of North Carolina in connection with Defendant's fraudulent and illegal conduct.

289. Had the State of North Carolina known that Defendant was violating the federal and state laws cited herein, the State of North Carolina would not have paid such claims.

290. As a result of Defendant's violations of NC ST § 1-607(a), the State of North Carolina has been damaged in an amount far in excess of millions of dollars exclusive of interest.

291. Defendant did not, within 30 days after they first obtained information as to such violations, furnish such information to officials of the State responsible for investigating false claims violations, did not otherwise fully cooperate with any investigation of the violations, and have not otherwise furnished information to the State regarding the claims for reimbursement at issue.

292. Relator is a private person with direct and independent knowledge of the allegations in this Complaint, who has brought this action pursuant to NC ST § 1-607(a) on behalf of himself and the State of North Carolina.

293. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate

damage to the State of North Carolina in the operation of its Medicaid program.

294. WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendant:

To the STATE OF NORTH CAROLINA:

Three times the amount of actual damages which the State of North Carolina has sustained as a result of Defendant's fraudulent and illegal conduct;

A civil penalty of not less than $5,000 and not more than $11,000 for each false claim which Defendant caused to be presented to the State of North Carolina;

Prejudgment interest; and

All costs incurred in bringing this action.

To RELATOR:

The maximum amount allowed pursuant NC ST § 1-610 and/or any other applicable provision of law;

Reimbursement for reasonable expenses which Relator incurred in connection with this action;

An award of reasonable attorneys' fees and costs; and

Such further relief as this court deems equitable and just.

**COUNT TWENTY-THREE**
**VIOLATION OF THE RHODE ISLAND FALSE CLAIMS ACT**

295. Relator re-alleges and incorporates the allegations in paragraphs 1-95 as if fully set forth herein.  Additionally, Relator states that the course of conduct described in this Complaint was a nationwide, continuous practice of Rite Aid.  Rite Aid conducts business in the State of Rhode Island.  Upon information and belief, Defendant's actions described herein occurred in the State of Rhode Island as well.

296. This is a qui tam action brought by Relator and the State of Rhode Island to recover treble damages and civil penalties under the Rhode Island False Claims Act, Gen. Laws 1956, §§

9-1.1-1 *et seq.*

297. Gen. Laws 1956, § 9-1.1-3(a) provides liability for any person who:

(1) Knowingly presents, or causes to be presented, to an officer or employee of the state or a member of the guard a false or fraudulent claim for payment or approval;

(2) Knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state;

298. Defendant violated Gen. Laws 1956, §§ 9-1.1-3 & 40-8.2-3 by continuously engaging in the fraudulent and illegal conduct described herein.

299. Defendant furthermore violated Gen. Laws 1956, § 9-1.1-3 and knowingly caused thousands of false claims to be made, used, and presented to the State of Rhode Island by their continuous violation of federal and state laws, including Gen. Laws 1956, § 40-8.2-3, as described herein.

300. The State of Rhode Island, by and through the State of Rhode Island Medicaid program and other state health care programs, and unaware of Defendant's fraudulent and illegal conduct, paid the claims of Rite Aid in connection therewith.

301. Compliance with applicable Medicaid laws and regulations, and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Rhode Island in connection with Defendant's fraudulent and illegal conduct.

302. Had the State of Rhode Island known that Defendant was violating the federal and state laws cited herein, the State of Rhode Island would not have paid such claims.

303. As a result of Defendant's violations of Gen. Laws 1956, § 9-1.1-3, the State of Rhode Island has been damaged in an amount far in excess of millions of dollars exclusive of interest.

304. Relator is a private person with direct and independent knowledge of the allegations in

- 81 -

United States ex rel. Loyd F. Schmuckley Jr. v. Rite Aid Corporation Complaint

this Complaint, who has brought this action pursuant to Gen. Laws 1956, § 9-1.1-4(b) on behalf of himself and the State of Rhode Island.

305. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Rhode Island in the operation of its Medicaid program.

306. WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendant:

To the STATE OF RHODE ISLAND:

>    Three times the amount of actual damages which the State of Rhode Island has sustained as a result of Defendant's fraudulent and illegal conduct;

>    A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendant caused to be presented to the State of Rhode Island;

>    Prejudgment interest; and

>    All costs incurred in bringing this action.

To RELATOR:

>    The maximum amount allowed pursuant Gen. Laws 1956, § 9-1.1-4(d) and/or any other applicable provision of law;

>    Reimbursement for reasonable expenses which Relator incurred in connection with this action;

>    An award of reasonable attorneys' fees and costs; and

>    Such further relief as this court deems equitable and just.

## COUNT TWENTY-FOUR
### VIOLATION OF THE TENNESSEE FALSE CLAIMS ACT

307. Relator re-alleges and incorporates the allegations in paragraphs 1-95 as if fully set forth herein.  Additionally, Relator states that the course of conduct described in this Complaint was a nationwide, continuous practice of Rite Aid.  Rite Aid conducts business in the State of

Tennessee.  Upon information and belief, Defendant's actions described herein occurred in Tennessee as well.

308. This is a qui tam action brought by Relator and the State of Tennessee to recover treble damages and civil penalties under the Tennessee Medicaid False Claims Act, Tenn. Code Ann. §§ 71-5-181 *et seq*.

309. Section 71-5-182(a)(1)[6] provides liability for any person who:

(A) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval under the medicaid program;

(B) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim to get a false or fraudulent claim under the medicaid program paid for or approved;

* * *

(D) Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money, or property to the state, or knowingly conceals, or knowingly and improperly, avoids, or decreases an obligation to pay or transmit money or property to the state, relative to the medicaid program;

310. Defendant violated Tenn. Code Ann. § 71-5-182(a)(1) from at least 2001 to the present by continuously engaging in the fraudulent and illegal conduct described herein.

311. Defendant furthermore violated Tenn. Code Ann. § 71-5-182(a)(1) and knowingly caused hundreds of thousands of false claims to be made, used, and presented to the State of Tennessee from at least 2001 to the present by their continuous violation of federal and state laws, as described herein.

---

[6] As amended pursuant to Pub. Ch. 806 (H.B. No. 2378), April 23, 2012.

United States ex rel. Loyd F. Schmuckley Jr. v. Rite Aid Corporation Complaint

312. The State of Tennessee, by and through the Tennessee Medicaid program and other state health care programs, and unaware of Defendant's fraudulent and illegal conduct, paid the claims submitted by Rite Aid in connection therewith.

313. Compliance with applicable Medicaid laws and regulations, and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Tennessee in connection with Defendant's fraudulent and illegal conduct.

314. Had the State of Tennessee known that Defendant was violating the federal and state laws cited herein, the State of Tennessee would not have paid such claims.

315. As a result of Defendant's violations of Tenn. Code Ann. § 71-5-182(a)(1), the State of Tennessee has been damaged in an amount far in excess of millions of dollars exclusive of interest.

316. Relator is a private person with direct and independent knowledge of the allegations in this Complaint, who has brought this action pursuant to Tenn. Code Ann. § 71-5-183(a)(1) on behalf of himself and the State of Tennessee.

317. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Tennessee in the operation of its Medicaid program.

318. WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendant:

To the STATE OF TENNESSEE:

Three times the amount of actual damages which the State of Tennessee has sustained as a result of Defendant's fraudulent and illegal conduct;

A civil penalty of not less than $5,000 and not more than $25,000 for each false claim which Defendant caused to be presented to the State of Tennessee;

Prejudgment interest; and

All costs incurred in bringing this action.

To RELATOR:

The maximum amount allowed to Tenn. Code Ann. §71-5-183(c) and/or any other applicable provision of law;

Reimbursement for reasonable expenses which Relator incurred in connection with this action;

An award of reasonable attorneys' fees and costs; and

Such further relief as this Court deems equitable and just.

## COUNT TWENTY-FIVE
## VIOLATION OF THE VIRGINIA FRAUD AGAINST TAXPAYERS ACT

319. Relator re-alleges and incorporates the allegations in paragraphs 1-95 as if fully set forth herein.  Additionally, Relator states that the course of conduct described in this Complaint was a nationwide, continuous practice of Rite Aid.  Rite Aid conducts business in the Commonwealth of Virginia.  Upon information and belief, Defendant's actions described herein occurred in the Commonwealth of Virginia as well.

320. This is a qui tam action brought by Relator and the Commonwealth of Virginia to recover treble damages and civil penalties under the Virginia Fraud Against Taxpayers Act, Va. Code Ann. §§ 8.01-216.1 *et seq*.

321. Va. Code Ann. § 8.01-216.3 provides liability for any person who:

1. Knowingly presents, or causes to be presented, to an officer or employee of the Commonwealth a false or fraudulent claim for payment or approval;

2. Knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Commonwealth;

* * *

- 85 -

United States ex rel. Loyd F. Schmuckley Jr. v. Rite Aid Corporation Complaint

7.  Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Commonwealth or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Commonwealth;

322. Defendant violated Va. Code Ann. § 8.01-216.3 by continuously engaging in the fraudulent and illegal conduct described herein.

323. Defendant furthermore violated Va. Code Ann. § 8.01-216.3 and knowingly caused hundreds of thousands of false claims to be made, used, and presented to the Commonwealth of Virginia by their continuous violation of federal and state laws, as described herein.

324. The Commonwealth of Virginia, by and through the Commonwealth of Virginia Medicaid program and other state health care programs, and unaware of Defendant's fraudulent and illegal conduct, paid the claims submitted by Rite Aid in connection therewith.

325. Compliance with applicable Medicaid laws and regulations, and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the Commonwealth of Virginia in connection with Defendant's fraudulent and illegal conduct.

326. Had the Commonwealth of Virginia known that Defendant was violating the federal and state laws cited herein, the Commonwealth of Virginia would not have paid such claims.

327. As a result of Defendant's violations of Va. Code Ann. § 8.01-216.3, the Commonwealth of Virginia has been damaged in an amount far in excess of millions of dollars exclusive of interest.

328. Relator is a private person with direct and independent knowledge of the allegations in this Complaint, who has brought this action pursuant to Va. Code Ann. § 8.01-216.5(A) on behalf of himself and the Commonwealth of Virginia.

329. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the Commonwealth of Virginia in the operation of its Medicaid program.

330. WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendant:

To the COMMONWEALTH OF VIRGINIA:

Three times the amount of actual damages which the Commonwealth of Virginia has sustained as a result of Defendant's fraudulent and illegal conduct;

A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendant caused to be presented to the Commonwealth of Virginia;

Prejudgment interest; and

All costs incurred in bringing this action.

To RELATOR:

The maximum amount allowed pursuant to Va. Code Ann. § 8.01-216.7 and/or any other applicable provision of law;

Reimbursement for reasonable expenses which Relator incurred in connection with this action;

An award of reasonable attorneys' fees and costs; and

Such further relief as this court deems equitable and just.

## COUNT TWENTY-SIX
## VIOLATION OF THE WASHINGTON MEDICAID FRAUD FALSE CLAIMS ACT

331. Relator re-alleges and incorporates the allegations in paragraphs 1-95 as if fully set forth herein.  Additionally, Relator states that the course of conduct described in this Complaint was a nationwide, continuous practice of Rite Aid.  Rite Aid conducts business in the State of Washington.  Upon information and belief, Defendant's actions described herein occurred in Washington as well.

332. This is a qui tam action brought by Relator and the State of Washington to recover treble damages and civil penalties under the Washington Medicaid Fraud False Claims Act, WA ST 74.66.010, *et seq*.

333. Section 74.66.020 provides liability for any person who:

(a) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(b) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

* * *

(g) Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the government entity, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the government entity.

334. Defendant violated WA ST 74.66.020(1)(a) from at least 2002 to the present by continuously engaging in the fraudulent and illegal conduct described herein and knowingly presenting, or causing to be presented, a false or fraudulent claim for payment or approval.

335. Defendant knowingly caused hundreds of thousands of false claims to be made, used, and presented to the State of Washington from at least 2002 to the present by their continuous violation of federal and state laws, as described herein.

336. Defendant also violated WA ST 74.66.020(1)(b) from at least 2002 by knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim.

337. The State of Washington, by and through the Washington Medicaid program and other state health care programs, and unaware of Defendant's fraudulent and illegal conduct, paid the

United States ex rel. Loyd F. Schmuckley Jr. v. Rite Aid Corporation Complaint

claims submitted by Rite Aid in connection therewith.

338. Compliance with applicable Medicaid laws and regulations, and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Washington in connection with Defendant's fraudulent and illegal conduct.

339. Had the State of Washington known that Defendant was violating the federal and state laws cited herein, the State of Washington would not have paid such claims.

340. Defendant also violated WA ST 74.66.020(1)(g) from at least 2002 by knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the government entity, and by knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the State of Washington.

341. As a result of Defendant's violations of WA ST 74.66.020(1)(a), WA ST 74.66.020(1)(b), and WA ST 74.66.020(1)(g) the State of Washington has been damaged in an amount far in excess of millions of dollars exclusive of interest.

342. Relator is a private person with direct and independent knowledge of the allegations in this Complaint, who has brought this action pursuant to WA ST 74.66.050 on behalf of himself and the State of Washington.

343. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Washington in the operation of its Medicaid program.

344. WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendant:

To the STATE OF WASHINGTON:

Three times the amount of actual damages which the State of Washington has sustained as a result of Defendant's fraudulent and illegal conduct;

A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant caused to be presented to the State of Washington;

Prejudgment interest; and

All costs incurred in bringing this action.

To RELATOR:

The maximum amount allowed to WA ST 74.66.070 and/or any other applicable provision of law;

Reimbursement for reasonable expenses which Relator incurred in connection with this action;

An award of reasonable attorneys' fees and costs; and

Such further relief as this court deems equitable and just.

## DEMAND FOR JURY TRIAL

Relator, on behalf of himself and the United States and the individual states, demands a jury trial on all claims alleged herein.

Dated:   June 26, 2012                         Respectfully submitted,

**WATERS, KRAUS & PAUL**


By:  /s/ Jennifer McIntosh

Jennifer McIntosh
jmcintosh@waterskraus.com
711 Van Ness Avenue, Suite 220
San Francisco, CA 94102
Telephone:  415/296-6060
and 800/226-9880
214/777-0470 (fax)

**WATERS & KRAUS, LLP**
Loren Jacobson
ljacobson@waterskraus.com

United States ex rel. Loyd F. Schmuckley Jr. v. Rite Aid Corporation Complaint

3219 McKinney Ave.
Dallas, TX 75204
Telephone:  214-357-6244
and 800-226-9880
214-357-7252 (fax)

Wm. Paul Lawrence II
plawrence@waterskraus.com
Washington D.C. Metro Office
37163 Mountville Road
Middleburg, VA 20117
Telephone:  540-687-6999
540-687-5457 (fax)


Attorneys for Plaintiff/Relator

United States ex rel. Loyd F. Schmuckley Jr. v. Rite Aid Corporation Complaint