MORGAN, LEWIS & BOCKIUS LLP
ERIC W. SITARCHUK, Admitted *pro hac vice*
 eric.sitarchuk@morganlewis.com
KELLY A. MOORE, Admitted *pro hac vice*
 kelly.moore@morganlewis.com
BENJAMIN P. SMITH, Bar No. 197551
 benjamin.smith@morganlewis.com
MICHAEL Q. EAGAN, Jr., Bar No. 275823
 michael.eagan@morganlewis.com
One Market, Spear Street Tower
San Francisco, CA 94105-1596
Tel: +1.415.442.1000; Fax: +1.415.442.1001

Attorneys for Defendant
RITE AID CORPORATION

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, and the STATES OF CALIFORNIA, et al., *ex rel.* LOYD F. SCHMUCKLEY, JR.,<br><br>Plaintiffs,<br><br>vs.<br><br>RITE AID CORPORATION,<br><br>Defendant.<br><br>STATE OF CALIFORNIA, *ex rel.* LOYD F. SCHMUCKLEY, JR.,<br><br>Plaintiffs,<br><br>vs.<br><br>RITE AID CORPORATION,<br><br>Defendant. | Case No. 2:12-cv-01699-KJM-EFB<br><br>**DEFENDANT RITE AID CORPORATION'S NOTICE OF MOTION AND MOTION TO EXCLUDE PLAINTIFFS' PROPOSED SAMPLING METHODOLOGY; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>[E.C.F. Nos. 128, 137, 176, 193] |

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANT'S MOTION TO EXCLUDE
PLAINTIFFS' SAMPLING METHODOLOGY
Case No. 2:12-cv-01699-KJM-EFB

1

**NOTICE OF MOTION AND MOTION**

2

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

3

**PLEASE TAKE NOTICE THAT**, pursuant to the Court's orders [*see*, *e.g.*, ECF Nos.

4   128 at 5, 137, 176, 193], on June 28, 2019 at 10:00 a.m., or as soon thereafter as the matter may

5   be heard, in Courtroom 3 of the above-entitled Court, located at 501 I Street, 15th Floor,

6   Sacramento, CA 95814, Defendant Rite Aid Corporation ("Rite Aid" or "Defendant"), by through

7   its attorneys of record, will and does hereby move this Court for an order excluding the sampling

8   methodology proposed by the State of California ("State, by and through the California

9   Department of Justice's Bureau of Medi-Cal Fraud and Elder Abuse ("BMFEA")) and Relator

10  Loyd F. Schmuckley, Jr. ("Relator," with the State, "Plaintiffs").

11

Rite Aid bases this Motion upon this Notice of Motion and Motion, the accompanying

12  Memorandum of Points and Authorities, the concurrently-filed Declaration of Michael Q. Eagan,

13  Jr., and the attached exhibits, any reply filed in support of this Motion, oral argument of counsel

14  at the hearing, the files and records in this action, and upon such other matters as may be

15  presented to the Court at, or prior to, the hearing of this Motion.

16

17  Dated: April 15, 2019                          MORGAN, LEWIS & BOCKIUS LLP

18                                                  By  */s/ Benjamin P. Smith*
                                                        Benjamin P. Smith
19

20                                                  Attorneys for Defendant
                                                    RITE AID CORPORATION
21

22

23

24

25

26

27

28

DEFENDANT'S MOTION TO EXCLUDE
PLAINTIFFS' SAMPLING METHODOLOGY
Case No. 2:12-cv-01699-KJM-EFB

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................. 1

II.     RELEVANT FACTUAL BACKGROUND ........................................................... 2

    A.     Plaintiffs' Proposed Sample and Phase 1 Discovery. ............................. 2

    B.     Mr. Petron's Narrowly-Scoped Opinion and Plaintiffs' Lack of Knowledge About the 1,904 Sample's Creation. ...................................... 4

        1.     The Petron Report Merely Confirms the "Randomness" of the 1,904 Sample, But Not Its Statistical Validity. ............................. 4

        2.     Mr. Petron and the State Lack Critical Knowledge of the Creation of Claims Universes and Plaintiff's Samples. ............................... 5

    C.     Plaintiffs' Proposed Sampling Methodology Is Statistically Invalid ..................... 9

        1.     Plaintiffs' Sampling Methodology Violates "Total Survey Design" Principles. ......................................................................... 9

        2.     Plaintiffs' Sample Fails to Use Cluster Sampling. .................................. 11

        3.     Numerous Example Claims Demonstrate the Measurement Error in Plaintiffs' Sample. ................................................................ 12

III.    PLAINTIFFS' PROPOSED SAMPLE AND MR. PETRON'S REPORT ARE UNRELIABLE UNDER RULE 702 ........................................................... 13

    A.     The Failure to Account For Measurement Error Renders Plaintiffs' Sampling Methodology Inadmissible. ..................................................... 13

    B.     Plaintiffs' Proposed Sample Testing Method, Unexamined By Mr. Petron, Fails to Accurately Assess Alleged Code 1 Violations. ........................ 16

    C.     Mr. Petron Concedes He May Have to Redesign the Sample Should Measurement Procedures Be Affected By Court Rulings. ................................. 18

IV.     CONCLUSION ................................................................................................. 20

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

i

DEFENDANT'S MOTION TO EXCLUDE
PLAINTIFFS' SAMPLING METHODOLOGY
Case No. 2:12-cv-01699-KJM-EFB

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Estate of Barabin v. AstenJohnson, Inc.*,
  740 F.3d 457 (9th Cir. 2014)...................................................................................13

*U. S. ex rel. Hendow v. Univ. of Phoenix*,
  461 F.3d 1166 (9th Cir. 2006)..................................................................................3

*U.S. ex rel. Kester v. Novartis Pharm. Corp.*,
  2014 WL 6655703 (S.D.N.Y. Nov. 24, 2014) ..........................................................6

*Kwan Software Eng'g, Inc. v. Foray Techs.*,
  2014 WL 572290 (N.D. Cal. Feb. 11, 2014)...........................................................14

*U.S. ex rel. Loughren v. UnumProvident Corp.*,
  604 F. Supp. 2d 259 (D. Mass. 2009) ...............................................................14, 18

*U.S. ex rel. Martin v. Life Care Centers of Am., Inc.*,
  114 F. Supp. 3d 549 (E.D. Tenn. 2014) ..................................................................15

*U.S. ex rel. Michaels v. Agape Senior Community, Inc.*,
  2015 WL 3903675 (D. S.C. June 25, 2015).............................................................15

*U.S. ex rel. Ruckh v. Genoa Healthcare, LLC*,
  2015 WL 1926417 (M.D. Fla. Apr. 28, 2015) ........................................................18

*Tyson Foods, Inc. v. Bouaphakeo*,
  136 S. Ct. 1036 (2016) ............................................................................................14

*U.S. v. Fadul*,
  2013 WL 781614 (D. Md. Feb. 28, 2013) ...............................................................14

*U.S. v. Friedman*,
  1993 U.S. Dist. LEXIS 21496 (D. Mass. July 23, 1993).........................................15

*U.S. v. Sierra Pac. Indus.*,
  2011 WL 5508864 (E.D. Cal. Nov. 8, 2011) ............................................................7

*Universal Health Servs., Inc. v. U.S. ex rel. Escobar*,
  136 S. Ct. 1989 (2016) ............................................................................................15

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) ................................................................................................14

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

ii

DEFENDANT'S MOTION TO EXCLUDE
PLAINTIFFS' SAMPLING METHODOLOGY
Case No. 2:12-cv-01699-KJM-EFB

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*U.S. ex rel. Wall v. Vista Hospice Care, Inc.*,
  2016 WL 3449833 (N.D. Tex. June 20, 2016)............................................................................15

**Statutes**

Cal. Code Regs., tit. 22, section 51476(c)............................................................................16

Cal. Legis. Serv. Ch. 511 (2017)............................................................................12

Cal. Welf. & Inst. Code, § 14124.1 (Westlaw 2017)............................................................................12

False Claims Act............................................................................3

**Other Authorities**

Federal Rule of Evidence 702............................................................................13, 14

1    <u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2    **I.    <u>INTRODUCTION</u>**

3        Defendant Rite Aid Corporation ("Defendant" or "Rite Aid")[1] submits this Memorandum

4    of Points and Authorities in support of its Motion to Exclude Plaintiffs' Proposed Sampling

5    Methodology.  Plaintiffs propose to prove purported falsity for over 500,000 prescription

6    reimbursement claims submitted by Rite Aid to Medi-Cal through a sample of just 1,904 claims.

7    Plaintiffs contend that simply because the 1,904 claims were randomly selected from the total

8    "universe" of 500,000 claims, the sample can be used to extrapolate findings of "falsity"

9    concerning Code 1 compliance to the universe of 500,000 claims.  Plaintiffs are mistaken.  Their

10   sample is unreliable because random selection is but one component of statistical validity.

11       The unreliability of Plaintiffs' proposed sampling methodology is demonstrated by

12   Plaintiffs' failure to comply with total survey design principles, *i.e.*, the identification of all

13   information needed, and the means of measuring that information, for purposes of generating a

14   valid extrapolation from a sample to a greater population.  Plaintiffs' expert Michael Petron did

15   not and could not follow total sample design principles because he played no role in designing the

16   samples.  Because government attorneys, investigators and contractors—not statisticians—

17   designed Plaintiffs' sample, Plaintiffs' statistics expert had no occasion to assess or specify the

18   information needed to ensure a statistically valid sample.

19       As a result, Plaintiffs' proposed methodology fails to use the federally-endorsed

20   methodology to assess patients' claim histories: cluster sampling.  Plaintiffs instead assume no

21   relationship between different prescriptions for the same patient for the same prescribed drug over

22   time.  Thus, Plaintiffs will deem a claim for reimbursement "false" if Rite Aid's electronic

23   records do not reveal a Code 1 "notation" on the face of a *scanned* copy of a patient's

24   prescription, regardless of whether (1) a *paper* copy of the prescription or a separate Code 1

25   documentation form reflects the notation; (2) the notation appears on a prescription filled earlier

26   ─────────────────────

27   [1] As discussed in the parties' February 2019 Joint Statement to the Court, the parties are meeting and conferring regarding the proper defendant to this action.  ECF No. 188.  The positions and arguments presented herein apply regardless of the outcome of those efforts and the identity of

28   any eventual defendant added to this action.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1

DEFENDANT'S MOTION TO EXCLUDE
PLAINTIFFS' SAMPLING METHODOLOGY
Case No. 2:12-cv-01699-KJM-EFB

for the same drug for the same patient; or (3) the notation appears on a prescription for a drug to be taken in combination with the prescription deemed "false" and filled at the same time.  These are not mere hypothetical possibilities; Plaintiffs have deemed claims for reimbursement under *each* of these circumstances "false," and now seek to extrapolate this presumed falsity to the claims universe as a whole.

As a matter of statistics, and as a result of Plaintiffs' failure to utilize cluster sampling, Plaintiffs' proposed methodology is infected by measurement error, *i.e.*, the assumption that reference to a single prescription record can prove a claim to be false even though other documentation—such as, other prescriptions for the same drug and the patient's dispensing history—proves it to be accurate.  The widespread measurement error inherent in Plaintiffs' methodology means that the sampling methodology is biased towards findings of falsity, findings of falsity will be overstated, and no statistically reliable confidence interval can be generated. Plaintiffs' expert report and methodology do not address, let alone propose, a means of remedying this admittedly "troubl[ing]" measurement error, which Plaintiffs' expert claims without basis can be fixed (in unspecified ways) on the "back-end."  In this regard, Plaintiffs' expert concedes that it is entirely possible that a complete re-design of Plaintiffs' sampling methodology may be required depending upon legal rulings as to the information that is to be considered in determining whether a particular claim meets Code 1 documentation requirements or is otherwise "false."  Plaintiffs' sampling methodology is unreliable, biased, and inadmissible.

Moreover, beyond the specific and severe deficiencies in Plaintiffs' sample, sampling is an inappropriate means of determining liability in this case because of the individualized circumstances and analysis required to determine the alleged falsity of each claim.

## II.   RELEVANT FACTUAL BACKGROUND

### A.   Plaintiffs' Proposed Sample and Phase 1 Discovery.

The State of California ("State") and Relator Loyd F. Schmuckley, Jr. ("Relator," with the State, "Plaintiffs") allege that Rite Aid submitted false claims concerning prescriptions for certain, but not all, Code 1 diagnosis-restricted drugs to Medi-Cal for reimbursement.  During the

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

2

DEFENDANT'S MOTION TO EXCLUDE
PLAINTIFFS' SAMPLING METHODOLOGY
Case No. 2:12-cv-01699-KJM-EFB

pre-intervention investigation[2] into Relator's allegations, the United States Attorney's Office for the Eastern District of California ("USAO"), in conjunction with the State and government contractors, drew various samples of Medi-Cal claims that Rite Aid submitted for dispensing Code 1 drugs.  Plaintiffs now propose to use a combination of three such samples, totaling 1,904 claims altogether (the "1,904 Sample"), to extrapolate its findings of alleged Code 1 regulatory violations to three separate claims universes totaling approximately 500,000 claims.  Plaintiffs seek to "prove" the elements of falsity and damages under the False Claims Act ("FCA")[3] through sampling, while contending that sampling is inappropriate for the elements of materiality and scienter, which Plaintiffs claim—Rite Aid submits erroneously—can be proven on an aggregate rather than claim-by-claim basis.  *See* ECF No. 131 at 2-3.

In March 2018, Plaintiffs proposed to divide discovery in this matter into two phases, with Phase 1 discovery focused on Plaintiffs' proposed 1,904 Sample, and Phase 2 directed at more generalized discovery "so that preparation of the case for trial will not be significantly delayed if it becomes necessary to redraw the statistical sample."  *See* ECF 119 at 5-6.  The Court's May 29, 2018 Status Order adopted Plaintiffs' proposal and ordered Plaintiffs to serve their sampling expert report "at the earliest feasible point" in Phase 1.  ECF No. 128 at 5.  On July 27, 2018, the State served the "Expert Report No. 1 of Michael J. Petron, CPA, CFE" upon Rite Aid, along with anonymized Medi-Cal claims universes.  *See* Eagan Decl., Ex. A ("Petron Report").

After considering the parties' proposals, the Court ordered Rite Aid to serve a rebuttal "Sampling Methodology Expert Report" and to file a single "Motion Challenging Plaintiffs'

---

[2] This action was filed under seal by Relator on June 26, 2012. ECF Nos. 1, 7.  The USAO, after investigating the matter for over two years, declined to intervene on August 28, 2014, and other state investigative authorities followed suit.  ECF Nos. 38, 40, 53. Thereafter, the State, by and through the California Department of Justice's Bureau of Medi-Cal Fraud and Elder Abuse ("BMFEA") sought further time to investigate, and received seven additional extensions of time to do so.  ECF Nos. 42, 44, 48, 50, 55, 65, 68. The State finally intervened on May 11, 2017, and filed its Complaint ("State Complaint") on September 26, 2017.  ECF Nos. 69, 75. The Relator filed his First Amended Complaint ("Relator Complaint") on September 28, 2017.  ECF No. 79.

[3] *See*, *e.g.*, *U. S. ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1174 (9th Cir. 2006) (the "essential elements" of an FCA claim are: "(1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material, causing (4) the government to pay out money…")

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

3

DEFENDANT'S MOTION TO EXCLUDE
PLAINTIFFS' SAMPLING METHODOLOGY
Case No. 2:12-cv-01699-KJM-EFB

Sampling Methodology and Design" during Phase 1, with opposition and reply memoranda to follow suit. ECF Nos. 137, 176, 193. Rite Aid timely served the "Report No. 1 of Dr. Roy J. Epstein PhD" on February 15, 2019. *See* Eagan Decl., Ex. C ("Epstein Report").

**B.** **Mr. Petron's Narrowly-Scoped Opinion and Plaintiffs' Lack of Knowledge About the 1,904 Sample's Creation.**

**1.** **The Petron Report Merely Confirms the "Randomness" of the 1,904 Sample, But Not Its Statistical Validity.**

Mr. Petron states in his 11-page report that he "was asked by the [State] if a certain sample methodology **developed by the [USAO]**[4] … is statistically valid for the purposes of estimating the number of, percentage of, and total payments associated with false claims made by Rite Aid to Medi-Cal for Code 1 drugs." Petron Report, ¶ 5 (emphasis added)[5]. Mr. Petron also states that he "understands" the "allegations in this matter are, in part, that Rite Aid has violated the [Code 1 documentation] rules … and knowingly **created false records** by failing to verify that Code 1 diagnosis restrictions were met." *Id.* ¶ 8 (emphasis added).[6]

As Mr. Petron observes, Plaintiffs' proposed 1,904 Sample is derived from three claims universes (or "sample frames") labeled by Plaintiffs as "Off Formulary," "Diagnosis Related," and "Symmetry." The USAO created the Off Formulary and Diagnosis Related universes during its pre-intervention investigation, and a contractor for the California Department of Health Care Services ("DHCS"), which administers the Medi-Cal program in California, purportedly created the Symmetry universe. *Id.* ¶¶ 12-13. Mr. Petron admits that he was not involved in the original creation of Plaintiffs' 1,904 Sample or in developing its methodology, stating he "was provided with the [USAO] sample frames [*i.e.* claims universes] and original populations." *Id.*; *see also* Eagan Decl., Ex. B ("Petron Dep.") at 206:10-12 ("I was here to render an opinion on whether the sample *as it was designed and presented to me* was valid.") (emphasis added).

---

[4] Although Mr. Petron uses the term "U.S. DOJ" in his report, the relevant federal prosecuting authority was the USAO, which Rite Aid will reference herein. *See also* ECF No. 176 at 4, n.2.

[5] All citations to the Petron Report and Epstein Report herein will omit citations and footnotes.

[6] Mr. Petron's understanding that Rite Aid allegedly "created false records" contradicts the State's view of how it intends to measure "falsity" explained below—*i.e.* by noting the presence or absence of a particular "notation" on the face of Rite Aid's electronic prescription records.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

4

DEFENDANT'S MOTION TO EXCLUDE
PLAINTIFFS' SAMPLING METHODOLOGY
Case No. 2:12-cv-01699-KJM-EFB

Mr. Petron's report purports to repeat the steps taken by the USAO and State to create and stratify two of the three claims universes. Petron Report, ¶¶ 15-16. Mr. Petron then confirmed that the sample claims were randomly selected from the universes. *Id.* ¶ 17. Mr. Petron did so by inputting "seed" values into a computerized random number generator. *Id.* ¶ 21. Mr. Petron says he was able to "recreate[] the sample selection process…and match[] the original samples produced by the [USAO.]" *Id.* ¶ 22. Based on a formula provided by one of his authorities, and with little additional explanation, Mr. Petron also concludes that "the sample sizes selected [by the USAO] should be large enough to produce reliable estimates." *Id.* ¶ 19.

As explained below, Mr. Petron's limited analysis single-mindedly focuses on the concepts of stratification and random selection, without regard to more complex and critical factors that affect the validity of Plaintiffs' sampling methodology. *See* Epstein Report, ¶ 18 ("[T]here are many ways in which California's sampling methodology can yield statistically invalid conclusions irrespective of whether the samples were drawn randomly.").

### 2. Mr. Petron and the State Lack Critical Knowledge of the Creation of Claims Universes and Plaintiff's Samples.

Because neither Plaintiffs nor Mr. Petron created the universes from which they purport to draw random samples, they both lack critical information concerning the sampling methodology.

Mr. Petron states the Off Formulary and Diagnosis Related sample universes were limited to certain drugs by filtering the drugs' National Drug Codes ("NDCs"). Petron Report, ¶ 12. In his report, Mr. Petron did not explain why or how this list of drugs was selected or why drugs with certain NDCs were excluded from the sample universes. At his deposition, Mr. Petron explained that certain drug codes, including codes for pregnancy drugs, were removed from the sample universes, but he could not explain why. Petron Dep. at 72:22-75:22; 77:3-77:18. He testified that other drugs were excluded because they have Code 1 gender or age restrictions that are automatically blocked by electronic dispensing systems, but lacked further information. *Id.* Mr. Petron says he learned this limited information "in discussions with" counsel for the State and the USAO. *Id.* Mr. Petron did not do any independent analysis of the final NDC list to understand why the particular drug codes were removed or verify they were removed correctly,

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

5

DEFENDANT'S MOTION TO EXCLUDE
PLAINTIFFS' SAMPLING METHODOLOGY
Case No. 2:12-cv-01699-KJM-EFB

1   other than to confirm that some "filtering" had been done. *Id.* Mr. Petron did not know the

2   criteria used to filter drugs out of the Off Formulary and Diagnosis Related universes. *Id.* at

3   232:20-233:7 ("As I sit here I can't recall them all. I'm not even certain that I know them all to

4   recreate it. I don't remember trying to recreate it.").

5         Once certain drugs or types of drugs were removed (for unclear reasons) from the NDC

6   list, and therefore the total universe of claims, Mr. Petron states that the remaining claims data—

7   totaling approximately 495,000 claims—was divided into the Off Formulary and Diagnosis

8   Related sample universes. Petron Report, ¶ 12; *see also* Epstein Report, ¶ 31. The Off Formulary

9   universe contained claims for drugs identified as "commonly prescribed and dispensed outside of

10  the approved Code 1 diagnosis restriction." Petron Report, ¶ 12; Epstein Report, ¶ 21. At his

11  deposition, Mr. Petron could not explain how it was determined that certain NDCs were

12  determined to be "more prone to violate Code 1," only that unnamed "experts" and/or

13  "consultants" at the California DHCS determined which drugs met that criteria. Petron Dep. at

14  81:4-82:8. The remainder of the claims comprise the Diagnosis Related sample universe.

15  Epstein Report, ¶ 21. The Off Formulary and Diagnosis Related universes were then stratified, or

16  "subdivided," into different time frames. Petron Report, ¶ 14. Although Mr. Petron provided no

17  explanation for selecting these different time frames, he claimed in his report that he was able to

18  replicate these universes. *Id.* ¶¶ 15, 22.

19        Plaintiffs have provided essentially no additional information regarding the creation of the

20  Off Formulary and Diagnosis Related universes.[7] Specifically, Plaintiffs have failed to provide

21

22  [7] Rite Aid served document requests upon the State for documents related to the 1,904 Sample
    and the claims universes. The State has not produced any documents in response to those

23  requests other than those it produced in connection with the Petron Report. Eagan Decl., ¶ 8. The
    State's position that it lacks possession, custody and/or control over DHCS documents and

24  information is directly contrary to the terms of a Memorandum of Understanding signed between
    the State and the DHCS and the State's own representations before another federal court. *See id.*;

25  ECF No. 154-3 (MOU); *see also U.S. ex rel. Kester v. Novartis Pharm. Corp.*, 2014 WL
    6655703, at *9 (S.D.N.Y. Nov. 24, 2014). Rite Aid served a subpoena on the DHCS on or about

26  September 19, 2018 to better understand how the State's universes were created, and what they
    purport to represent. DHCS has not produced any documents that show how the universes and

27  samples were created, and its outside counsel represents that DHCS has no knowledge of the
    same. Eagan Decl., ¶ 9. Rite Aid's efforts to understand the USAO's role in the creation of the

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

6

DEFENDANT'S MOTION TO EXCLUDE
PLAINTIFFS' SAMPLING METHODOLOGY
Case No. 2:12-cv-01699-KJM-EFB

1  information as to why or how certain drugs with certain NDCs were excluded from the universes,

2  or why different time frames were used.  The State indicates only that a DHCS contractor and

3  member of the U.S. Attorneys' office "finalized two lists of [NDCs] that were Code 1 diagnosis-

4  restricted drugs" in creating the universes.  ECF No. 154-7 at 9 (Resp. to Interrog. No. 1).

5           Plaintiffs' third sample universe, named "Symmetry," was apparently first generated at the

6  California DHCS using a third-party software program named "Symmetry."  The State's

7  interrogatory responses say that a DHCS employee or contractor "provided" the State with 10,810

8  paid pharmacy claims from January 1, 2010 to December 31, 2013 "that a software program

9  called 'Symmetry' obtained."  ECF No. 154-7 at 7-9. The State provides no further information

10  about the Symmetry universe.  *Id.*  But, according to Mr. Petron's report, the software program

11  outputted selected claims from the time period 2010 through 2013 to create the Symmetry sample

12  frame.  Petron Report, ¶ 13.  Any claims that appeared both in the Symmetry universe and in one

13  of the other two universes were then removed from the other two universes.  *Id.*  The Symmetry

14  universe was not stratified as were the Off Formulary and Diagnosis Restricted universes; Mr.

15  Petron's report contains no explanation as to why.  *Id.* ¶ 14.  Mr. Petron's report admits that he

16  "was not able to recreate was the original identification of the Symmetry [universe], as it was

17  beyond my scope of work," but does not explain why.  *Id.* ¶ 15.

18  _____

19  universes, although ongoing, has also been stymied by the time required for the USAO to seek
   internal approvals as well as the USAO's claims of work-product privilege regarding Mr.

20  Petron's consultation with the USAO during the pre-intervention investigation.  *Id.* ¶ 10; *see also*
   Petron Dep. at 38:24-39:11, 39:21-40:14, 41:2-43:4, 44:13-18, 44:22-45:21, 48:21-49:17, 53:3-

21  24, 56:4-10, 67:19-25, 68:24-69:1, 69:18-20, 105:3-11.  Phase 1 discovery remains open until
   June 26, 2019 [ECF No. 193], and Rite Aid reserves the right to supplement the record before the

22  Court if and when new discovery is obtained from Plaintiffs, the DHCS and/or the USAO. Rite
   Aid also reserves the right to strike Mr. Petron's report based on Plaintiffs' failure to disclose

23  documents and information reviewed by Mr. Petron during his pre-intervention consultation

24  concerning Plaintiffs' samples and methodology, and/or to compel the same. *See*, *e.g.*, *U.S. v.*
   *Sierra Pac. Indus.*, 2011 WL 5508864, at *5–7 (E.D. Cal. Nov. 8, 2011) (in case of testifying

25  expert's "dual capacit[y]" where "the line between consultant and witness is blurred," and
   regardless of the holder of the purported privilege, the test to determine whether documents are

26  generated or considered uniquely in the role of a consultant is whether the documents generated

27  or reviewed by the expert could reasonably be viewed as germane to the subject matter on which
   the expert has offered an opinion); *citing S.E.C. v. Reyes*, 2007 WL 963422, at *1-2 (N.D. Cal.

28  Mar. 30, 2007).

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

7

DEFENDANT'S MOTION TO EXCLUDE
PLAINTIFFS' SAMPLING METHODOLOGY
Case No. 2:12-cv-01699-KJM-EFB

During his deposition, Mr. Petron explained that he was told by counsel that Symmetry "is a rules-based software program that takes characteristics of Medi-Cal claims and can output certain… high-risk claims."  Petron Dep. at 32:4-35:9; 237:8-11 ("the Symmetry universe was created through a set of criteria designed to isolate claims that had a higher likelihood of a false claim"). Mr. Petron did not "attempt[] to redo what the Symmetry software did," as he was not provided with a copy the Symmetry software, even though that would be "something [he] would ordinarily ask for."  *Id.*  Instead of verifying the selection of claims to be included in the Symmetry universe, as he did for the others, Mr. Petron testified that the Symmetry universe was simply "given to me" and "basically it's just a fact and it's a fact that I took."  *Id.* at 221:14-222:13.  Ultimately, when asked if he relied upon someone else's explanation of how the Symmetry universe was created, Mr. Petron responded:

> I considered it, but relying on it; I think I wanted to understand it, so, yeah, yes, I guess I -- I really don't know… ***I feel like I'm stumbling around because I don't know and I should just say I don't know.***

*Id.* (emphasis added).  This ignorance portends the severe defects in Plaintiffs' methodology.[8]

---

[8] Plaintiffs' reliance on skewed claims universes—raw Medi-Cal claims data that was distilled down to claims with a "high-risk" of Code 1 violations—raises serious questions about what question any extrapolation of falsity from the 1,904 Sample would answer.  The more the universes were progressively whittled down by the USAO, the State and/or DHCS, the less they become representative of Rite Aid's California operations and dispensing practices.  Epstein Report, ¶¶ 75-83.  Dr. Epstein provides data showing that the claims in all three universes are unmistakably skewed towards an overrepresentation of certain drugs and certain stores in low-population areas.  This "skew in the data towards a small number of drugs in predominantly small towns raises significant questions of whether the sample accurately represents any relevant general pattern of conduct by Rite Aid on a state-wide basis." *Id.* ¶¶ 77.  When asked whether the limited, non-random universes used to create the 1,904 Sample can be extrapolated to make any inferences about Rite Aid's generalized business practices, Mr. Petron simply responded, "I feel like that's sort of not my area to discuss what the argument is.  I guess what I would respond to that is I am going to take a sample of a sample frame and I will extrapolate that sample to that sample frame, and what that means beyond what I just said, that's not in my purview."  Petron Dep., 236:6-17; *see also id.* at 238:9-239:1 (Plaintiffs' Symmetry universe is "probably more indicative of having a false claim under a Code 1 drug than a randomly selected claim" and "that sample should apply to that universe and that universe only.")  Thus, in addition to the statistical deficiencies inherent in Plaintiffs' sample discussed below, Rite Aid reserves the right to argue that the claims universes that Plaintiffs used to create their 1,904 Sample do not fairly reflect Rite Aid's business and dispensing practices in California as a whole.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

8

DEFENDANT'S MOTION TO EXCLUDE
PLAINTIFFS' SAMPLING METHODOLOGY
Case No. 2:12-cv-01699-KJM-EFB

### C. Plaintiffs' Proposed Sampling Methodology Is Statistically Invalid

Defendant's statistical and econometrics expert Dr. Epstein establishes that Plaintiffs' proposed sampling methodology is not statistically valid because it fails to apply accepted statistical principles and methods. Specifically, the methodology fails to follow the principles of "total survey design" or use proper sampling techniques. As a result, Plaintiffs' proposed methodology "will not provide useful information for assessing the incidence or value of false claims because it fails to account for *pervasive nonsampling measurement error*. This deficiency leads me to the conclusion that California's proposed sampling methodology is *not statistically valid*." Epstein Report, ¶ 10 (emphasis added). Discussion of these deficiencies follows.

### 1. Plaintiffs' Sampling Methodology Violates "Total Survey Design" Principles

In his report, Mr. Petron purports to rely upon the concept of "total survey design," which is "concerned with obtaining the best possible precision in the survey estimates while striking an overall economic balance between sampling and nonsampling errors." Petron Report, ¶ 9, *quoting* Särndal, Swensson & Wretman, *Model Assisted Survey Sampling*, Springer-Verlag (1992) ("Särndal"), p. 19 (emphasis added) (*see* Eagan Decl., Ex. D). According to Mr. Petron, total survey design requires first that "the objective of the sample be understood in order to create the sample" and second that the survey specifications "determine[] key elements of the sample, such as population, sampling design, measurement procedures, estimators and auxiliary variables." *Id.* ¶¶ 10-11, citing Särndal, p. 19. To determine "measurement procedures," the methodology "must identify what information is needed to answer the question at hand, and how to gather that information." Epstein Report, ¶ 13; *see also* Petron Dep. at 147:6-10 ("…I need to know…what the measurement methodology is.").

However, Plaintiffs' methodology fails to use "total survey design" because neither the "objective" of the methodology (i.e., the exact question the statistical methodology is designed to measure) nor the information needed to address the objective of the study are specified. Although he played no role in the design of the sampling methodology, Mr. Petron claims that the objective of Plaintiffs' sampling methodology is "to estimate the number, percentage, and total payments

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

9

DEFENDANT'S MOTION TO EXCLUDE
PLAINTIFFS' SAMPLING METHODOLOGY
Case No. 2:12-cv-01699-KJM-EFB

associated with false claims made by Rite Aid to Medi-Cal for Code 1 drugs."  Petron Report, ¶

10.  But, Mr. Petron never specifies what information is required or the criteria to be applied to

determine whether or not a particular claim is false.  As noted by Dr. Epstein:

> [T]he authority [Mr. Petron] cites for the principle of total survey design states that the **statistician must be unequivocal** on the kinds of information needed for the population, which variables should be measured, and specification of the data collection method.  **Yet the Petron Report provides no discussion of these questions**… His report and deposition are not clear on how the relevant information for the sample was selected or even what it precisely is.  However, it is critical for a statistician to consider such information **at the survey design stage** to guide the ultimate determination of what is or is not a false claim.

Epstein Report, ¶ 13 (emphasis added).  Mr. Petron's proposed "methodology" addresses none of

these issues, and instead focuses entirely on the narrow and simplistic issues of stratification,

sample size and random selection for universes designed and selected by others.  Mr. Petron's

rudimentary analysis—"the sort of exercise one finds in introductory statistics courses,"

according to Dr. Epstein—sidesteps the complex issue of measurement in this case.  *Id.* ¶ 32.

        As Dr. Epstein illustrates, a statistician can easily design a sampling methodology to

estimate the number of black versus white chips in an urn, which is essentially all that Mr.

Petron's "methodology" purports to accomplish.  *Id.*  "In this setting, an efficient procedure

would be to pick a random sample of chips and use the share of white chips in the sample as an

estimate of the proportion of white chips in the entire urn."  *Id.*  But, such a simple design

requires two "textbook" assumptions: first, "no uncertainty about the color of a chip," and second,

"no other chip in the urn provides information about the color of a given chip in the sample."  *Id.*

        Here, by contrast, significant disagreement exists as to the information to be considered

and the determination made as to the existence of a purported Code 1 violation (i.e. "falsity").  As

admitted by Mr. Petron, "I am sure that there will be differences of opinion on what is and not a

false claim."  Petron Dep., at 90:22-24.  This disagreement stems in part from the fact that

reimbursement claims for a particular patient are oftentimes related to, and correlated with, other

prescriptions (and reimbursement claims) for the same patient.  Thus, in this case, "determination

of whether a claim violates the FCA is not as trivial as accurately observing the color of a chip. . .

Interpretation of the claims data requires judgment. The black and white textbook model of

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

10

DEFENDANT'S MOTION TO EXCLUDE
PLAINTIFFS' SAMPLING METHODOLOGY
Case No. 2:12-cv-01699-KJM-EFB

1  sampling—which is essentially all the Petron Report considers—assumes away the key statistical

2  issues raised by the individualized facts of this case." Epstein Report, ¶¶ 33-34.

3            **2.      Plaintiffs' Sample Fails to Use Cluster Sampling.**

4            Based on the survey design work of others, Plaintiffs propose to measure whether or not a

5  prescription reimbursement claim is Code 1 compliant solely by reference to the electronic record

6  supporting the claim maintained in Rite Aid's NexGen database.  *See* ECF No. 154-7 at 3 (Resps.

7  to Interrogs.) ("If there is no [Code 1] notation in the NexGen record(s), California would deem

8  that sample claim to be false.").  Thus, under Plaintiffs' proposed methodology, a claim will be

9  found "false" if Rite Aid's electronic records do not reveal a Code 1 notation on a *scanned* copy

10 of a patient's prescription regardless of whether (1) a *paper* copy of the prescription or a separate

11 Code 1 documentation form[9] reflects the notation; (2) the notation appears on a prescription filled

12 earlier for the same drug for the same patient; or (3) the notation appears on a prescription for a

13 drug to be taken in combination with the prescription deemed "false" and filled at the same time.

14           Such determinations result from Plaintiffs' refusal to account for patient histories and to

15 sample a patient's prescription history—a cluster of data points—rather than an individual claim.

16 Thus, Plaintiffs' proposal departs from the federally-endorsed methodology when considering

17 patients' claim histories, *i.e.* "cluster sampling."  According to the Medicare Program Integrity

18 Manual and its discussion of statistical sampling, it is often necessary to use cluster sampling

19 rather than simple random sampling when the complete claim record of a patient might be

20 relevant.  Eagan Decl., Ex. E  (Integrity Manual, Chapter 8)[10]; *see also* Epstein Report, ¶ 48.

21           Dr. Epstein agrees and opines that "[c]onsideration of the patient's history—instead of just

22 a single cherry-picked, out-of-context prescription record" that now remains in Rite Aid's

23

24

---

25 [9] *See*, *e.g.*, ECF No. 75 (State Complaint), ¶ 92 (excerpts from communication to Rite Aid stores
   regarding compliance with Code 1 documentation requirements via a separate "Code 1
26 Documentation Form.").

27 [10] The version attached to the Eagan Decl. was in effect when the State created the 1,904 Sample
   and when Mr. Petron wrote his report.  Eagan Decl. ¶ 6, n.2.

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANT'S MOTION TO EXCLUDE
PLAINTIFFS' SAMPLING METHODOLOGY
Case No. 2:12-cv-01699-KJM-EFB

possession[11]—"may be critical in determining if fraud took place, whether California can prove each element of its claim, and whether it could ever be appropriate to extrapolate from the sample to other claims." Epstein Report, ¶ 16. "Failure to consider the correlation of sample claims with other claims for the same beneficiary will likely exclude relevant information[,] lead to erroneous conclusions," and ultimately "inflate an estimate of allegedly false claims in the universe." *Id.* ¶ 47.

When asked about cluster sampling as an alternative to Plaintiffs' sampling design, Mr. Petron testified at his deposition that, because his "task" was not to "re-design" the sample, he did not consider an alternative sample design such as cluster sampling. Petron Dep. at 205:12-206:18 ("*The thought crossed my mind*, but… I wasn't here to design the sample. I was here to render an opinion on whether the sample as it was designed and presented to me was valid.") (emphasis added). Because Mr. Petron did not view it as his role to suggest that Plaintiffs' sample be designed differently, he did not.

### 3. Numerous Example Claims Demonstrate the Measurement Error in Plaintiffs' Sample.

The scenario outlined by Dr. Epstein, wherein a patients' prior dispensing history is directly relevant to assessing Code 1 compliance, is not isolated or uncommon one. Dr. Epstein observes that a "great many" claims in the three universes display "correlation," meaning "the dispensing of the same drug to the same patient for the same disease on multiple occasions over a long period of time." Epstein Report, ¶ 16. For example, Dr. Epstein cites to a specific sample claim—one for an HIV treatment drug—that the State asserts is a false claim.[12] *Id*. ¶ 17. Dr. Epstein shows that this same patient filled prescriptions for this same drug a total of 78 times over

---

[11] Plaintiffs' false claim allegations date back to 2007. Until 2016, a three-year record retention requirement applied to Rite Aid's prescription records. *See* Cal. Welf. & Inst. Code, § 14124.1 (Westlaw 2017) ("Each provider...shall keep and maintain records of each such service rendered... for a period of **three years from the date the service was rendered**." (emphasis added)), *amended by* 2017 Cal. Legis. Serv. Ch. 511 (A.B. 1688) (West) (effective Jan. 1, 2018). Thus, in many cases, Plaintiffs seek to infer the lack of Code 1 documentation based on documents that Rite Aid was no longer required to maintain in its possession.

[12] On September 28, 2018 the State served a supplemental response to certain interrogatories in which it presented its initial findings of claims it asserts are "false." *See* Eagan Decl., Ex. F.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

12

DEFENDANT'S MOTION TO EXCLUDE
PLAINTIFFS' SAMPLING METHODOLOGY
Case No. 2:12-cv-01699-KJM-EFB

1  a period of eight years, and also filled prescriptions for another HIV treatment drug an additional

2  86 times over that same period.  *Id.*  Dr. Epstein reasonably observes that, where a patient

3  obviously suffers from HIV based on prescription history, "it would be relevant to inquire if other

4  pharmacy records, including earlier prescriptions, document the Code 1 diagnosis before

5  determining whether a claim was false."  *Id.*  This exemplifies the measurement error inherent in

6  Plaintiffs' methodology and "illustrates the problems that arise if such historical correlation is

7  ignored."  *Id.*

8      Dr. Epstein sets forth a number of additional examples in which measurement error is not

9  just a hypothetical concern, but evidence of a fundamental issue unaddressed by Mr. Petron's

10  report.  Plaintiffs' proposed sampling methodology, as adopted by Mr. Petron, will result in

11  invalid confidence intervals[13], find false claims where there are none and inflate damages because

12  of the failure to consider measurement error in the sample design stage.

13  ### III.   PLAINTIFFS' PROPOSED SAMPLE AND MR. PETRON'S REPORT ARE UNRELIABLE UNDER RULE 702

14

15  #### A.   The Failure to Account For Measurement Error Renders Plaintiffs' Sampling Methodology Inadmissible.

16      Plaintiffs' proposed use of the 1,904 Sample to "prove" falsity and damages does not

17  survive an inquiry under Federal Rule of Evidence 702.  Under Rule 702, "[i]f scientific,

18  technical, or other specialized knowledge will assist the trier of fact to understand the evidence or

19  to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience,

20  training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the

21  testimony is based upon sufficient facts or data, (2) the testimony is the product of *reliable*

22  *principles and methods*, and (3) the witness has *applied the principles and methods reliably* to the

23  facts of the case."  *Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463 (9th Cir. 2014)

24  (*citing* Fed. R. Evid. 702) (emphasis added). The Ninth Circuit requires that "[e]xpert testimony

25  ... be both relevant and reliable."  *Id.*, *citing U.S. v. Vallejo*, 237 F.3d 1008, 1019 (9th Cir. 2001).

26

27  ---

[13] "Margin of error" and "confidence interval" are interrelated concepts. Mr. Petron describes the "confidence interval" as "an indication of the probable range of error associated with a sample value obtained from a probability sample."  Petron Report, ¶ 18, n.20.

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

13

DEFENDANT'S MOTION TO EXCLUDE
PLAINTIFFS' SAMPLING METHODOLOGY
Case No. 2:12-cv-01699-KJM-EFB

1    Under Rule 702, "[t]he proponent of the expert testimony has the burden of proving the proposed

2    expert testimony is admissible," and the trial court acts "as a 'gatekeeper' by "making a

3    preliminary determination of whether the expert's testimony is reliable." *Kwan Software Eng'g,*

4    *Inc. v. Foray Techs.,* 2014 WL 572290, at *4 (N.D. Cal. Feb. 11, 2014).

5            Plaintiffs' proposed use of statistical sampling cannot reliably be used to establish FCA

6    liability in this case because it (i) fails to follow total survey design principles to specify

7    measurement criteria; (ii) fails to recognize and account for measurement error; (iii) will not

8    calculate valid confidence intervals; (iv) will overstate falsity and damages in one direction only;

9    and (v) thus cannot be used to extrapolate any findings of falsity or liability to the wider claims

10   universes totaling over 500,000 claims. *See U.S. ex rel. Loughren v. UnumProvident Corp.*, 604

11   F. Supp. 2d 259, 269 (D. Mass. 2009) ("*Loughren*") (rejecting statistical expert opinion, in part,

12   because its wide confidence interval "signals that random error is substantial" and  "the estimate

13   may be seriously wrong," and "leaves the Court's confidence in the reliability of [expert's] result

14   shaken.") (citations omitted).

15           Moreover, no sampling methodology would be appropriate to extrapolate estimated

16   liability under the facts of this case. *See Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1046

17   (2016) (the permissibility of using sampling in a particular case turns on the "degree to which the

18   evidence is reliable in proving or disproving the elements of the relevant cause of action."); *Wal-*

19   *Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 367 (2011) (*"Dukes"*) (where the nature of a particular

20   cause of action requires an individualized determination of liability, that determination cannot be

21   replaced by a "Trial by Formula," and rejecting plaintiffs' attempt to establish liability by

22   selecting a random sample of class members and extrapolate to the whole class).

23           To counsel's knowledge, no circuit endorsed statistical sampling and extrapolation in an

24   FCA case to prove *liability*, as opposed to simply damages. *Cf. U.S. v. Fadul*, 2013 WL 781614,

25   at *14 (D. Md. Feb. 28, 2013). District courts directly addressing the issue have disagreed

26   whether it is legally permissible under the FCA to sample certain claims and extrapolate their

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

14

DEFENDANT'S MOTION TO EXCLUDE
PLAINTIFFS' SAMPLING METHODOLOGY
Case No. 2:12-cv-01699-KJM-EFB

falsity to a universe of unreviewed claims.[14]  Courts have found it particularly inappropriate to estimate false claims through sampling where, as here, determinations of falsity depend upon individualized and uncertain determinations.  *See U.S. ex rel. Wall v. Vista Hospice Care, Inc*., 2016 WL 3449833, at *13 (N.D. Tex. June 20, 2016) ("*Vista*") ("sampling and extrapolation cannot always be used to prove liability, and courts are required to engage in a particularized analysis of the whether extrapolation from a particular data set can reliably prove the elements of the specific claim."), *citing Dukes*, 564 U.S. at 367; *see also U.S. ex rel. Michaels v. Agape Senior Community, Inc.*, 2015 WL 3903675 at *6-7 (D. S.C. June 25, 2015) ("*Agape*"); *U.S. v. Friedman*, 1993 U.S. Dist. LEXIS 21496, at *9 n.1 (D. Mass. July 23, 1993) (rejecting random sample of 350 Medicare claims to universe of 676 claims when unreviewed claims would not be subject to same analysis, discussion, and cross-examination).

In *Agape*, the court found that sampling was inappropriate to determine FCA liability where a determination of medical necessity for a certain treatment involved "[a] highly fact-intensive inquiry" after a "thorough review" of medical records for "each individual patient." 2015 WL 3903675 at *8.  Like in *Agape*, Rite Aid contends this case similarly requires the thorough analysis of thousands of patient prescription records, over varying periods of time and frequency, in connection with a multitude of different pharmacy personnel dispensing various different drugs prescribed by various doctors for various chronic and non-chronic conditions.  As observed by Dr. Epstein, the process of determining and documenting a Code 1 compliant diagnosis varies among patients, diagnoses, and drugs for a plethora of reasons.  *See* Epstein Report, ¶¶ 40-49.  Such factors unquestionably will impact the findings not only of falsity, but also application of the FCA's "rigorous" materiality and scienter elements[15]—a claim-by-claim

---

[14] As they have previously [*see* ECF No. 126 at 34; ECF No. 131 at 5-6], Plaintiffs are likely to cite *U.S. ex rel. Martin v. Life Care Centers of Am., Inc*., 114 F. Supp. 3d 549 (E.D. Tenn. 2014) in their opposition.  However, that opinion was issued at the summary judgment stage, not at the outset of the case as here.  *Id.* at 550.  Moreover, Plaintiffs' methodology, which lacks any valid confidence interval and/or margin of error, would be excluded under the standard applied.  *Id.* at 559 ("Given that the nature of a statistical sample is to draw an inference from the sample to the larger population, statisticians account for any discrepancies by calculating a margin of error.").

[15] *See Universal Health Servs., Inc. v. U.S. ex rel. Escobar*, 136 S. Ct. 1989, 2002 (2016) ("*Escobar*").

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

15

DEFENDANT'S MOTION TO EXCLUDE
PLAINTIFFS' SAMPLING METHODOLOGY
Case No. 2:12-cv-01699-KJM-EFB

analysis that Plaintiffs desperately seek to avoid by mere reference to generic corporate policies and as yet unidentified Medi-Cal documents. *See* ECF No. 131 at 2-3. Sampling should not be permitted as a "shortcut" for Plaintiffs to establish liability in this FCA case.

### B. Plaintiffs' Proposed Sample Testing Method, Unexamined By Mr. Petron, Fails to Accurately Assess Alleged Code 1 Violations.

The inherent flaw in Plaintiffs' approach to determining falsity, and thus the design of its sampling methodology, is misapplication of the relevant law they rely upon. Plaintiffs here principally base their allegations of falsity under the FCA here on a particular California regulation, Cal. Code Regs., tit. 22, section 51476(c). *See* ECF No. 75 (State Complaint), ¶¶ 20, 40-41; ECF No. 79 (Relator Complaint), ¶ 24. In relevant part, Section 51476(c) states that:

> Records of providers shall document the meeting of Code I restrictions…for drugs listed in the Medi-Cal List of Contract Drugs as follows: [...] (2) The dispenser shall maintain readily retrievable documentation of the patient's diagnostic or clinical condition information that fulfills the Code I restriction. If this Code I diagnostic or clinical condition information is transmitted to the dispenser other than by personal handwritten order from the prescriber, the dispenser shall document the transmittal date and the name of prescriber or the employee or agent who is legally authorized to transmit such information. The documentation shall be personally signed by the dispenser. *Id.*

According to its interrogatory responses, however, the State proposes to measure the "falsity" of a particular claim—that is, whether or not it complies with Section 51476(c)'s requirements—differently than the statute requires:

> [The State's] sample testing would involve reviewing Rite Aid's NexGen records in connection to a particular sample claim to see whether the NexGen record has any notation showing that a pharmacy associate performed a Code 1 review for that sample claim. If there is no such notation in the NexGen record(s), California would deem that sample claim to be false, i.e., pertinent here, Rite Aid did not perform or document the requisite Code 1 diagnosis review."[16]

---

[16] The State also proposes to analyze patients' Medi-Cal claims data and medical records to see if an underlying diagnosis is present and thus infer whether Rite Aid did or "did not perform the requisite Code 1 diagnosis review." ECF No. 154-7 at 3-4 (7/27/18 Rog. Resps.). However, Section 51476(c) does not impose <u>any</u> requirement that pharmacists "perform a Code 1 review," as the State often claims. *See, e.g.*, ECF No. 75 (State Complaint), ¶ 100. Indeed, the regulation requires no notation at all be made by a Rite Aid pharmacist if the prescription record transmitted

Bockius LLP
Attorneys at Law
San Francisco

16

DEFENDANT'S MOTION TO EXCLUDE
PLAINTIFFS' SAMPLING METHODOLOGY
Case No. 2:12-cv-01699-KJM-EFB

ECF No. 154-7 at 3.  As Dr. Epstein notes, it appears the State is saying "that if a particular notation does not appear in Rite-Aid's electronic records, it will regard that claim as false, regardless of any other circumstances that could show its validity."  Epstein Report, ¶ 42. However, "the description is ambiguous regarding timing" and it is "unclear if [the State] plans to consider records for other prescriptions filled at other times."  *Id.* ¶ 44.  California's proposed application of the statute contrary to its express terms may explain at least some of the discrepancy (and measurement error) between the USAO's and State's determinations of falsity.

Yet, nowhere in Section 51476(c) is a provider like Rite Aid required to "document the meeting of Code I restrictions" on the face of *each and every* prescription.  Thus, contrary to Plaintiffs' assumption, one cannot examine the face of a sampled prescription in isolation and reliably estimate the incidence of missing Code 1 documentation among a larger population of claims universes.  If Plaintiffs' proposed sampling methodology will not accurately measure falsity because it fails to take into account patients' relevant prescription histories, it must be excluded.

Mr. Petron's report does little to correct this, because the context-specific and individualized measurement required in this case cannot be justified by simply confirming a sample was randomly selected.  In fact, Mr. Petron does not consider at all the propriety of Plaintiffs' proposed measurement procedure, or the impact it may have on sample design. Epstein Report, ¶ 43. ("Despite acknowledging the importance of specifying measurement procedures, the Petron Report is silent on whether the relevant data should be limited to the prescription documentation and/or a medical record viewed in isolation at the time of dispensing, or whether other information should be considered that may show the Code 1 condition was met.").  As Mr. Petron's *own authorities* state, "identifying the relevant data to sample and analyze is a task that ***must*** be performed on the front end of a study, not the back end."  *Id.* (emphasis added).

---

by the prescriber already reflects the Code 1 condition.  Maintenance of *any* documentation of the condition, whether made by a doctor or the pharmacist, satisfies Section 51476(c)—a fact Plaintiffs continue to ignore.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

17

DEFENDANT'S MOTION TO EXCLUDE
PLAINTIFFS' SAMPLING METHODOLOGY
Case No. 2:12-cv-01699-KJM-EFB

Yet, Mr. Petron refused to do so in his report, and struggled to do so at his deposition. When asked to explain what the "attribute of interest" that is being measured in the 1,904 sample, Mr. Petron responded that "[i]t is whether or not a particular sampling unit, which is a claim, was submitted as a false claim," meaning, "that the Code 1 restrictions were not followed." Petron Dep. at 90:6-18.  But, when asked *how* he understood such a determination would be made, Mr. Petron responds, "[y]ou know, I don't exactly [understand].  I'm not the one that determined what is and is not a false claim, so I'm not the person to, to really answer that question." *Id.*

Because the measurement in this case requires more sophistication and context than Mr. Petron and Plaintiffs envision, the proposed sample cannot estimate alleged falsity reliably.

**C.     Mr. Petron Concedes He May Have to Redesign the Sample Should Measurement Procedures Be Affected By Court Rulings.**

At best, evaluation of Plaintiffs' sampling methodology is premature at this time, and the Court should decline to endorse it with an advisory opinion at this stage.  As Dr. Epstein notes, Plaintiffs' failure to account for measurement error means no valid confidence interval can be calculated, meaning we cannot know whether the sample is appropriate for extrapolation at all at this stage.  Epstein Report, ¶ 66.  *See U.S. ex rel. Ruckh v. Genoa Healthcare, LLC*, 2015 WL 1926417, at *4 (M.D. Fla. Apr. 28, 2015) (declining to address propriety of sampling methodology as premature because "until the expert completes the statistical sampling, the margin of error is unavailable"); *see also Loughren*, 604 F. Supp. 2d at 269 (stressing importance of valid confidence interval to sample's reliability).  This alone renders Plaintiffs' sample proposal premature and unreliable.

As previewed above, Rite Aid fundamentally disagrees with Plaintiffs' interpretation of Section 51476(c)'s Code 1 documentation requirements, including their apparent contention that a single sampled claim must be viewed in complete isolation rather than in connection with other relevant claims and/or patient prescription histories.  Rite Aid anticipates the Court will need to resolve such critical questions of law in the future, likely at the summary judgment/adjudication stage.  As Dr. Epstein argues, the resolution of such questions necessarily affects the sample design, whether by adopting cluster sampling or some other way.  Epstein Report, ¶ 53.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

18

DEFENDANT'S MOTION TO EXCLUDE
PLAINTIFFS' SAMPLING METHODOLOGY
Case No. 2:12-cv-01699-KJM-EFB

Mr. Petron did not consider this possibility at all in his report. But, Rite Aid counsel asked Mr. Petron how his opinion would be affected if the Court were to hold that the presence of a Code 1 documentation on a patient's earlier claim meant that continued documentation was not necessary for each and every single subsequent refill of that same prescription. Petron Dep., 207:19-208:24. Mr. Petron conceded that he had not "thought this through," but that it was an "interesting question" that he did not consider in rendering his opinion on the purported validity of Plaintiffs' methodology. *Id.* Asked to assume another, similar hypothetical in which Rite Aid documented the presence of a chronic, incurable condition (such as HIV) in one instance, but did not continue to document the presence of this incurable condition in each and every subsequent (or contemporaneous) instance thereafter, Mr. Petron responded that he would give "basically the same answer," "would want to think it through," and that "[i]t very well could affect the design" or "the extrapolation and how one would conduct the extrapolation." *Id.* at 208:25-209:19; *see also* 212:25-213:4 (the presence of Code 1 documentation for an earlier prescription but not for a subsequent refill sampled by Plaintiffs "might cause me to do certain things… [I]t's an interesting question, one that I haven't given a great deal of thought to.").

Mr. Petron also admits that he did not consider whether or not the majority of claims present in the 1,904 Sample are related to chronic conditions. *Id.* at 213:5-11. Mr. Petron attempts to explain away his failure to consider such additional information relevant to a patient's diagnosis or condition by saying he could make "a series of adjustments on the back end to deal with that fact" when the time comes to perform the extrapolation. *Id.* at 208:11-13; 214:12-16; 218:4-7. Mr. Petron gives no hint as to what those "adjustments on the back end" might be, simply stating that, "I will consider that when the time comes." *Id.* at 219:2-3. Even then, Mr. Petron acknowledges that such "back end adjustments" may prove to be insufficient, and that "**a new design might be a more efficient way to do it**." *Id.* at 218:22-219:2 (emphasis added).

Both Dr. Epstein's Report and Mr. Petron's own cited authorities demonstrate that "back end" adjustments *cannot* save a fundamentally statistically invalid sample design. Epstein Report, ¶ 12 ("There is no statistical 'back-end' adjustment that can cure such a fundamental problem in a belated attempt to generate statistically valid conclusions."); Petron Report, ¶¶ 10-11, citing

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

19

DEFENDANT'S MOTION TO EXCLUDE
PLAINTIFFS' SAMPLING METHODOLOGY
Case No. 2:12-cv-01699-KJM-EFB

1  Särndal, p. 19 (total survey design requires "objective of the sample be understood **in order to**

2  **create the sample**" as well as specifying "measurement procedures" (emphasis added)).

3          Mr. Petron's testimony demonstrates amply why, at an absolute minimum, it would be

4  premature for the Court to "bless" Plaintiffs' proposed Plaintiffs' methodology at this stage, when

5  so many questions of law as applied to the facts of this case still must be determined.  A

6  resolution of such questions, Mr. Petron concedes, must be decided <u>before</u> one can categorically

7  affirm the validity of Plaintiffs' proposed sampling design.  Petron Dep. at 207:14-18 ("I would

8  want to understand the judge's opinion or ruling and then think through how that could affect the

9  design, yes.  Or **whether or not that it would require a new design** or an adjustment to the

10  existing design or nothing at all.") (emphasis added), at 208:21-24 ("I definitely…know that a

11  judge can rule basically anything at any time **and it might change things**…") (emphasis added).

12  In effect, Mr. Petron acknowledges his opinion is, in essence, preliminary and subject to revision

13  based on how the Court may apply the law in this case.  Accordingly, any order from the Court at

14  this stage approving Plaintiffs' proposed sample, before answering such unresolved critical

15  questions of law, would be premature at best.

16  **IV.    <u>CONCLUSION</u>**

17          The Court should decline to approve Plaintiffs' proposed sampling methodology because

18  it is bias and unreliable owing to its failure to account for inherent measurement error. Moreover,

19  the necessity for individualized, context-specific determinations as to whether a submitted claim

20  was false or not precludes the use of sampling at all in this case to estimate the incidence of

21  falsity across the claims universe. Plaintiffs' attempt to introduce skewed, unreliable sampling

22  evidence to establish falsity, while attempting to evade any claim-specific analysis of scienter and

23  materiality, should not be permitted by the Court.

24  Dated: April 15, 2019                              MORGAN, LEWIS & BOCKIUS LLP

25                                                     By   */s/ Benjamin P. Smith*
                                                          Benjamin P. Smith
26

27                                                     Attorneys for Defendant
                                                       RITE AID CORPORATION
28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANT'S MOTION TO EXCLUDE
PLAINTIFFS' SAMPLING METHODOLOGY
Case No. 2:12-cv-01699-KJM-EFB