1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

XAVIER BECERRA
Attorney General of California
VINCENT DICARLO
Supervising Deputy Attorney General
BERNICE L. LOUIE YEW, State Bar No. 114601
Deputy Attorney General
E-mail:  Bernice.Yew@doj.ca.gov
EMMANUEL R. SALAZAR, State Bar No. 240794
Deputy Attorney General
E-mail:  Emmanuel.Salazar@doj.ca.gov
 2329 Gateway Oaks Drive, Suite 200
 Sacramento, CA 95833-4252
 Telephone:  (916) 621-1835
 Fax:  (916) 274-2929

*Attorneys for State of California*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, et al., *ex rel.* LOYD F. SCHMUCKLEY, JR., <br><br> Plaintiffs, <br><br> **v.** <br><br> RITE AID CORPORATION, <br><br> Defendant. | 2:12-CV-1699 KJM EFB <br><br> **PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF OPPOSITION TO RITE AID CORPORATION'S MOTION TO EXCLUDE SAMPLING METHODOLOGY (ECF NOS. 128, 137, 193, 195)** |
| STATE OF CALIFORNIA *ex rel.* LOYD F. SCHMUCKLEY, JR., <br><br> Plaintiff, <br><br> v. <br><br> RITE AID CORPORATION, <br><br> Defendant. | |

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES……………………………………………………………..2

INTRODUCTION ........................................................................................................... 4

FACTUAL BACKGROUND .......................................................................................... 4

    I.    The Government Investigates Allegations Relating to Code 1 Drugs. ................... 4

        A.    Rite Aid Signed Provider Agreements and Computer Media Claims
              Agreements. ........................................................................................... 5

        B.    Medi-Cal Does Not Pay a Pharmacy Claim for a Code 1 Diagnosis-
              Restricted Drug Without Affirmative Representations of
              Compliance. ........................................................................................... 5

        C.    Rite Aid's Purported Policies and Procedures Apply to All Code 1
              Drugs. ..................................................................................................... 7

    II.    The Government Uses Statistical Sampling to Decide on Intervention................. 7

        A.    The Government's Sampling Is to Estimate the Number of False
              Claims Related to Code 1 Diagnosis-Restricted Drugs. ....................... 7

        B.    The Investigation Expands from a Small Subset of Claims to the
              Current Claims Universes. ..................................................................... 9

        C.    The Government's Probe Sample Operations Led to California's
              Intervention. ......................................................................................... 10

PROCEDURAL BACKGROUND.................................................................................. 12

ADMISSIBILITY OF EXPERT OPINION ................................................................... 13

ARGUMENT .................................................................................................................. 14

    I.    The Status of the Litigation and Discovery Should Have No Effect on
        Sampling Validity. ................................................................................................. 14

    II.    The Government's Sampling Methodology Is Valid and Admissible.................. 16

        A.    The Sampling Objective Is to Determine Whether Rite Aid
              Performed the Requisite Code 1 Review, Verification, and
              Documentation When It Overrode the Initial Claim Denial for a
              Code 1 Diagnosis-Restricted Drug............................................... 16

        B.    The Overall Universe Consists of the Symmetry, Off-Formulary,
              and Diagnosis-Related Sample Frames.................................................. 17

        C.    The Sampling Unit Is an Individual Claim for the Dispensing of a
              Code 1 Diagnosis-Restricted Drug That Was Paid Because of Rite
              Aid's Use of Claim Override Codes. ..................................................... 19

        D.    Stratified Random Sampling Is a Valid Sampling Design....................... 20

        E.    The Sample Sizes Are Adequate.............................................................. 23

        F.    The Samples Are Representative of the Sample Frames. ....................... 23

CONCLUSION ............................................................................................................... 23

1

1

## TABLE OF AUTHORITIES

2

C<small>ASES</small>

3

*Clicks Billiards, Inc. v. Sixshooters, Inc.*
    251 F.3d 1252 (9th Cir. 2001)........................................................................18

4

5

*Daubert v. Merrell Dow Pharms., Inc.*
    43 F.3d 1311 (9th Cir. 1995)..........................................................................13

6

7

*Daubert v. Merrell Dow Pharms. Inc.*
    509 U.S. 579 (1993)........................................................................................13

8

*In re Countrywide Fin. Corp. Mortgage-Backed Secs. Litig. v. Countrywide Fin.*
    *Corp.*
    984 F. Supp. 2d 1021 (C.D. Cal. 2013)..................................................14, 19, 21

9

10

*Kennedy v. Collagen Corp.*
    161 F.3d 1226 (9th Cir. 1998)........................................................................13

11

12

*Kumho Tire Co. v. Carmichael*
    526 U.S. 137 (1999)........................................................................................13

13

14

*Mukhtar v. Cal. State Univ.*
    299 F.3d 1053 (9th Cir. 2002)........................................................................13

15

*Ratanasen v. California Dep't of Health Servs.*
    11 F.3d 1467 (9th Cir. 1993)..........................................................................15

16

17

*San Bois Health Servs. v. Hargan*
    2017 U.S. Dist. LEXIS 183406 (E.D. Okla. 2017).........................................19

18

19

*Superior Home Health Servs. LLC v. Azar*
    2018 U.S. Dist. LEXIS 130519 (W.D. Tex. 2018).........................................17

20

*Transyd Enters., LLC v. Sebelius*
    2012 U.S. Dist. LEXIS 42491 (S.D. Tex. 2012)............................................20

21

22

*United States ex rel. El-Amin v. George Washington Univ.*
    533 F. Supp. 2d 12 (D.D.C. 2008) ................................................................14

23

24

*United States ex rel. Lujan v. Hughes Aircraft Co.*
    67 F.3d 242 (9th Cir. 1995).............................................................................7

25

*United States ex rel. Martin v. Life Care Ctrs. of Am.*, Inc.,
    114 F. Supp. 3d 549 (E.D. Tenn. 2014)………………………………………14

26

*United States ex rel. Wall v. Vista Hospice Care*, Inc.
    2016 U.S. Dist. LEXIS 80160..........................................................................7

27

28

2

*United States v. Pena*
    532 Fed. Appx. 517 (5th Cir. 2013) .........................................................................17


**STATUTES**

42 U.S.C. 1396r-8(d)(5) ....................................................................................................5

False Claims Act, Cal. Gov't Code, §§ 12650-12652 ......................................................7

Welfare and Institutions Code Chapters 7 and 8.............................................................4


**REGULATIONS**

Cal. Code Regs. Title 22, § 51313.3(b) ..........................................................................5

Cal. Code Regs., Title 22 § 51458.2(b) .........................................................................15

Cal. Code Regs. Title 22, § 51476(c).........................................................................4, 5


**FEDERAL RULES**

Fed. R. Evid. 702 .....................................................................................................12, 13


**OTHER AUTHORITIES**

Arkin, Herbert, *Handbook of Sampling for Auditing and Accounting* 19 (3rd ed.
    New Jersey: Prentice Hall 1984).............................................................................18

Cochran, *Sampling Techniques* (John Wiley & Sons 3rd ed.) (1977) ...............15, 16, 19

False Claims Act Correction Act of 2008, S. Rep. No. 110-507 (2008) ..........................7

Fed. Jud. Ctr., *Ref. Manual on Sci. Evid.* 299 (3rd ed. 2011) ......................................19

GAO, *Using Statistical Sampling* 14
    (May 1992), https://www.gao.gov/assets/80/76112.pdf .........................................14

Särndal, Swensson & Wretman, *Model Assisted Survey Sampling*
    (New York: Springer-Verlag) (1992)...........................................................12, 15, 21

PLAINTIFFS' MEM. OF POINTS AND AUTHORITIES IN SUPPORT OF OPPOSITION TO RITE AID
CORPORATION'S MTN. TO EXCLUDE SAMPLING METHODOLOGY (ECF NOS. 128, 137, 193, 195)

**INTRODUCTION**

Because of the extreme volume of pharmacy claims, Plaintiff State of California ("California") has proposed to use a sampling methodology it developed during the pre-intervention investigation to estimate the number of false claims in this action. "[S]o that preparation of the case for trial will not be significantly delayed if it becomes necessary to redraw the statistical sample," California and Relator Loyd F. Schmuckley, Jr., ("Relator," and together with California, "Plaintiffs") requested and the Court agreed and ordered Defendant Rite Aid Corporation ("Rite Aid") to file a motion challenging Plaintiffs' sampling methodology and design during the *first* phase of discovery. ECF No. 128 at 5; ECF No. 137 at 2.

Despite California's statistical expert, Mr. Michael Petron ("Mr. Petron"), and Rite Aid's statistical expert, Dr. Roy Epstein ("Dr. Epstein"), both fundamentally agreeing the sampling methodology is valid, Rite Aid moves to exclude it. In doing so, Rite Aid repeats previously rejected legal arguments, claims that it lacks purportedly necessary information without explaining the need for the information or any prejudice suffered for not obtaining the information, and confuses sampling validity with measurement validity—a topic that was clearly and necessarily outside the scope of the Petron Report, the first phase of discovery, and the ordered motion.

In this opposition, therefore, Plaintiffs will first discuss the underlying investigative facts that led to the development of the Government's sampling methodology. We will then explain the evidentiary rules governing expert opinions. We shall then focus on each completed feature of the Government's sampling methodology to show its validity and address Rite Aid's pertinent challenges. In conclusion, we will ask the Court to find that Rite Aid's challenges lack merit and that we do not need to resample. The Court should therefore deny Rite Aid's motion.

**FACTUAL BACKGROUND**

**I.    THE GOVERNMENT INVESTIGATES ALLEGATIONS RELATING TO CODE 1 DRUGS.**

Relator, on behalf of the United States and California (together, "the Government"), filed under seal a *qui tam* complaint alleging, relevant here, claim violations relating to Medi-Cal "Code 1" drugs. ECF No. 1. The Government investigated and found the below pertinent facts.

4

### A. Rite Aid Signed Provider- and Computer Media Claims Agreements.

Medi-Cal is a federal-state program in which the United States and California pay for medical care, including covered pharmaceutical drugs. ECF No. 75, Complaint-in-Intervention ("CII") ¶¶ 13-16; ECF No. 147, First Amended Answer to California's CII ("FAA") ¶¶ 13-15. To participate in and receive payment from Medi-Cal's prescription drug coverage program, Rite Aid executed provider agreements whereby Rite Aid agreed to, among other things, (1) comply with all applicable provisions of Chapters 7 and 8 of the Welfare and Institutions Code ("WIC") and any applicable rules or regulations promulgated by the California Department of Health Care Services ("DHCS"); (2) make, keep and maintain in a systematic and orderly manner, and have readily retrievable, such records as are necessary to fully disclose the type and extent of all services, goods, supplies, and merchandise provided to Medi-Cal beneficiaries, including, but not limited to, the records described in section 51476 of title 22 of the California Code of Regulations ("section 51476"); and (3) comply with all the billing and claims requirements contained in the WIC, its implementing regulations, and the provider manual. CII ¶¶ 20, 52; FAA ¶ 20.

To be eligible to submit pharmacy claims electronically, Rite Aid applied for and entered into Medi-Cal telecommunications provider and biller agreements (also known as computer media claims ("CMC") agreements), whereby Rite Aid, among other things, (1) acknowledged it has received, read, and understood the provider manual and its contents, (2) agreed to read and comply with all provider manuals and bulletins relating to electronic billing, (3) agreed to retain personal responsibility for the development, transcription, data entry, and transmittal of all claim information for payment, (4) assumed personal responsibility for verification of every submitted claim with source documents, (5) agreed that no claim shall be submitted until the required source documentation is completed and made readily retrievable in accord with Medi-Cal statutes and regulations, and (6) acknowledged its participation in the electronic claims submission program will be terminated if it fails or refuses to produce or retain source documents in accord with federal and state law or the CMC agreements. CII ¶¶ 21, 52; FAA ¶ 21.

### B. Medi-Cal Does Not Pay a Pharmacy Claim for a Code 1 Diagnosis-Restricted Drug Without Affirmative Representations of Compliance.

5

PLAINTIFFS' MEM. OF POINTS AND AUTHORITIES IN SUPPORT OF OPPOSITION TO RITE AID CORPORATION'S MTN. TO EXCLUDE SAMPLING METHODOLOGY (ECF NOS. 128, 137, 193, 195)

1    Code 1 drugs, which are identified on the Medi-Cal Contract Drug List ("CDL") with an

2    asterisk ("*"), require prior authorization in accord with section 51003 of title 22 of the California

3    Code of Regulations (i.e., the Treatment Authorization Request ["TAR"] regulation), unless they

4    are to be used under the conditions specified in the CDL.  Cal. Code Regs. tit. 22, § 51313.3(b).

5    Complaint ¶ 38.  Before a pharmacy dispenses a Code 1 drug, and before the pharmacy can be

6    paid for that particular claim, the pharmacy must either affirmatively certify that the dispensing of

7    the drug meets the restrictions specified in the CDL or obtain prior authorization by submitting a

8    TAR to DHCS.  Cal. Code Regs. tit. 22, § 51313.3(b); 42 U.S.C. 1396r-8(d)(5).  CII ¶ 39; FAA ¶

9    39.

10    The dispensing of Code 1 drugs is also subject to prescription documentation

11    requirements. Cal. Code Regs. tit. 22, § 51476(c) ("Records of providers shall document the

12    meeting of Code 1 restrictions.").  The dispenser of a Code 1 drug is required by Medi-Cal

13    regulations to maintain readily retrievable documentation of the patient's diagnostic or clinical

14    condition information "that fulfills the Code 1 restriction," *see* Cal. Code Regs. tit. 22, §

15    51476(c)(2), and such records "shall be made at or near the time at which the service is rendered."

16    § 51476(a); *see also* § 51313.3(b).  CII ¶¶ 40, 41; FAA ¶¶ 40, 41.  Noncompliance with the

17    documentation requirements may require refunding payment for the claim.  CII ¶ 40; FAA ¶ 40.

18    When submitting claims for Code 1 drugs through CMC (electronic billing), the Medi-Cal

19    provider manual instructs as follows: "When submitting a claim using the CMC system, select '7'

20    as the submission clarification code, if the drug is subject to Code 1 restrictions and these

21    restrictions have been met."  CII ¶¶ 43-44; FAA ¶¶ 43-44.  Medi-Cal's claims processing system

22    subjects each such pharmacy claim to a series of automated edits.  To implement Code 1 drugs'

23    diagnosis[1] restrictions, Medi-Cal's fiscal intermediary has programmed Medi-Cal's claim

24    payment system to automatically deny every claim for a Code 1 drug when it is submitted for the

25    first time.  CII ¶ 45.  To get paid, the pharmacy must, after the initial denial, resubmit the claim

26    with affirmative statements of compliance with Code 1 requirements.  CII ¶ 46.  For a pharmacy

27    claim that is automatically denied because of a Code 1 diagnosis restriction, the Medi-Cal

28    _____
[1] "Diagnosis," here and throughout also refers to patient conditions.  § 51476(c)(2).

provider manual provides resubmission instructions, e.g., when a CMC billing is denied, NCPDP reject code "34" with the message "Missing or invalid submission clarification code" is displayed on the response screen.  When the pharmacy thereafter confirms that the drug is Code 1 restricted and the restrictions have been met, the pharmacy overrides the denied claim by selecting "7" as the submission clarification code.  CII ¶ 47; FAA ¶ 47.

### C.    Rite Aid's Purported Policies and Procedures Apply to All Code 1 Drugs.

Under Rite Aid's policies and procedures, a Rite Aid pharmacy associate is required to ascertain whether Code 1 requirements are met, and, if met, to complete appropriate hard copy documentation showing the patient's diagnosis, and the date, time, and name of the person consulted, and enter Rite Aid's own override codes into Rite Aid's computer based dispensing system ("system") so that the claim can be resubmitted to Medi-Cal for adjudication.  Rite Aid's system generates a Code 1 alert message providing these override codes to the pharmacy associate.  CII ¶¶ 82-83; FAA ¶¶ 82-83.  If the Code 1 requirements are not met, the pharmacy associate must contact the prescriber to determine whether to change the drug therapy to comply with Code 1 restrictions or advise that a TAR must be submitted to Medi-Cal for approval.  In either case any changes must be documented in hard copy.  CII ¶ 84; FAA ¶ 84.  Once the information concerning a Code 1 prescription has been properly documented, in addition to filing the hard copy at the store, Rite Aid's stated procedures require the pharmacy associate to rescan the document into Rite Aid's system to allow for easy retrieval.  CII ¶ 85; FAA ¶ 85.

Rite Aid explained these procedures and understanding of the Code 1 regulatory framework to all California pharmacy associates in a series of several statewide bulletins.  CII ¶¶ 89-92; FAA ¶¶ 89-92.  Rite Aid's statewide bulletins demonstrate that for each and every subject Code 1 claim the pharmacy associate must review, verify, and document that the beneficiary had the qualifying Code 1 diagnosis.  CII ¶¶ 89-92; FAA ¶¶ 89-92.

## II.    THE GOVERNMENT USES STATISTICAL SAMPLING TO DECIDE ON INTERVENTION.

### A.    The Government's Sampling Is to Estimate the Number of False Claims Related to Code 1 Diagnosis-Restricted Drugs.

Given the above facts and the tens of millions of pharmacy claims every year, *see* CII ¶

95, in determining whether intervention in the *qui tam* matter was worthy and meritorious, *see*

*United States ex rel. Lujan v. Hughes Aircraft Co.*, 67 F.3d 242, 246 (9th Cir. 1995), False Claims

Act Correction Act of 2008, S. Rep. No. 110-507, at 4 (2008), the Government used and relied on

statistical sampling "for the purposes of estimating the number of, percentage of, and total

payments associated with false claims made by Rite Aid to Medi-Cal for Code 1 drugs."  ECF

No. 204, Declaration of Emmanuel R. Salazar ("Salazar Decl."), filed concurrently herewith, Exh.

A, Expert Rep. No. 1 of Mr. Petron ("Petron Rep."), served on July 27, 2018, ¶ 10; Exh. B,

Transcript of Dep. of Roy J. Epstein ("Epstein Dep.") 84:2-22.  Specifically, given California's

understanding of the Medi-Cal provider and CMC agreements, Medi-Cal pharmacy claim

submission processes in general and in connection with Code 1 diagnosis-restricted drugs, Code

1-related and Medi-Cal pharmacy provider statutes and regulations, pharmacy board

requirements, and Rite Aid's own policies and procedures in purported compliance with Code 1

implementation (collectively, "universal facts"), as alleged in the CII and described above, the

Government has developed a sampling methodology to test whether Rite Aid's pharmacy

associate, notified with a rejection message from the submission of a subject claim, actually

performed the requisite Code 1 review, verification, and documentation that the beneficiary had

the qualifying diagnosis at the time of dispensing, before resubmitting, by use of a combination of

override codes the subject claim to Medi-Cal for payment ("the sampling objective").[2]  *See* CII ¶¶

97-106; ECF No. 128 at 4.

---

[2] In connection with the Government's sampling objective to estimate the number of false claims,
Rite Aid confounds the terms "false," "falsity," and "false claims," on one hand, with "FCA [False Claims
Act] violations," on the other.  *See, e.g.*, ECF No. 195 at 3 fn. 3.  The former is but one element of an FCA
violation.  California intends to prove materiality and scienter not by proof for each individual claim but
through universal facts, all of which would apply to *all* the claims in the sample frames.  *See* ECF No. 134
at 6-10.  Accordingly, under Plaintiffs' theories of the case, testing individual sample claims for
materiality and scienter is unnecessary.  Dr. Epstein agrees.  *See* Salazar Decl., Exh. B, Epstein Dep.,
154:8-157:6.  *See cf. United States ex rel. Wall v. Vista Hospice Care, Inc.*, 2016 U.S. Dist. LEXIS 80160
at *37, fn. 100 ("Extrapolation from sampling may also be appropriate where the evidence establishes that
a defendant's objective approach was similar in all cases, making the sample a reasonable basis for
extrapolation to the whole.").

**B.   The Investigation Expands from a Small Subset of Claims to the Current Claims Universes.**

Bearing the sampling objective in mind, the Government asked DHCS to pull a subset of paid claims identified by "a rules-based software program" called "Symmetry."  ECF No. 39-1, Decl. of Bernice L. Louie Yew in Support of California's Ex Parte Mtn. for Ext. of Time to Consider Intervention and to Retain Statutory Seal ("Yew Decl.") ¶ 5; Salazar Decl., Exh. C, Petron Dep. 32:4-12.  Symmetry is a third-party software that "takes characteristics of Medi-Cal claims and can output high-risk [outlier] claims," which, here, were "claims where a drug [had] been prescribed to a particular beneficiary whose claim history [did] not support the use of the prescribed drug."  Salazar Decl., Exh. A, Petron Rep. ¶ 13; Exh. C, Petron Dep. 32:4-12.  The Symmetry output consisted of 10,810 such paid Fee-For-Service ("FFS") pharmacy claims submitted by Rite Aid for Code 1 diagnosis-restricted drugs without a TAR and for dates of service ("DOS") for the preceding four full years, i.e., 2010 to 2013.[3]  Salazar Decl., Exh. D, Resp. to Interrog., served on July 27, 2018, 14:13-21; Exh. E, Declaration of Marilyn Meixner ("Meixner Decl."), filed concurrently herewith, ¶ 4.  The Government then probed a random sample from the Symmetry data pull, by reviewing Rite Aid's pharmacy records and prescribers' medical records connected to the probe Symmetry sample claims.  ECF No. 39-1, Yew Decl. ¶¶ 5-6.

After analyzing the probe Symmetry sample claims and finding a "statewide pattern of non-compliance," the Government consulted Rite Aid and Medi-Cal subject matter experts, further refined the sample testing, and broadened the subset of potentially affected claims.  ECF No. 46-1, Yew Decl. ¶¶ 5-7 ("Specifically, California . . . collaborated with [DHCS] to address the effects of the Medi-Cal Program's claims processing system that affected the sampling, as well as

---

[3] In outputting the subset of 10,810 claims in 2014, Symmetry ran its rules-based program through the then-existing paid Medi-Cal claims data for the preceding four full years.  If we were to run Symmetry today, Symmetry can only scan paid claims data for the years 2015 through 2018.  Because the Medi-Cal claims databases are not static and Medi-Cal claim submissions, including those for medical, pharmacy, and laboratory services, among other types of services, are too voluminous, *see* Salazar Decl., Exh. E, Meixner Decl. ¶ 8, replicating the original Symmetry data pull in 2014 would be laborious and expensive, if not impossible.  Salazar Decl., Exh. C, Petron Dep. 246:3-19.

9

to address the concerns defendant raised.").  California thereafter ran a data query from the Medi-Cal claims database with the following pertinent criteria:

| DOS | 2007 to 2012 |
|-----|--------------|
| Program Code | 9 (Medi-Cal Fee-For-Service) |
| Last Positive Claim Indicator | Yes |
| Code 1 Indicator | Yes |
| TAR Control Number | 00000000000 |
| Billing Providers | Rite Aid% or Thrifty Payless% or RiteAid% or ThriftyDrug% |

Salazar Decl., Exh. D, Resp. to Interrog. 15:1-10; Exh. E, Meixner Decl. ¶ 5.  In 2015, California ran the same data query except this time for DOS 2013 to 2014.  Salazar Decl., Exh. E, Meixner Decl., ¶ 5.  The combined output resulted to more than 3.8 million claims.  *Id.*

Because not all the 3.8 million claims for the dispensing of Code 1 drugs had diagnosis restrictions, *see id.*, Salazar Decl., Exh. C, Petron Dep. 73:18-75:15, the Government further consulted with DHCS to identify the national drug codes ("NDCs") relevant to the Government's sampling objective.  Salazar Decl., Exh. D, Resp. to Interrog. 15:11-18.  Out of a total of 15,324 NDCs for all Code 1 drugs, the Government identified a total of 2,919 NDCs that were consistent with the sampling objective.  Salazar Decl., Exh. E, Meixner Decl., ¶ 6.

Upon consultation, DHCS also listed classes of drugs that it thought might likely be prescribed inconsistently from the CDL.  The Government separated 938 NDCs for these suspect drug classes out of the total of 2,919 NDCs and called the list "Off-Formulary."  The remaining 1,938 NDCs out of the 2,919 were grouped as "Diagnosis-Related."  Salazar Decl., Exh. C, Petron Dep. 72:8-73:11; Exh. D, Resp. to Interrog. 15:15-18.  The Government then filtered the over 3.8 million pharmacy claims with the two NDC group lists, resulting in the Diagnosis-Related and Off-Formulary universes.  Salazar Decl., Exh. D, Resp. to Interrog. 15:18-22.

**C.      The Government's Probe Sample Operations Led to California's Intervention.**

Consistent with the sampling objective and based in part on Rite Aid's legal arguments raised during the investigation, the Government elected to use stratified random sampling design.  ECF No. 46-1, Yew Decl. ¶ 6; Salazar Decl., Exh. A, Petron Rep. ¶ 16; Exh. C, Petron Dep. 87:4-

11.  The Diagnosis-Related and Off-Formulary universes were each stratified by time period into three sample frames:  The three Diagnosis-Related sample frames were sample frames "A", "B", and "C", and the three Off-Formulary sample frames were sample frames "D", "E", and "F".  Salazar Decl., Exh. A, Petron Rep. ¶ 21.

Due to its size, covered period, and "outlier" nature, the Symmetry output was grouped together to form one relatively small sample frame consisting of the original 10,810 outputted claims.  Salazar Decl., Exh. E, Meixner Decl. ¶ 4.  To avoid duplicate claims and maintain precision, all Symmetry claims that were also in the Off-Formulary or Diagnosis-Restricted universes were removed from them.  Salazar Decl., Exh. A, Petron Rep. ¶ 13.  *See also* ECF No. 201, Report No. 1 of Roy J. Epstein ("Epstein Rep.") ¶ 21 ("The claims in the three universes do not overlap.").

The Government chose a confidence level of 95% to determine the size for each sample from its corresponding sample frame.  Salazar Decl., Exh. A, Petron Rep. ¶ 18.  In summary, the time periods, sample frame sizes, and sample sizes are as follows:

| Sample Frame | Time Period | Sample Frame Size | Sample Size |
|---|---|---|---|
| A | 1/1/2007 to 6/30/2010 | 121,735 | 383 |
| B | 7/1/2010 to 6/30/2013 | 137,243 | 296 |
| C | 7/1/2013 to 12/31/2014 | 41,098 | 88 |
| D | 1/1/2007 to 6/30/2010 | 69,880 | 383 |
| E | 7/1/2010 to 6/30/2013 | 92,883 | 285 |
| F | 7/1/2013 to 12/31/2014 | 31,996 | 98 |
| S | 1/1/2010 to 12/31/2013 | 10,810 | 371 |
| Total | | 505,645 | 1,904 |

Salazar Decl., Exh. A, Petron Rep. ¶¶ 14, 21; Exh. D, Resp. to Interrog. 15:23-27; Exh. E, Meixner Decl. ¶ 7.

The final step was sample selection.  To select the claims to comprise the sample from each sample frame, the Government used the U.S. Office of Inspector General-approved software, RAT-STATS, to generate the random numbers.  Salazar Decl., Exh. A, Petron Rep. ¶ 21.

In 2015, the Government informed Rite Aid about the refined sampling methodology and proposed testing of sample claims.  ECF No. 46-1, Yew Decl. ¶ 7.  Consistent throughout, the

1  sample testing would collect and review Rite Aid pharmacy records and prescribers' medical

2  records connected to the sample claims.  *Id.*  In 2015 and 2016, the Government tested additional

3  sample claims and discussed its findings with Rite Aid.  ECF No. 47-1, Yew Decl. ¶¶ 5-6; ECF

4  No. 49-1, Yew Decl. ¶¶ 4-5; ECF No. 52-1, Yew Decl. ¶ 7; ECF No. 58-1, Yew Decl. ¶¶ 8-10.

5  Settlement discussions failing, on May 11, 2017, California filed its Notice of Partial

6  Intervention, ECF No. 69, and on September 21, 2017, California filed its CII, ECF No. 75,

7  which Relator adopted by reference in his Amended Complaint.  ECF No. 134 at 2.

8  **PROCEDURAL BACKGROUND**

9  On May, 29, 2018, the Court issued a Status (Pretrial Scheduling) Order, ECF No. 128,

10  adopting the parties' request to conduct discovery in phases.  *Id.* at pp. 3-4.  The first phase of

11  discovery was to address statistical sampling, and the second phase of discovery would address

12  all other discovery.  *Id.* at pp. 4-5.

13  In connection with the first phase of discovery (statistical sampling), the Court stated:

14
15  Plaintiffs believe the total universe of paid Rite Aid claims for Code 1 diagnosis-
    restricted drugs from 2007 through 2014 is more than 490,000 claims.  To prove
    Rite Aid's liability and damages, the plaintiffs **[A]** will rely in part upon a
16  statistically valid, random *sample* of approximately 1,904 claims for Code 1
    diagnosis-restricted drugs and **[B]** will use Rite Aid's pharmacy records, or the
    absence thereof, and the prescriber's medical records as the evidentiary basis from
17  which an expert will extrapolate the total number of false claims in the universe of
    490,000 claims, plus the total amount of damages believed to have been suffered
18  by California and the United States.
19

20  [ ]

21  At the earliest feasible point during this stage of discovery, plaintiffs will make
    disclosures concerning their statistics experts and the design of the statistical
22  *sample* so that Rite Aid can conduct discovery concerning the same.  Rite Aid
    will file any motions directed toward the viability of statistical *sample* during this
23  stage of discovery so that preparation of the case for trial will not be significantly
    delayed if it becomes necessary to *redraw* the statistical *sample*.
24

25  ECF No. 128 at pp. 4-5 (added or omitted material in brackets; italics added).

26  On July 27, 2018, California served the Petron Report and materials, which explained the

27  features of the sampling methodology completed by the Government, namely the sampling

28  objective, population, sample frames, sampling unit, sample design, sample size, and sample

1  selection.  Salazar Decl., Exh. A, Petron Rep. ¶¶ 10, 12-19, 21.  The Petron Report concluded that

2  the Government's sampling methodology completed thus far is valid and should reliably meet the

3  sampling objective, ¶ 23, while reserving for a future report "all remaining sampling procedures"

4  as well as "estimates and other statistics resulting from this sample."  ¶ 24.  Also on July 27,

5  2018, California served its verified Responses to Interrogatories that provided additional details

6  regarding the sampling features and the persons involved.  Salazar Decl., Exh. D, Resp. to

7  Interrog. 2:25 to 4:7, 5:16-21, 14:3 to 16:21.

8        Overall, the Petron Report, materials, and discovery responses, thus far, are all about

9  subject matter **[A]** of the case scheduling order, i.e., the methodology employed in reaching a

10  "statistically valid, random sample of approximately 1,904 claims for Code 1 diagnosis-restricted

11  drugs."  *See* ECF No. 128 at 5.  Because Rite Aid has not completed producing pharmacy records,

12  California has not and cannot yet serve reports and materials relating to subject matter **[B]**, i.e.,

13  "Rite Aid's pharmacy records . . . and prescribers' medical records as the *evidentiary* basis from

14  which an expert will extrapolate the total number of false claims in the universe of 490,000

15  claims, plus the total amount of damages believed to have been suffered by California and the

16  United States."  *See* ECF No. 128 at 5 (italics added).  California will serve such reports and

17  materials upon completion of data collection, analysis, and estimation.  Salazar Decl., Exh. A,

18  Petron Rep. ¶ 24; Exh. D, Resp. to Interrog. 2:25 to 3:3, 5:16-21, 17:21 to 18:25.  *See generally*

19  Särndal, Swensson & Wretman, *Model Assisted Survey Sampling* 4-5, 14-15, 601 (New York:

20  Springer-Verlag) (1992) (cited sections available in Salazar Decl., Exh. F).

21        Now before the Court is Rite Aid's motion to exclude Plaintiffs' sampling methodology.

22  ECF Nos. 128 at 5, 193 at 2, 195.

23                    **ADMISSIBILITY OF EXPERT OPINION**

24        Federal Rule of Evidence 702 governs the admissibility of expert testimony.  Rule 702

25  states:

26        A witness who is qualified as an expert by knowledge, skill, experience, training, or
           education may testify in the form of an opinion or otherwise if:

27           (a)    the expert's scientific, technical, or other specialized knowledge will
                     help the trier of fact to understand the evidence or to determine a fact in

28                     issue;

13

(b)   the testimony is based on sufficient facts or data;
(c)   the testimony is the product of reliable principles and methods; and
(d)   the expert has reliably applied the principles and methods to the facts of
      the case.

Fed. R. Evid. 702.  In applying Rule 702, the Court functions as a gatekeeper, determining by preponderance of the evidence that the expert testimony "both rests on a reliable foundation and is relevant to the task at hand."  *Daubert v. Merrell Dow Pharms. Inc.* ("*Daubert I*"), 509 U.S. 579, 592, 597 (1993); *Mukhtar v. Cal. State Univ.*, 299 F.3d 1053, 1063-64 (9th Cir. 2002).  This two-step assessment requires consideration of whether (1) the reasoning or methodology underlying the testimony is scientifically valid (the reliability prong); and (2) whether the reasoning or methodology properly can be applied to the facts in issue (the relevancy prong).  *Id.* at 592-93; *Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1228 (9th Cir. 1998).

In testing reliability, the Supreme Court outlined a non-exhaustive list of factors, but the inquiry remains flexible.  *Daubert I* at 594.  "Daubert's list of specific factors neither necessarily nor exclusively applies to all experts or in every case.  Rather, the law grants a district court the same broad latitude when it decides how to determine reliability as [the Court] enjoys in respect to its ultimate reliability determination."  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141-142 (1999).  Furthermore, the inquiry focuses on the principles and methodology underlying an expert's testimony, not on the expert's conclusions.  *Daubert*, 509 U.S. at 595.

Meanwhile, the relevancy, or "fit," prong requires that the testimony "logically advances a material aspect of the proposing party's case."  *Daubert v. Merrell Dow Pharms., Inc.* ("*Daubert II*"), 43 F.3d 1311, 1315 (9th Cir. 1995).  Relevancy requires opinions that would assist the trier of fact in reaching a conclusion necessary to the case.  *See Kennedy*, 161 F.3d at 1230.  Given these rules, we now turn to each feature of the Government's sampling methodology.

## ARGUMENT

### I.   THE STATUS OF THE LITIGATION AND DISCOVERY SHOULD HAVE NO EFFECT ON SAMPLING VALIDITY.

Phased discovery in this case was aimed to obtain an early ruling on whether Plaintiffs have to resample.  ECF No. 128 at 5.  Despite our formal discovery requests and repeated meet-and-

1  confer efforts, Rite Aid has not completed production of relevant pharmacy records.[4]  We

2  therefore cannot complete our data collection and analysis until Rite Aid completes its production

3  of responsive pharmacy records.  Accordingly, the scope of opinions in the July 2018 Petron

4  Report was expressly and necessarily limited to the Government's sampling methodology,

5  namely, with respect to the sampling objective, population, sampling unit, sample frame,

6  sampling design, and sample selection, all to answer the question as to whether we need to

7  resample.[5]  Salazar Decl., Exh. A, Petron Rep. ¶¶ 10, 11, 17, 20.  *See In re Countrywide Fin.*

8  *Corp. Mortgage-Backed Secs. Litig. v. Countrywide Fin. Corp.* ("*Countrywide*"), 984 F. Supp. 2d

9  1021, 1031, 1034, 1037 (C.D. Cal. 2013) (finding the expert opinion on the completed sampling

10  methodology admissible and reserving decision on the admissibility of the extrapolation

11  methodology when plaintiff provides the extrapolation report); *United States ex rel. El-Amin v.*

12  *George Washington Univ.,* 533 F. Supp. 2d 12, 19 (D.D.C. 2008) (ruling on motions in limine to

13  resolve specific evidentiary issues in advance of trial); *United States ex rel. Martin v. Life Care*

14  *Ctrs. of Am.*, Inc., 114 F. Supp. 3d 549, 555-556 (E.D. Tenn. 2014) (court finding it can resolve

15  issue of whether statistical sampling may be used to prove the number of false claims in an FCA

16  action given there were no disputes as to material facts relevant to the issue)*; see generally* U.S.

17  Government Accountability Office ("GAO"), *Using Statistical Sampling* 109 (May 1992),

18  https://www.gao.gov/assets/80/76112.pdf (last visited May 5, 2019) ("Sampling is the precursor

19  to data collection.").

20

21

---

22  [4] Since October 2017, California has asked Rite Aid to produce all documents relating to "patient information," "drug information," and "dispensing information" related to the sample claims.  To date, Rite Aid has not completed document production and refuses to produce further documents relating to "patient medication histories."  *See* Salazar Decl., Exh. G, California's Early Rule 34 Requests for Production of Documents ("RFP"); Exh. H, California's RFP No. 2; Exh. I, California's RFP No. 15; Exh. J, California's RFP No. 16; Exh. L, email thread among counsel relating to status of pharmacy record production.

25  [5] Confusing litigation-related issues with sampling validity, Rite Aid asserts that the Government has violated "total survey design."  ECF No. 195 at 9-10.  This is wrong.  As stated above, California will provide future reports on measurement and extrapolation.  ECF No. 128 at 4; Salazar Decl., Exh. A, Petron Rep. ¶¶ 7, 24; Exh. C, Petron Dep. 105:25 to 106:14; Exh. D, Resp. to Interrog., 2:25 to 3:3, 5:16-21, 17:21 to 18:25.  For the same reasons, Rite Aid's arguments about "determinations of falsity" and "measurement," ECF No. 195 at 12-15, are likewise premature.

28

PLAINTIFFS' MEM. OF POINTS AND AUTHORITIES IN SUPPORT OF OPPOSITION TO RITE AID
CORPORATION'S MTN. TO EXCLUDE SAMPLING METHODOLOGY (ECF NOS. 128, 137, 193, 195)

Having clarified the intended scope of the Petron Report, as we will explain below, Mr. Petron and Dr. Epstein fundamentally agree that consistent with the sampling objective the Government's sampling methodology is valid.[6]  It, therefore, is admissible.  The parties do not need to resample and should now focus on completing the remaining steps of sample operations, i.e., data collection, analysis, and estimation.  Salazar Decl., Exh. A, Petron Rep. ¶ 20.

## II.   THE GOVERNMENT'S SAMPLING METHODOLOGY IS VALID AND ADMISSIBLE.

The relevant features of the Government's sampling methodology are (A) identifying the sampling objective, (B) defining the population, (C) identifying the sampling unit, (D) creating the sampling frames, (E) choosing a sampling design, and (F) selecting the sample units.  Salazar Decl., Exh. A, Petron Rep. ¶¶ 10, 11, 17, 20; *see also* Cal. Code Regs., tit. 22 § 51458.2(b) ("Probability sampling shall be done in conformance with generally accepted statistical standards and procedures described in any textbook on statistical sampling methods"); *see generally* Särndal, et al., *Model Assisted Survey Sampling* 4-5, 19; Cochran, William, *Sampling Techniques* 4-8 (John Wiley & Sons 3rd ed.) (1977) (cited chapters available in Salazar Decl., Exh. M).

### A.   The Sampling Objective Is to Determine Whether Rite Aid Performed the Requisite Code 1 Review, Verification, and Documentation When It Overrode the Initial Claim Denial for a Code 1 Diagnosis-Restricted Drug.

The first step in any statistical sampling is to identify the objective.  "Without this, it is easy in a complex survey to forget the objectives when engrossed in the details of planning, and to make decisions that are at variance with the objectives."  Cochran, *Sampling Techniques* 5.  Both statistical experts agree that California's objective is to estimate the number of "false claims." *See* Salazar Decl., Exh. A, Petron Rep. ¶ 10; Exh. B, Epstein Dep. 87:2-17.  The parties, however, diverge on the legal definition of "false claims."

Based on the universal facts, California defined "false claims" in this matter and for purposes of its sampling methodology as Rite Aid's failure to review, verify, and document that the beneficiary had a qualifying Code 1 diagnosis when it submitted a subject claim for payment

---

[6] Dr. Epstein also agrees statistical sampling is necessary and appropriate in this matter.  Salazar Decl., Exh. B, Epstein Dep., 26:2-5, 236:7-16 ("[I]f you're trying to characterize something like 500,000 claims, you probably have to use a sampling methodology of some sort, because life is not long enough to go through 500,000 claims.").  *See also Ratanasen v. California Dep't of Health Servs.*, 11 F.3d 1467, 1471 (9th Cir. 1993) (finding statistics as an effective means of detecting fraud).

1    using override codes.  CII ¶¶ 98-107.  In contrast, Rite Aid's definition would like to disregard all

2    universal facts and rely solely on its misguided legal interpretation of section 51476(c)(2).  ECF

3    No. 195 at 16.  To uphold Rite Aid's definition of "false claims," the Court must first wholly

4    ignore the universal facts.  This Court, however, having considered the universal facts in denying

5    Rite Aid's motion to dismiss, has concluded that "Rite Aid's submission of claims with override

6    codes, representing Code 1 requirements were met when Code 1 review was not performed,

7    entailed the making of 'explicit lies in a claim for payment.'  CII ¶¶ 107-11.  These allegations,

8    taken together, sufficiently allege factually false claims made by Rite Aid."  ECF No. 134 at 5.

9        Nonetheless, Rite Aid argues that section 51476(c) "does not impose <u>any</u> requirement that

10   pharmacists 'perform a Code 1 review.'"  ECF No. 195 at fn. 16 (underline in original).  This

11   restates a legal argument that Rite Aid previously raised and the Court already rejected.  As the

12   Court would put it, "Without that [review], Rite Aid as a 'dispenser' could not have possibly

13   'maintained readily retrievable documentation of the patient's diagnostic or clinical condition

14   information that fulfills the Code 1 restriction.'"  ECF No. 134 at 13 (explaining § 51476(c)(2) in

15   connection with pharmacy-associate's diagnosis notations).

16       The Court has correctly summarized what constitutes false claims in this matter, and it is

17   accurately reflected in California's sampling objective.  Bearing the sampling objective in mind,[7]

18   *see* Cochran, *Sampling Techniques* 5, we now discuss the features of California's sampling

19   methodology.

20       **B.    The Overall Universe Consists of the Symmetry, Off-Formulary, and
              Diagnosis-Related Sample Frames.**

21       We have discussed in section II. in the Factual Background section above the

22   particularized details of the Government's methodology in creating the universes and sample

23   frames.  As to this feature, Rite Aid seeks to exclude the sampling methodology based on two

24

25       [7] Dr. Epstein did not consider California's sampling objective when he reviewed California's
     sampling methodology.  *See* Salazar Decl., Exh. B, Epstein Dep. 18:6-18, 56:2-57:14, 59:13-25, 60:1-4,

26   12-18, 20-22, 61:17-19, 62:7-63:12, 187:1-17, 207:22-25, 208:1-4, 10-17, 209:20-210:8, 210:9-211:5,
     211:10-12, 211:24-215:10.  He instead followed Rite Aid's misguided legal interpretation, i.e., he

27   deliberately ignored the universal facts and interpreted section 51476(c)(2) wrongly, in isolation, and out
     of context, *see id.*, thereby rendering his opinion unreliable.  *See also* ECF No. 204, Pls.' Mtn. to Exclude

28   Portions of Expert Rep. and Test. of Dr. Epstein, filed concurrently herewith, at 13-18.

17

1    grounds.  One, it claims it did not obtain additional information regarding "why or how certain

2    NDCs were excluded" in creating the Off-Formulary and Diagnosis-Related universes, and two, it

3    could not replicate the original Symmetry data pull in creating the Symmetry universe.  ECF No.

4    195 at 6-7.  These contentions lack merit.

5         First, Rite Aid does not explain the need for and any prejudice sustained as a result of

6    either contention.  Dr. Epstein does not opine that the sampling methodology is invalid based on

7    Rite Aid's claimed lack of information or inability to replicate the Symmetry data pull.  As Dr.

8    Epstein stated, "Anybody is free to pick a universe.  The question is – what inferences do you

9    draw in that universe."  Salazar Decl., Exh. B, Epstein Dep. 135:1-23.

10        Here, the sampling objective is to estimate the number of false claims out of the sample

11   frames.  Any estimation of the number of false claims will be based on a reliable extrapolation of

12   findings within a sample *only* to its corresponding sample frame.  Salazar Decl., Exh. C, Petron

13   Dep. 236:6-24, 238:15-239:1; *see United States v. Pena*, 532 Fed. Appx. 517, 520 (5th Cir. 2013)

14   ("[T]he essence of inferential statistics is that one may confidently draw inferences about the

15   whole from a representative sample of the whole.").  No extrapolation therefore will extend to

16   claims for NDCs not included in the definition of the Off-Formulary and Diagnosis-Related

17   universes.  *See* Salazar Decl., Exh. C, Petron Dep. 236:6-24, 238:15-239:1.  Nor will there be a

18   statistical extrapolation to Rite Aid's "generalized business practices," as Rite Aid posits.  *Id.*.;

19   ECF No. 195 at fn. 8.  *See cf.* Salazar Decl., Exh. B, Epstein Dep. 178:15-179:2, 181:15-23

20   (failing to consider the claims universes are for Medi-Cal Fee-for-Service claims).

21        Moreover, the selection of the NDCs in creating the Off-Formulary and Diagnosis-Related

22   universes was born of the essential need to choose a universe relevant to the sampling objective,

23   the extreme volume of claims, and the Government's scarce resources.  *See, e.g., Superior Home*

24   *Health Servs. LLC v. Azar*, 2018 U.S. Dist. LEXIS 130519 at *15-16 (W.D. Tex. 2018) (allowing

25   government flexibility in choosing sampling frames given the large number of claims).  There is

26   no fatal flaw with the Government's process in creating the sample frames that would warrant

27

28

PLAINTIFFS' MEM. OF POINTS AND AUTHORITIES IN SUPPORT OF OPPOSITION TO RITE AID
CORPORATION'S MTN. TO EXCLUDE SAMPLING METHODOLOGY (ECF NOS. 128, 137, 193, 195)

1    excluding the sampling methodology.[8]  *Cf. Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d

2    1252, 1263 (9th Cir. 2001) (claimed defects regarding methodology and survey design go to the

3    weight of the survey rather than its admissibility).

4         Rite Aid's contention based on the inherent inability to replicate the Symmetry data pull is

5    similarly baseless.  Findings from the Symmetry sample again will be extrapolated only to the

6    relatively small Symmetry sample frame.  Moreover, the Medi-Cal claim database containing

7    hundreds of millions of claims is not static.  Replication of the Symmetry data pull created five

8    years ago therefore would be laborious and expensive, cost of which would likely exceed the

9    reimbursement amount for all 10,810 claims totaling $1,133,652.92.  *See infra* at fn. 3.

10   Furthermore, Rite Aid had the opportunity to replicate the Symmetry data pull in 2014 but never

11   asked.  *See* ECF No. 46-1, Yew Decl. ¶¶ 5-7.

12        In sum, Rite Aid's challenges based on claimed lack of additional information and

13   inability to replicate the Symmetry universe do not invalidate the Government's sampling

14   methodology.  The Court should therefore deny the motion.  *Cf. Clicks Billiards, Inc.*, 251 F.3d at

15   1263 (challenge relates to weight rather than admissibility).

16        **C.    The Sampling Unit Is an Individual Claim for the Dispensing of a Code 1
               Diagnosis-Restricted Drug That Was Paid Because of Rite Aid's Use of**
17             **Claim Override Codes.**

18        Next, "[t]he definition of the sampling unit must be considered in the light of the test

19   objective.  For instance, if the objective of the test is to determine the frequency with which

20   disbursement vouchers occur without proper authorizing signature, the *voucher* itself becomes the

21   sampling unit, and the presence or absence of the signature, the characteristic measured."  Arkin,

22

23   _____

24        [8] The report, materials, and responses California produced to Rite Aid were sufficient to show the
     critical features of the sampling methodology and its validity.  On July 27, 2018, California identified the
25   third parties and their involvement in the creation of the universes.  Salazar Decl., Exh. D, Resp. to
     Interrog. 14:1-16:21.  Rite Aid had expressed its purported plan to depose the third parties last year, *see*
26   ECF No. 148 at 10:7-11, but did not follow through.  Salazar Decl., Exh. N, Declaration of Grant Lien
     ("Lien Decl.") ¶¶ 5-6.  Rite Aid did not include California or Relator in its meet-and-confer
27   communications with DHCS or the United States.  Salazar Decl. ¶ 19.  This indicates that even Rite Aid
     does not believe it needs any additional information. *See also* Exh. N, Lien Decl. ¶¶ 2-4.  To fill any
28   actual, created, or perceived information gap, nonetheless, we provide the Declarations of Marco Gonzales
     and Bernice Louie L. Yew.  Salazar Decl., Exhs. O and Q.

                                                    19

Herbert, *Handbook of Sampling for Auditing and Accounting* 19 (3rd ed. New Jersey: Prentice Hall 1984) (available in ECF No. 196-4 at 12) (italics in original).

Here, the sampling objective is to estimate the number of false Code 1 diagnosis-restricted claims submitted by use of override codes without the proper review, verification, and documentation.  As such, the *claim* itself must be the sampling unit, and the presence or absence of the review, verification, and documentation, the characteristic measured.  *See id.;* Salazar Decl., Exh. A, Petron Rep. ¶ 14; Exh. B, Epstein Dep. 92:13-19.  Consistent with the sampling objective, the individual claim as the sampling unit is valid and appropriate.  Salazar Decl., Exh. A, Petron Rep. ¶¶ 14, 23; *see also* Exh. B, Epstein Dep. 92:13-19, 130:1-132:14.

**D.    Stratified Random Sampling Is a Valid Sampling Design.**

**1.    Stratified Random Sampling Is Appropriate in This Case.**

The most common sampling designs are simple random sampling, systematic sampling, stratified sampling, and cluster sampling, or a combination of these.  *San Bois Health Servs. v. Hargan*, 2017 U.S. Dist. LEXIS 183406 (E.D. Okla. 2017) (citing Medicare Program Integrity Manual ("MPIM") Chap. 8, § 8.4.4.1, the March 2018 version of which is attached as Salazar Decl., Exh. P).  Stratified random sampling is where a universe is divided into relatively homogenous groups called "strata," and draws a random sample separately from each stratum.  Fed. Jud. Ctr., *Ref. Manual on Sci. Evid.* 299 (3rd ed. 2011).  It is a common, well-researched, and established sampling design.  Salazar Decl., Exh. A, Petron Rep. ¶ 16; Cochran, *Sampling Techniques* 89-90.  Its main objective is to lower the margin of error.  *See Countrywide*, 984 F. Supp. 2d at 1036.

Given the facts in creating the universes and the arguments Rite Aid raised during the investigation, the Government determined that stratified random sampling would be appropriate.  Salazar Decl., Exh. A., Petron Rep. ¶ 16.  Because of the varying likelihoods of finding a "false claim" within each grouping, the Government kept separate the Symmetry ("outliers"), Off-Formulary ("likely potential"), and Diagnosis-Related (remainder) universes.  Moreover, factoring defenses Rite Aid raised during the investigation, the Government stratified the Off-Formulary and Diagnosis-Related universes to three time periods, resulting to the six sample

frames "A" to "F".  This stratification maintains precision as any extrapolation from a sample would be limited to each independent, non-overlapping sample frame.

### 2.   Rite Aid's "Sampling Design" Challenge Is Really about Measurement of False Claims, Not Sampling of Claims.

Rite Aid's only *substantive* statistical challenge against the sampling methodology actually has nothing to do with *sampling*.  In fact, Dr. Epstein does not at all suggest we resample.  He stated that if he were to "recast [the] analysis," he "would take the random numbers generated – or, I guess, used by Mr. Petron and use those random numbers to go back to a particular prescription, which would then identify a particular patient.  You – you can do that with the sample."  Salazar Decl., Exh. B, Epstein Dep. 192:19-193:22.  In other words, Dr. Epstein would still use the Government's random numbers generated in the final step in its sampling methodology.  *Infra* at 8.  He evidently has no issue with the *sampling features* the Government has completed.[9]

Rather, his principal concern relates to the *measurement* (or "sample testing") of claims.  He "suggests" that the Government should include "patients' claim histories, i.e., cluster sampling" in assessing which sample claims are false.  ECF No. 195 at 11-14; Salazar Decl., Exh. B, Epstein Dep. 26:13-27:3, 185:2-5, 185:14-186:5, 199:9-203:6, 227:15-228:2.  Rite Aid, however, then takes Dr. Epstein's suggestion and argues that Plaintiffs' failure to account for measurement error makes the Government's sampling methodology inadmissible.  ECF No. 195 at 13-14.  This argument fails.

---

[9] In its motion, Rite Aid cites the March 2018 edition of the MPIM Chapter 8 and confuses the term "cluster sampling" as a sampling design with "cluster of data points" used to assess whether the sample claim is false.  ECF No. 195 at 11.  According to the edition of the MPIM Chapter 8 which Rite Aid cites, ECF No. 195 at 11, in choosing a sampling design, the use of either stratified random sampling and/or cluster sampling will produce valid results when done correctly.  Salazar Decl., Exh. P, MPIM Chap. 8, § 8.4.4.1.4.  *See also Transyd Enters., LLC v. Sebelius*, 2012 U.S. Dist. LEXIS 42491 at *16 (S.D. Tex. 2012) ("[T]he MPIM does not prescribe any particular sampling design, but notes that any design that results in a probability sample, including … stratified sampling, or cluster sampling is acceptable.").  The Government having followed the rules of probability sampling, Salazar Decl., Exh. A, Petron Rep. ¶¶ 15, 19, 22, 23, the Court should thus find the stratified random sampling design here is valid.

1    First, Dr. Epstein's measurement criteria is at odds with the Government's sampling

2    objective and relies upon a misguided legal interpretation of section 51476(c)(2).  *Infra* at 14, fn.

3    7; ECF No. 204, Pls' Mtn. to Exclude Portions of Exp. Rep. and Test. of Def.'s Expert.

4    Second, his opinion on measurement error is premature.  Under the concept of total survey

5    design, "survey operations" include the following stages: (1) sample selection, (2) data collection,

6    and (3) data processing.  Salazar Decl., Exh. A, Petron Rep. ¶ 20; Särndal, et al., *Model Assisted*

7    *Survey Sampling* 601.  "The term measurement errors [] denotes those errors in individual data

8    that occur during the data collection stage.  By 'error' we mean that the recorded value on a study

9    variable for a sampled element differs from the true value."  *Id.*  With data collection, data

10   processing, and analysis still ongoing, *see infra* at footnote 5, Plaintiffs have not been able to

11   finalize our findings and therefore cannot yet account for measurement error.  In this vein, Rite

12   Aid may not, on one hand, delay discovery of purportedly exonerating records, and on the other

13   hand, use our inability to finish data collection and analysis to challenge the validity of the

14   sampling methodology.

15   Moreover, Rite Aid's concern here does not involve statistics.  Neither statistical expert can

16   properly opine on what pharmacy records would be relevant and admissible in assessing which

17   sample claims are false.[10]  *See* Salazar Decl., Exh. B, Epstein Dep. 121:1-8; Exh. C, Petron Dep.

18   147:2-12, 247:21-248:2.  These evidentiary disputes may be raised in future motions in limine but

19   are not pertinent to the instant motion.

20   Finally, litigation is expensive.  Plaintiffs do not want to provide tentative and incomplete

21   results to our statistical expert every time Rite Aid serves us with a new rolling batch of pharmacy

22   records.  *See Countrywide*, 984 F. Supp. 2d at 1034-35 ("Litigation is expensive, and each party

23   has the discretion to decide where valuable litigation dollars are best spent.").

24   Overall, Rite Aid's challenge regarding the sampling design is unavailing.  The Court

25   therefore must find the stratified random sampling design here is appropriate and admissible.

26

27   [10] For example, from the Epstein Report, contrast page A-13, which shows no indication that links
     this pharmacy record to sample A-032 (DOS 7/12/2008, Rx # 1010425), with page A-21, which, subject to
     further confirmation through discovery, *seems* to indicate that an earlier prescription record (DOS
28   6/11/2009, Rx # 583884) was linked to sample S-150 (DOS 9/16/10, Rx # 674945).

**E.     The Sample Sizes Are Adequate.**

Both experts agree the sample sizes from each sample frames are adequate.  Salazar Decl., Exh. A, Petron Rep. ¶¶ 17, 19 ("The sample sizes selected should be large enough to produce reliable estimates."); Exh. B, Epstein Dep., 153:7-154:7 ("[T]he sample here, which is the 15- or 1600 from the Diagnostic and Off Formulary universes and the balance from the Symmetry – those sample sizes are probably large enough to make inferences about falsity.").

**F.     The Samples Are Representative of the Sample Frames.**

Last but not least, Dr. Epstein found the samples randomly selected are representative of the corresponding sample frames.  Salazar Decl., Exh. B, Epstein Dep., 108:18-22, 110:1-10.  The Government's sample selection for all seven sample frames, therefore, is valid.  *See* GAO, *Using Statistical Sampling* 14 ("Representativeness: The Goal of Statistical Sampling"); *Ref. Manual on Sci. Evid.* 230 ("It is randomness in the technical sense that provides assurance of unbiased estimates from … a probability sample.").

**CONCLUSION**

Plaintiffs have shown that the features of the Government's sampling methodology are valid, reliable, and therefore admissible.  The Court thus must deny Rite Aid's motion.

Dated:  May 15, 2019                             Respectfully submitted,

                                                 XAVIER BECERRA
                                                 Attorney General of California

                                                 /S/ EMMANUEL R. SALAZAR
                                                 EMMANUEL R. SALAZAR
                                                 Deputy Attorney General
                                                 *Attorneys for Plaintiff State of California*


                                                 BARTLETT BARROW LLP

                                                 /s/ Brian P. Barrow
                                                 BRIAN P. BARROW
                                                 *Attorneys for Relator Loyd F. Schmuckley, Jr.*

23

1

**PROOF OF SERVICE OF DOCUMENT**

2

I am over the age of 18 and not a party to this action.  My business address is:  2329 Gateway Oaks Drive, Suite 200, Sacramento, CA 95833.

3

A true and correct copy of the foregoing document entitled:

4

5

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF OPPOSITION TO RITE AID CORPORATION'S MOTION TO EXCLUDE SAMPLING METHODOLOGY (ECF NOS. 128, 137, 193, 195)**

6

7

was served in the manner stated below:

8

**SERVED BY CM/ECF SERVICE**:  Pursuant to Fed. R. Civ. P. 5(b)(2)(E) and Local Rule 135, on 5/15/2019, I served the following persons and/or entities by the Court's CM/ECF service:

9

10

Eric W. Sitarchuk                       Michael L. Armitage
Kelly A. Moore                         Wm. Paul Lawrence

11

Benjamin P. Smith                      Charles S. Segal
Michael Q. Eagan                       c/o Waters & Kraus

12

Morgan, Lewis & Bockius, LLP           37163 Mountville Rd.
One Market, Spear Street Tower         Middleburg, VA 20117

13

San Francisco, CA 94105-1596

14

Catherine J. Swann                     Jennifer L. Bartlett

15

United States Attorney's Office        Brian P. Barrow
501 I Street, Suite 10-100             Bartlett Barrow LLP

16

Sacramento, CA 95814                   225 S. Lake Avenue, Suite 300
                                        Pasadena, CA 91101

17

18

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

19

20

5/15/2019              Sharon Brecht                    */s/ Sharon Brecht*

21

_____    _____

22

*Date*              *Printed Name*                    *Signature*

23

24

25

26

27

28