1  XAVIER BECERRA
   Attorney General of California
2  VINCENT DICARLO
   Supervising Deputy Attorney General
3  BERNICE L. LOUIE YEW, State Bar No. 114601
   Deputy Attorney General
4  E-mail:  Bernice.Yew@doj.ca.gov
   EMMANUEL R. SALAZAR, State Bar No. 240794
5  Deputy Attorney General
   E-mail:  Emmanuel.Salazar@doj.ca.gov
6   2329 Gateway Oaks Drive, Suite 200
    Sacramento, CA 95833-4252
7   Telephone: (916) 621-1835
    Fax:  (916) 274-2929
8
   WM. PAUL LAWRENCE, II                    BRIAN P. BARROW (SBN 177906)
9  Admitted Pro Hac Vice                    JENNIFER L. BARTLETT (SBN 183154)
   WATERS & KRAUS                           BARTLETT BARROW LLP
10 Washington D.C. Metro Office             225 S. Lake Avenue, Suite 300
   37163 Mountville Road                    Pasadena, California 91101
11 Middleburg, Virginia 20117               Telephone: (626) 432-7234
   Telephone: (540) 687-6999                brian@bartlettbarrow.com
12 plawrence@waterskraus.com                jennifer@bartlettbarrow.com

13
14                    **UNITED STATES DISTRICT COURT**

15               **FOR THE EASTERN DISTRICT OF CALIFORNIA**

16

17 UNITED STATES OF AMERICA,            Case No.: 2:12-cv-1699 KJM EFB
   and the STATE OF CALIFORNIA, et
18 al., ex rel LOYD F. SCHMUCKLEY,      **CORRECTED** ***NOTICE OF
   JR.,                                 MOTION AND MOTION TO
19                                       EXCLUDE PORTIONS OF EXPERT
                    Plaintiffs,          REPORT AND TESTIMONY OF
20                                       DEFENDANT'S EXPERT ROY J.
                    vs.                  EPSTEIN, PH.D.**

21 RITE AID CORPORATION.                [Fed. R. Evid. 702, 703]

22                    Defendant.        Date:  June 28, 2019
                                        Time:  10:00 a.m.
23                                      Ctrm:  8

24

25

26
   _____
27      * Plaintiffs are filing this version to correct the page numbers in the Table of Contents and
   Table of Authorities.

28

**TO THE COURT, ALL PARTIES, AND THEIR COUNSEL:**

    **PLEASE TAKE NOTICE** that on June 28, 2019, at 10:00 a.m. or as soon thereafter as this matter may be heard in Courtroom 8 of the above-entitled Court, located at 501 I Street, 13th Floor, Sacramento, California 95814, the State of California ("California") and relator Loyd F. Schmuckley, Jr. ("Relator," and together with California, "Plaintiffs), by and through their attorneys of record, will and hereby do move this Court for an order excluding portions of the expert report and testimony of Roy J. Epstein, Ph.D., Rite Aid's statistical expert, on whether California's proposed statistical sampling methodology is valid.  Specifically, Plaintiffs move under Federal Rules of Evidence 702 and 703, and *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 147-149, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999)*,* to exclude any of Dr. Epstein's opinions that California's proposed sampling methodology is invalid based on purported "measurement error."  Plaintiffs likewise move to exclude his opinions relating to scienter and materiality.

    This motion will be made on the grounds that Dr. Epstein does not have specialized knowledge necessary to qualify him as an expert for the specific opinions relating to "measurement error," scienter, and materiality.  His opinions are based on insufficient facts and data and on unreliable, prejudicial, and objectionable documents.  His opinions ultimately hinge on or constitute his own misguided legal interpretation of California statutes and regulation.

    This motion is based on this notice of motion, the attached memorandum of points and authorities, and such further oral and documentary evidence or argument as may be presented at the hearing.

///

///

///

///

///

1 | Dated:  May 15, 2019                    Respectfully submitted,

2 | XAVIER BECERRA
Attorney General of California

3 |

4 | /s/ Emmanuel R. Salazar
EMMANUEL R. SALAZAR

5 | Deputy Attorney General

6 | Attorneys for Plaintiff State of California

7 |

8 | BARTLETT BARROW LLP

9 | /s/ Brian P. Barrow

10 | BRIAN P. BARROW
Attorneys for Relator Loyd F. Schmuckley, Jr.

11 |

12 |

13 |

14 |

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

PLAINTIFFS' NOTICE OF MOTION AND MOTION TO EXCLUDE PORTIONS OF
EXPERT REPORT AND TESTIMONY OF DEFENDANT'S EXPERT ROY J. EPSTEIN, PH.D.

# <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES………………………………………………..............ii

INTRODUCTION ............................................................................................... 1

STATEMENT OF FACTS ................................................................................... 2

          A.     Summary of Rite Aid's Expert Report. ............................... 3

          B.     Summary of Dr. Epstein's Deposition Testimony. ............................ 4

INADMISSIBILITY OF EXPERT OPINION EVIDENCE .................................. 7

ARGUMENT ....................................................................................................... 9

I.     The Court Should Exclude Dr. Epstein's Opinions on Measurement Error Because They are Unreliable and Irrelevant. .............................. 9

          A.     Dr. Epstein's Measurement Criteria Are Unreliable Because He Does Not Have Specialized Knowledge about How to Evaluate What Is a False Claim in This Action. ................................... 9

          B.     Dr. Epstein's Measurement Criteria Are Unreliable Because They Rest on Insufficient Facts or Data. ........................... 10

          C.     Dr. Epstein's Opinions on Measurement Error Are Irrelevant Because He Relied on Unreliable, Objectionable, and Prejudicial Documents. ................................... 12

          D.     Dr. Epstein's Opinions on Measurement Error Hinges on or Constitutes a Wrong Legal Conclusion. ................................ 13

II.    Dr. Epstein's Opinion That the Methodology Is Invalid Because It Does Not Account for Scienter or Materiality Rests On Improper Legal Conclusions. ............................... 16

CONCLUSION................................................................................................ 17

# <u>TABLE OF AUTHORITIES</u>

### CASES

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*
    43 F.3d 1311 (9th Cir. 1995) ......................................................................... 7

*Daubert v. Merrell Dow Pharms.*
    509 U.S. 579 (1993) ........................................................................................ 7

*General Elec. v. Joiner*
    522 U.S. 136 (1997) .................................................................................... 8, 11

*Hangarter v. Provident Life & Acc. Ins. Co.*
    373 F.3d 998 (9th Cir. 2004.) ..................................................................... 9, 13

*Kumho Tire Co. v. Carmichael*
    526 U.S. 137 (1999) ........................................................................................ 7

*Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*
    523 F.3d 1051 (9th Cir. 2008) ....................................................................... 13

*Primiano v. Cook*
    598 F.3d 558 (9th Cir. 2010) ........................................................................... 7

*Slavkov v. Fast Water Heater Partners I, LP*
    2015 U.S. Dist. LEXIS 148369 (N.D. Cal. 2015) ........................................... 1

*United States. v. Chang*
    207 F.3d 1169 (9th Cir. 2000) ......................................................................... 9

*United States v. Grace*
    504 F.3d 745 (9th Cir. 2007) ........................................................................... 8

*United States v. Hermanek*
    289 F.3d 1076 (9th Cir. 2002) ......................................................................... 7

*United States v. Nixon*
    694 F.3d 623 (6th Cir. 2012) ......................................................................... 13

1

**STATUTES**

2

Cal. Bus. & Prof. Code, § 4024 ................................................................. 14

3

Cal. Welf. & Inst. Code § 14105.45(b) ...................................................... 14

4

False Claims Act, Cal. Gov't Code, §§ 12650-12652 ......................................*passim*

5

6

7

**REGULATIONS**

8

Cal. Code Regs., Title 22, § 51476(a) ....................................................... 14

9

Cal. Code Regs., Title 22, § 51476(c) ....................................................... 14

10

Cal. Code. Regs. Title 22, § 51476(c)(2)......................................2, 14, 15

11

12

13

**FEDERAL RULES**

14

Fed. R. Evid. 403……………………………………………………………….8

15

Fed. R. Evid. 702 ................................................................1,6, 7, 8, 13

16

Fed. R. Evid. 703 ...........................................................................1, 8

17

18

19

**OTHER AUTHORITIES**

20

Fed. Jud. Ctr., *Ref. Manual on Sci. Evid.* 227-229 (3rd ed. 2011) ............................. 1

21

22

23

24

25

26

27

28

PLAINTIFFS' NOTICE OF MOTION AND MOTION TO EXCLUDE PORTIONS OF
EXPERT REPORT AND TESTIMONY OF DEFENDANT'S EXPERT ROY J. EPSTEIN, PH.D.

**INTRODUCTION**

In its Complaint-in-Intervention ("CII," ECF No. 75), the State of California ("California") alleges that Defendant Rite Aid Corporation ("Rite Aid") submitted and received payments from Medi-Cal for approximately over 490,000 claims involving Code 1 diagnosis-restricted drugs.  California alleges that some of Rite Aid's claims were false and fraudulent, and indicated that it intended to use statistical sampling to establish the number of false claims and the associated damages under the False Claims Act ("FCA").  CII at 35.  In accordance with this Court's scheduling order, the parties began to conduct discovery with respect to California's sampling methodology.  On July 27, 2018, California served the report of its sampling methodology expert, Michael J. Petron ("Mr. Petron"), along with discovery and related materials relating to California's sampling methodology.  On November 30, 2018, Rite Aid deposed Mr. Petron, and on February 15, 2019, served the report of its own expert, Roy J. Epstein, Ph.D ("Dr. Epstein").  Relevant to this motion, Dr. Epstein opined that California's proposed sampling methodology was invalid because it contained "measurement error" due to California's failure or refusal to consider "patient medication histories."  He also opines that to prove an FCA violation, California should also prove the elements of materiality and scienter by individually analyzing sample claims for these two elements.

Pursuant to Rules 702 and 703 of the Federal Rules of Evidence and related case law, California and Relator Loyd, F. Schmuckley, Jr. (together, "Plaintiffs") move to exclude portions of Dr. Epstein's report and testimony relating to his opinion that the proposed sampling methodology is invalid because it contains "measurement error."  Preliminarily, while his criticisms are supposedly directed to the *sampling* validity, his criticisms actually are toward the *measurement* validity.  *See* Fed. Jud. Ctr., *Ref. Manual on Sci. Evid.* 227-229 (3rd ed. 2011).  Nevertheless, to reach his conclusions about "measurement error," Plaintiffs find he lacks specialized knowledge with regard to the dispensing of Code 1 drugs and

compliance with applicable pharmacy and government requirements.  He also relied upon insufficient facts and data.  His conclusions were based on his comparison of a (a) pre-litigation settlement spreadsheet from the U.S. Attorney's Office and (b) California's early tentative supplemental responses to premature contention interrogatories.  *See Slavkov v. Fast Water Heater Partners I, LP*, 2015 U.S. Dist. LEXIS 148369 at *7-8 (N.D. Cal. 2015).  His opinion ultimately is based on a misguided legal interpretation of section 51476(c)(2) of Title 22 of the California Code of Regulations.  Likewise, his opinion regarding materiality and scienter are impermissible legal opinions.

Overall, because his methodology to reach his opinions relating to measurement error, materiality, and scienter are unreliable and irrelevant, his opinions therefor are inadmissible.  The Court thus should grant Plaintiffs' motion.

## STATEMENT OF FACTS

From 2007 to 2014, Medi-Cal paid Rite Aid publicly funded monies, tens of millions of which are for dispensing Code 1 diagnosis-restricted drugs.  Based on Rite Aid's alleged failure to perform its required "gatekeeper" functions with regard to Code 1 restrictions, California alleges that some of Rite Aid's claims were false. California, in conjunction with the United States Department of Justice, developed a statistical sampling methodology to estimate, out of the over 490,000 claims made by Rite Aid to Medi-Cal for Code 1 diagnosis-restricted drugs, how many of them were false and what was their value.  Using that methodology, California selected random samples comprised of 1,904 of Rite Aid's Code 1 diagnosis-restricted claims.  Based on California's ongoing review of the sample claims, it is evident that Rite Aid frequently did not perform the required Code 1 diagnosis review, verification, and documentation before dispensing the Code 1 diagnosis-restricted drugs.

///

### A.   Summary of Rite Aid's Expert Report.

Rite Aid retained Dr. Epstein to opine on the validity of "the sampling methodology proposed by the State of California . . . in this matter."  ECF No. 201, Report No. 1 of Dr. Roy J. Epstein, PhD ("Epstein Rep.") ¶ 5.  In his report, Dr. Epstein states he "analyzed California's sampling methodology and design" and opines it "will not provide useful information for assessing the incidence or value of false claims because it fails to account for pervasive nonsampling measurement error."  Epstein Rep. ¶ 11.  Specifically, Dr. Epstein challenges California's sampling methodology because California fails to account for "all of the relevant information about a prescription and the patient who receives it," i.e., "patient medication history."  *Id.* ¶¶ 40-42.  In Dr. Epstein's opinion, these patient medication histories are especially correlated for patients with chronic conditions.  *Id.* ¶ 46.  He concludes that California's perceived failure to account for patient medication histories lead to pervasive measurement error, *id.* at ¶¶ 35, 51, therefore precluding calculations of valid confidence intervals. *Id.* ¶¶ 63-65.

Dr. Epstein bases his opinion that there was pervasive measurement error on two grounds.  First, he compared information from a spreadsheet he refers to as the "Poulson Analysis" with California's September 2018 Supplemental Responses to Rite Aid's contention interrogatories.  *Id.* at ¶¶ 51-61.  He notes that under the Poulson Analysis, various claims are listed as "Code 1 Compliant," while California nevertheless asserts, in its early tentative contention interrogatory responses, that they are false.  *Id.*  Dr. Epstein thus concludes that the differences between the Poulson Analysis and California's early tentative contention interrogatory responses are "examples of measurement error that illustrate critical deficiencies in California's methodology."  *Id.* ¶ 61.  Second, he also bases his opinions relating to measurement error on his *own* case studies of patient medication histories.  *Id.* at ¶ 62.

1    In addition to his challenges based on alleged measurement error, Dr. Epstein

2    opines that California's methodology does not account for the FCA's materiality

3    and scienter elements.  Epstein Rep. at 24.  He suggests that California must prove

4    "at least three elements to establish liability under the FCA for each claim," namely

5    "falsity," materiality, and scienter.  As Dr. Epstein puts it, "[a] complete analysis of

6    the samples should include the questions of materiality and scienter.  Proper analysis

7    of each underlying claim will merit highly factual considerations as to whether these

8    elements are met, such as a prior prescription history and diagnoses, and whether or

9    not Medi-Cal would have reimbursed for dispensing a certain drug to a sick patient

10   regardless of technical Code 1 non-compliance."  *Id.* at ¶¶ 69-72.

11       **B.    Summary of Dr. Epstein's Deposition Testimony.**

12       Dr. Epstein testified in deposition that Rite Aid asked him to evaluate the

13   "statistical validity of a sample methodology that the State of California was

14   proposing to use."  ECF No. 202, Declaration of Emmanuel R. Salazar ("Salazar

15   Decl."), filed concurrently herewith, Exh. B, Epstein Dep. 15:15-16:7.  Dr. Epstein

16   opined that, although statistical sampling is appropriate in this matter, *id.* 26:2-5,

17   236:7-16, California's proposed sampling methodology is invalid because it does

18   not take into account the patient's medication history.  *Id.* 26:13-27:3.  More

19   specifically, he testified that the methodology only looks at single prescriptions in

20   isolation rather than as part of a medication history.  *Id.* 175:11-180:12.

21       Nevertheless, he conceded that each fill of a patient's prescription constitutes

22   a single Medi-Cal claim.  *Id.* 221:2-9.  He also conceded that if a patient's

23   medication history is irrelevant, his opinion may no longer be helpful.  Dr. Epstein

24   explained that he is only suggesting a "different review," but that it is not

25   necessarily critical to validity of the sampling methodology.  *Id.* 216:10-22.  As Dr.

26   Epstein put it, "the patient history should be relevant.  If it's not relevant, then I'm

27   not sure what – how much of my report survives at that point."  *Id.* 215:11-216:1.

28

Dr. Epstein further admitted that he has only been involved in one other FCA case and has never designed any statistical sampling methodology for use in such cases:

> Q.   Have you designed any sampling methodology in False Claims Act investigations?
> A.   No.

*Id.* 66:2-4.

Dr. Epstein also acknowledged he has no background in providing opinions about falsity, materiality, or scienter in FCA cases.  *Id.* 64:2-16.  Specifically, he admitted having no background in the evidence necessary to prove falsity:

> Q.   Do you have any background in providing an opinion about evidence of falsity that parties should submit in an FCA action?
> A.   No.

*Id.* at p. 64:9-12.

Over his career, Dr. Epstein has designed only three sampling methodologies, two for purposes of determining "music use" and another to survey how much travel time home healthcare workers incurred in visiting clients.  *Id.* at pp. 64:17-65:7.  Dr. Epstein acknowledged that he has no background in pharmacy practices, drug dispensing, or the like.  As he testified:

> Q.   Do you have any background in pharmacy?
>       [Objection.]
> A.   You mean dispensing drugs?
> Q.   Yes.  Okay.
> A.   No.
> Q.   How about general pharmacy practices?
> A.   No.
> Q.   Do you have any background in pharmacy claim adjudication?
> A.   No.
> Q.   How about pharmacy drug dispensing?
> A.   No.
> Q.   How about drug dispensing computer programs?

5

| | |
|---|---|
| A. | No. |
| Q. | Do you have any background with respect to compliance with healthcare programs? |
| | [Objection.] |
| A. | No. |
| Q. | How about any background in – with respect to compliance with Government-sponsored prescription drug coverage? |
| A. | No. |
| Q. | Do you have any background in corporate audits in terms of Government compliance? |
| A. | No. |

*Id.* 62-7-63:12.

Upon his retention to offer opinions in this case, Dr. Epstein did not consult with Rite Aid about anything related to its Code 1 policies and practices or its prescription drug dispensing process.  *Id.* 59:13-25.  Likewise, he did not consult with anyone regarding pharmacy practices, claim submissions in the Medi-Cal program, or Code 1 implementation.  *Id.* 60:1-18.  He did not review any Rite Aid documents regarding its policies and practices for compliance with Code 1 regulations.  *Id.* 207:22-208:4.  He did not review any documents produced by Rite Aid identified with the Bates-stamp "RAID" (which are Rite Aid policies and procedures, *see* CII ¶¶ 89-93), did not review any Medi-Cal provider agreements or electronic claim submission agreements, and did not consider the allegations of the CII regarding pharmacy recordkeeping requirements, pharmacy claim submissions, or Rite Aid's procedures and policies regarding Code 1 drugs.  *Id.* 56:2-19; 210:9-17; 211:10-12; 212:14-215:10.  Ultimately, Dr. Epstein admitted that he has no overall understanding of Rite Aid's Code 1 drug dispensing process:

| | |
|---|---|
| Q. | Do you have an understanding of the step-by-step policies of Rite Aid in – in dispensing a diagnosis-restricted Code 1 drug? |
| A. | No. |

*Id.* 209:13-16.  Diverging from California's sampling objective, *see* ECF No. 134 at 5; ECF No. 202, Pl's Opp. to Def.'s Mtn. to Exclude Sampling Methodology, filed

1  concurrently herewith, his view is *not at all* about Rite Aid's false use of override

2  codes—the heart of this FCA action. *Id.* 219:15-21.

3              **INADMISSIBILITY OF EXPERT OPINION EVIDENCE**

4          Federal Rule of Evidence 702 disallows a person to offer opinion evidence if

5  the person is not "qualified as an expert by knowledge, skill, experience, training, or

6  education" to "help the trier of fact to understand the evidence or to determine a fact

7  in issue," if the testimony is based on insufficient facts or data, if the testimony is

8  the product of unreliable principles and methods, or if the expert has unreliably

9  applied the principles and methods to the facts of the case. *See* Fed. R. Evid. 702.

10         District judges play a "gatekeeping" role to ensure that all expert testimony,

11  scientific or otherwise, is both relevant and reliable. *Kumho Tire Co. v. Carmichael,*

12  526 U.S. 137, 147-149, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).  Expert testimony

13  must be "properly grounded, well-reasoned, and not speculative." *United States v.*

14  *Hermanek*, 289 F.3d 1076, 1094 (9th Cir. 2002) (quoting Fed. R. Evid. 702 advisory

15  comm. note (2000).)  "[T]he trial court must assure that the expert testimony 'both

16  rests on a reliable foundation and is relevant to the task at hand.'" *Primiano v.*

17  *Cook,* 598 F.3d 558, 564 (9th Cir. 2010) (quoting *Daubert v. Merrell Dow Pharms*.,

18  509 U.S. 579, 592 (1993)).

19         In *Daubert*, the Supreme Court noted that the question of relevance is whether

20  the evidence is sufficiently tied to the facts of the case that it will assist the jury in

21  resolving the issues before them.  It continued, "The consideration has been aptly

22  described as one of 'fit.'  . . .  'Fit' is not always obvious, and scientific validity for

23  one purpose is not necessarily scientific validity for other, unrelated purposes."

24  *Daubert*, 509 U.S. at 591-92.  As stated by the Ninth Circuit on remand in *Daubert*,

25           The Supreme Court recognized that the "fit" requirement "goes
             primarily to relevance," . . . but it obviously did not intend the
26           second prong of Rule 702 to be merely a reiteration of the general
             relevancy requirement of Rule 402.  In elucidating the "fit"
27           requirement, the Supreme Court noted that scientific expert

28

> testimony carries special dangers to the fact-finding process
> because it "can be both powerful and quite misleading because of
> the difficulty in evaluating it." . . . Federal judges must therefore
> exclude proffered scientific evidence under Rule 702 and 403
> unless they are convinced that it speaks clearly and directly to an
> issue in dispute in the case, and that it will not mislead the jury.

*Daubert v. Merrell Dow Pharmaceuticals*, *Inc.*, 43 F.3d 1311, 1321 n. 17 (9th Cir. 1995).

Furthermore, an expert's opinion must be based on "sufficient facts or data." Fed. R. Evid. 702(b).  "In contrast to Rule 702's holistic focus on an expert's testimony, Rule 703 governs the inquiry into the reliability of particular data underlying expert testimony."  *U.S. v. Grace,* 504 F.3d 745, 762 (9th Cir. 2007). The Rule 702(b) "facts or data" upon which the expert opinion must be based may come from the expert's personal observation, or the expert may simply be "made aware of" those facts or data.  Fed. R. Evid. 703.  The "facts or data" need not be independently admissible if those facts are of the types upon which experts in the field would reasonably rely.  *Id.*  "But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect."  *Ibid.*

Finally, the Supreme Court has cautioned that "conclusions and methodology are not entirely distinct from one another."  *General Elec. v. Joiner*, 522 U.S. 136, 146 (1997).  As such, "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."  *Id.*  Nothing in either Daubert or the Federal Rules of Evidence requires the admission of opinion evidence purportedly connected to existing data "only by the ipse dixit of the expert."  *Id.*

///

8

# ARGUMENT

## I. THE COURT SHOULD EXCLUDE DR. EPSTEIN'S OPINIONS ON MEASUREMENT ERROR BECAUSE THEY ARE UNRELIABLE AND IRRELEVANT.

In this matter, Dr. Epstein "suggests" "a different set of criteria for proving falsity, in which case you would follow something along the lines of what I have described in my report." Salazar Decl., Exh. B, Epstein Dep. 187:1-17.  Since, in his view, California is not following his measurement criteria, i.e., consider all patient medication histories, to determine false claims, ECF No. 201 at fn. 38, he finds that California's sampling methodology suffers from pervasive nonsampling measurement error.  ECF No. 201 at ¶ 10.  Because Mr. Petron purportedly did not consider the potential risk of measurement error based on Dr. Epstein's measurement criteria, Dr. Epstein concludes California's sampling methodology is invalid.  *Id.*

As explained below, Plaintiffs challenge Dr. Epstein's measurement criteria, which was his basis for finding purported measurement error, as unreliable and irrelevant.  The Court should therefore exclude Dr. Epstein's opinions relating to measurement error.

### A. Dr. Epstein's Measurement Criteria Are Unreliable Because He Does Not Have Specialized Knowledge about How to Evaluate What Is a False Claim in This Action.

While Rule 702's conception of expert qualification is broad, Dr. Epstein does not have the specialized knowledge necessary for him to opine specifically about how to validly determine, or measure, whether a Medi-Cal pharmacy claim in this "Code 1" action as false or not.  Because an expert must be qualified to offer "helpful" testimony, the question of qualification is case specific, requiring Dr. Epstein to have qualifications and knowledge to qualify as a "measurement" expert in this case.  *See, e.g., U.S. v. Chang*, 207 F.3d 1169, 1173 (9th Cir. 2000).  To evaluate the reliability of an expert's opinion, the court must probe a witness's "knowledge and experience [] sufficient[ly] to satisfy [the court's] gatekeeping

9

1   role." *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1018 (9th Cir.

2   2004.)

3         Preliminarily, Dr. Epstein has not designed any sampling methodology in

4   FCA investigations, Salazar Decl., Exh. C, Epstein Dep. 66:2-4, and admits it would

5   not be a statistician who would decide on whether a claim is false or not. *Id.* 121:1-

6   8.  Dr. Epstein admits he has no background in pharmacy practices, pharmacy claim

7   adjudication, pharmacy drug dispensing, drug dispensing computer programs,

8   compliance with government-sponsored prescription drug coverage, or government

9   healthcare program compliance audits. *Id.* 62:7-63:12.  Nonetheless, he creates his

10  own suggested measurement criteria, i.e., California should consider *all* patient

11  medication histories in assessing whether a sample claim is false or not.

12        **B.    Dr. Epstein's Measurement Criteria Are Unreliable Because They Rest on Insufficient Facts or Data.**

13        In developing his measurement criteria, Dr. Epstein did not consult Rite Aid

14  or anyone about anything in this case.  Salazar Decl., Exh. B, Epstein Dep. 59:13-

15  15, 60:1-12, 61:17-19.  He did not consult Rite Aid about its Code 1 policies and

16  practices, and its prescription drug dispensing processes. *Id.* 59:16-25.  He did not

17  consult anyone about claim submissions in the Medi-Cal program and the Medi-Cal

18  program's Code 1 implementation. *Id.* 60:12-18.  Critically, he did not at all

19  consider the false use of claim override codes—which is the root of the false claims

20  in this matter. *Id.* 219:15-21. *See* ECF No. 134 at 5 ("Rite Aid's submission of

21  claims with override codes, representing Code 1 requirements were met when Code

22  1 review was not performed, entailed the making of "explicit lies in a claim for

23  payment." CII ¶¶ 107-11.  These allegations, taken together, sufficiently allege

24  factually false claims made by Rite Aid.").

25

26

27

28

Nor did he review any Rite Aid documents to inform his analysis or opinions. *Id.* 207:22-25, 208:1-4, 208:10-17.  He did not review key documents regarding compliance with Code 1 restrictions (such as Rite Aid's own Operation Bulletins). *Id.* 56:2-7; 207:22-25.  He had no understanding whatsoever of the step-by-step policies of Rite Aid in dispensing a diagnosis-restricted Code 1 drug.   *Id.* 209:13-16.  Nor did he consider the claim submission process that Rite Aid has implemented to comply with Medi-Cal's payment system.  *Id.* 182:15-183:11.  He even wholly ignored related portions of the CII.  *Id.* 56:2-19; 210:9-17; 211:10-12; 212:14-215:10.

Moreover, while he did not consult Rite Aid, Dr. Epstein conducted his own case studies of Rite Aid's patient medication histories.  ECF No. 201, Epstein Rep. at ¶ 62.  He did not personally use the Rite Aid's systems to print these records.  *Id.* 46:13-20.  He did not know who labeled the records with the purported sample claim numbers.  *Id.* 47:18-25.  He did not know what the dates in the records represent.  *Id.* 51:12-16.  He admitted the records he reviewed were not for the actual sample claims (different dates of service, different prescription numbers).  *Id.* 48:17-49:19, 50:7-10.

Without such facts and data, Dr. Epstein's measurement criteria are unreliable.  There is a huge analytical gap between the data and his measurement criteria.  *See General Elec. v. Joiner*, 522 U.S. at 146.  The Court should therefore exclude his opinions relating to "measurement."

///

///

///

11

### C.   Dr. Epstein's Opinions on Measurement Error Are Irrelevant Because He Relied on Unreliable, Objectionable, and Prejudicial Documents.

Not only does he not have pertinent qualifications or sufficient facts and data, in reaching his findings about measurement error, Dr. Epstein also relied upon unreliable, objectionable, and prejudicial documents.

Dr. Epstein reached his finding of measurement error by comparing a pre-litigation settlement spreadsheet with California's early tentative responses to objectionable contention interrogatories.  Dr. Epstein explained in his report, and confirmed in deposition, that the "direct evidence" he reviewed to find measurement error was a spreadsheet prepared "earlier in this litigation" known as the "Poulson Analysis."  ECF No. 201, Epstein Rep. at 19; Salazar Decl., Exh. B, Epstein Dep. 157:7-25.  Admissibility of the Poulson Analysis aside, it is not a reliable document because it was not prepared as a definitive analysis of the number of false claims in this matter.  Rather, the United States Attorney's Office prepared it for purposes of summarizing and making projections in an attempt to settle and resolve the matter pre-litigation.  Dr. Epstein seizes upon certain aspects of the Poulson Analysis and does not consider the underlying reason it was prepared and its inherent unreliability.  Salazar Decl., Exh. B, Epstein Dep. 162:1-163:4; Exh. C, Petron Dep. 132:5-133:17, 155:17-157:19.  Indeed, there is no indication that Dr. Epstein conducted any independent verification or analysis of the underlying theories, facts, and records supporting the Poulson Analysis.  Salazar Decl., Exh. B, Epstein Dep. 161:12-24, 169:6-170:20.  Regardless, however, the Poulson Analysis—prepared for the purposes of a potential settlement—is not the type of document upon which an expert might be expected to reasonably rely to show the existence of measurement error.  Introducing the Poulson Analysis will be prejudicial to the Government as it will only confuse a jury regarding the analysis of "false claims" in the current litigation.

1    This confusion further grows with Dr. Epstein comparing the Poulson

2    Analysis with California's early tentative responses to objectionable contention

3    interrogatories.  *Id.* 163:22-164:4, 166:8-168:16, 174:11-175:6.  When California

4    served these responses, it specifically explained that Rite Aid had not completed

5    production of pharmacy records, that California had not completed its analysis, and

6    that its findings were subject to change and further supplementation depending on

7    documents produced by Rite Aid in the future and consultation with subject-matter

8    experts.  *Id.* 166:8-167:25.  Dr. Epstein admitted in his deposition that he did not

9    consider the objections to Rite Aid's contention interrogatories and the likelihood

10   that California's substantive responses might change or be supplemented.  *Id.*

11   Again, experts in Dr. Epstein's field would not reasonably rely on early contention

12   interrogatory responses that are subject to change for purposes of identifying

13   whether there is actual measurement error.

14   Dr. Epstein developed a measurement criteria based on unreliable and

15   irrelevant documents.  This Court should find his methodology leading to his

16   opinion inadmissible and therefore grant Plaintiffs' motion.

17   **D.    Dr. Epstein's Opinions on Measurement Error Hinges on or**
         **Constitutes a Wrong Legal Conclusion.**

18
     It is well-settled that legal conclusions of an expert witness are not "helpful"
19
     and should be excluded.  Fed. R. Evid. 702(a); *Nationwide Transp. Fin. v. Cass Info.*
20
     *Sys., Inc.*, 523 F.3d 1051, 1058 (9th Cir. 2008).  While experts may use legal
21
     terminology, they may not "usurp the court's role" of defining the applicable law.
22
     *Hangarter v. Provident Life & Acc. Ins. Co.*, *supra*, 373 F.3d at 1015.  Testimony
23
     containing a legal conclusion "invades the province of the court to determine the
24
     applicable law and to instruct the jury as to the law."  *United States v. Nixon,* 694
25
     F.3d 623, 631 (6th Cir. 2012).
26
     To define his own measurement criteria, not only does Dr. Epstein lack
27
     specialized knowledge and expertise, ignore the relevant case facts, and use
28

1   unreliable, objectionable, and prejudicial documents, Dr. Epstein also admitted he

2   based his measurement criteria on his own legal interpretation of subdivision (c) of

3   California Code of Regulations, title 22, section 51476.  Epstein Rep. at fn. 38;

4   Salazar Decl., Exh. B, Epstein Dep. 56:20-57:14; 211:24-212:12.

5        Section 51476(c)(2) states, "The dispenser shall maintain readily retrievable

6   documentation of the patient's diagnostic or clinical condition information that

7   fulfills the Code 1 restriction."  Cal. Code. Regs. tit. 22, § 51476(c)(2).  In

8   interpreting this provision, Dr. Epstein finds section 51476(c)(2) is unclear as to the

9   timing of the required Code 1 review.  Salazar Decl., Exh. B, Epstein Dep. 80:7-

10  81:13.  Because it is purportedly "unclear," Dr. Epstein suggests that in deciding

11  whether a claim is false the finder of fact should be allowed to look at other records

12  that have prescription numbers and dates of service different from those connected

13  to the actual sample claim.  *Id.* 55:19-24, 95:1-96:11, 104:3-105:21.

14       To reach his finding of ambiguity, *id.* 98:19-99:13, he focuses solely on

15  subdivision (c)(2) and ignores subdivision (a) of section 51476—which does contain

16  a timing element.  *See* Cal. Code Regs., tit. 22, § 51476(a) ("Required records shall

17  be made at or near the time at which the service is rendered.").  Nonetheless, likely

18  because he has no relevant background in pharmacy practices, claim submissions,

19  and government healthcare compliance, he wholly misses the key term of section

20  51476(c)(2) that links the documentation requirement to each and every individual

21  claim with a specific prescription number and a date of service.

22       Section 51476(c)(2) refers to the "dispenser," which in a pharmacy setting

23  such as Rite Aid would be the pharmacy associate furnishing a drug to a beneficiary.

24  *Compare* 22 Cal. Code Regs., tit. 22, § 51476(c) ("Records of *providers* shall

25  document the meeting of Code 1 restrictions . . . [italics added].");  *see also* Cal. Bus.

26  & Prof. Code, § 4024 (defining "dispense" to mean the "furnishing of drugs").  Each

27  "dispensing" of a drug gives rise to one unique Medi-Cal claim, see Salazar Decl.,

28  Exh. B, Epstein Dep. 92:13-19, for which the provider is paid the cost of the drug

1    dispensed plus a fee for each dispensing.  CII ¶ 42; FAA ¶ 42; *see* Cal. Welf. & Inst.

2    Code § 14105.45(b).  Thus, contrary to Dr. Epstein's finding of legal ambiguity as

3    to timing, section 51476(c)(2) does require that when a pharmacy associate

4    dispenses a drug, i.e., furnishes a drug, for which Rite Aid submits a separate

5    individual claim, the pharmacy associate must, at or near the time of the dispensing

6    service and claim submission, maintain readily retrievable documentation

7    supporting the approved Code 1 diagnosis.  This interpretation comports with (a)

8    section 51476(a)'s "at or near the time at which the service is rendered"

9    requirement, (b) the CMC agreements' source documentation requirement for every

10   electronically submitted claim, (c) the Medi-Cal Code 1 claim payment system's

11   rejection message that appears for every claim submission of a Code 1 diagnosis

12   restricted drug and claim override procedure, and (d) Rite Aid's own pre-existing

13   policies and procedures requiring a Code 1 review, verification, and documentation

14   for every single subject claim.  CII ¶¶ 21, 43-44, 82-85, 89-92; FAA ¶¶ 21, 43-44,

15   82-85, 89-92.

16        Dr. Epstein's main critique of California's sampling methodology (and Mr.

17   Petron's opinions as to its validity) is based upon his own incorrect and misguided

18   reading of section 51476(c)(2) as not requiring that the Code 1 review occur at a

19   particular time.  But Dr. Epstein may not instruct this Court, or the trier of fact, as to

20   the applicable law, its requirements, or how to interpret section 51476.  This is

21   especially true given that Dr. Epstein admitted he is not qualified to interpret the

22   timing aspect of that regulation.  *See* Salazar Decl., Exh. B, Epstein Dep., *Id.* 98:19-

23   99:13, 115:14-117:2 ("[I]n a case like this, it's going to require somebody with

24   greater subject-matter expertise to make the call whether the appropriate Code 1

25   review was conducted with all of the considerations that we've touched on before,

26   like the timing and the sufficiency and everything that would go into that kind of

27   review.").  Yet, he relies on his own interpretation to find measurement error.  *Id.*

28   26:13-27:3; Epstein Rep. at ¶¶ 14-17.

1    Because Dr. Epstein's measurement criteria are premised on and constitutes

2  his own misguided legal interpretation, the Court should exclude his opinions

3  relating to measurement error.

4  **II.  DR. EPSTEIN'S OPINION THAT THE METHODOLOGY IS INVALID BECAUSE IT DOES NOT ACCOUNT FOR SCIENTER OR MATERIALITY RESTS ON IMPROPER LEGAL CONCLUSIONS.**

5

6    Dr. Epstein opines that in order for California to prove FCA violations,

7  California's proposed sampling methodology should account for the FCA elements

8  of scienter and materiality.  As Dr. Epstein puts it,

9

10          I understand that California must prove at least three elements to
           establish liability under the FCA for each claim.  First, it must prove

11          the "falsity" of a claim, i.e. that Rite Aid failed to comply with Code
           1 regulations in dispensing a Code 1 prescription.  Second, it must

12          prove that that the alleged falsity would be material to the
           government's decision to reimburse Rite Aid for dispensing the

13          drug.  Third, it must prove scienter, or knowledge of non-
           compliance with Code 1 regulations.

14

15  ECF No. 201, Epstein Rep. at 24, ¶ 69.

16    Dr. Epstein's opinions on materiality and scienter are impermissible legal

17  conclusions.  By opining that California's sampling methodology is invalid because

18  it does not consider any scienter and materiality requirements, Dr. Epstein is opining

19  about: (1) what the terms scienter, falsity, knowledge, compliance, claim, or

20  statement mean under the FCA; (2) what constitutes a false claim under the FCA;

21  and, (3) the quality of evidence required to establish an FCA violation.

22    Whether and to what extent California can use sampling to quantify the total

23  number of false claims and damages is, in the first instance, an issue for the Court.

24  And if the use of sampling is permitted, it is then for the jury to determine how

25  much weight to give the estimates that result from the sampling.  Dr. Epstein's

26  opinion about the validity of the proposed methodology is inadmissible to the extent

27  that he concludes that it does not properly apply the law or fails to consider certain

28

16

1  aspects of it.  This is particularly true given that Dr. Epstein admitted he never

2  consulted any legal expert about evidence that would be sufficient to meet the

3  elements of falsity, materiality, or scienter.  Salazar Decl., Exh. B, Epstein Dep.

4  61:4-16.

5                                        **CONCLUSION**

6          Dr. Epstein is not qualified, relies on insufficient facts and data, uses

7  unreliable, prejudicial, and objectionable documents, and applies his own legal

8  interpretations to define his own measurement criteria and opine on how California

9  should prove its FCA action.  These opinions are irrelevant, unreliable, and

10  therefore inadmissible.  This Court should thus grant this motion and exclude Dr.

11  Epstein's opinions and testimony on measurement error, scienter, and materiality

12  from consideration for all purposes and all proceedings in this matter.

13  Dated:  May 15, 2019                           Respectfully submitted,

14                                                          XAVIER BECERRA
                                                            Attorney General of California
15

16                                                          */s/ Emmanuel R. Salazar*
                                                            EMMANUEL R. SALAZAR
17                                                          Deputy Attorney General
                                                            *Attorneys for Plaintiff State of California*
18

19

20                                                          BARTLETT BARROW LLP

21                                                          */s/ Brian P. Barrow*
22                                                          BRIAN P. BARROW
                                                            *Attorneys for Relator Loyd F. Schmuckley, Jr.*
23

24

25

26

27

28

1
2
# PROOF OF SERVICE

3 I am over the age of 18 and not a party to this action.  My business address is: 2329 Gateway Oaks Drive, Suite 200, Sacramento, CA 95833.

4 A true and correct copy of the foregoing document entitled:

5
6 **NOTICE OF MOTION AND MOTION TO EXCLUDE PORTIONS OF EXPERT REPORT AND TESTIMONY OF DEFENDANT'S EXPERT ROY J. EPSTEIN, PH.D.**

7 was served in the manner stated below:

8
9 **SERVED BY CM/ECF SERVICE**:  Pursuant to Fed. R. Civ. P. 5(b)(2)(E) and Local Rule 135, on 5/16/2019, I served the following persons and/or entities by the Court's CM/ECF service:

10
11 Eric W. Sitarchuk                  Michael L. Armitage
Kelly A. Moore                   Wm. Paul Lawrence
12 Benjamin P. Smith                 Charles S. Segal
Michael Q. Eagan                  c/o Waters & Kraus
13 Morgan, Lewis & Bockius, LLP       37163 Mountville Rd
One Market, Spear Street Tower     Middleburg, VA 20117
14 San Francisco, CA 94105-1596

15 Catherine J. Swann                 Jennifer L. Bartlett
United States Attorney's Office    Brian P. Barrow
16 501 I Street, Suite 10-100         Bartlett Barrow LLP
Sacramento, CA 95814              225 S. Lake Avenue, Suite 300
17                                   Pasadena, CA 91101

18
19 I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.
20

21 5/16/2019             Sharon Brecht                    */s/ Sharon Brecht*
22 _____   _____      _____
   *Date*                *Printed Name*                   *Signature*