UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, and the STATE OF CALIFORNIA, et al., ex rel. LOYD F. SCHMUCKLEY, JR., | No.  2:12-cv-1699-KJM-EFB |
| Plaintiffs, | ORDER |
| v. | |
| RITE AID CORPORATION, | |
| Defendant. | |

       In this *qui tam* action, the court previously granted in part plaintiff-intervenor State of California's ("California") motion for sanctions ("first sanctions motion") and ordered defendant Rite Aid Corporation ("Rite Aid") to reimburse California the reasonable expenses it incurred in bringing its motion.  ECF No. 261, 273.  California was directed to submit billing records establishing its reasonable expenses, and Rite Aid was granted an opportunity to file a response to California's submission.  ECF No. 273.

       California timely complied with that order.  But before Rite Aid's deadline for submitting its response, California filed a second motion for sanctions pursuant to Federal Rule of Civil Procedure 37(b)(2).  ECF No. 275.  That motion was before the court for hearing on February 26, 2020.  ECF No. 290.  California Deputy Attorneys General Emmanuel Salazar, Bernice Yew, and Vincent DiCarolo appeared on behalf of California.  Attorney Jennifer Bartlett appeared on behalf

1

1  of relator.  Attorneys Benjamin Smith, Kevin Papay, and Ryan McCarthy appeared on behalf of

2  Rite Aid.

3        Like the first motion, the second is predicated on Rite Aid's purported failure to comply

4  with the court's November 5, 2019 order, which required Rite Aid to produce certain documents

5  by no later than November 25, 2019.  *See* ECF No. 258.  California argues, among other things,

6  that Rite Aid has wrongly withheld relevant documents it claims to be protected by the attorney-

7  client privilege.  ECF No. 275 at 6.  Because the motion could not be resolved on the parties'

8  briefs and the arguments presented at the hearing, Rite Aid was ordered to submit the withheld

9  documents for *in camera* review.  It was also directed to submit supporting declarations

10  explaining the basis for each assertion of the privilege and to serve plaintiff with a copy of each

11  submitted declaration.[1]

12        On April 8, 2020, Rite Aid submitted the majority of the disputed documents, together

13  with an amended privilege log and a supporting declaration.[2]  ECF No. 302.  On the same date,

14  California filed a third motion for sanctions, ECF No. 303, which is also premised on Rite Aid's

15  alleged failure to comply with the court's November 5, 2019 order.[3]

16        After a careful *in camera* review of the documents, the court denies California's second

17  and third motions for sanctions.  The court further awards California $12,928.00 for the

18  reasonable expenses it incurred in bringing its first motion for sanctions.

19  /////

20  /////

21

22      [1]  The order also notified Rite Aid that it could redact from the declarations served on
California any privileged information needed to be disclosed to the court in order to explain each
23  assertion of the attorney-client privilege.  Rite Aid has since complied with that order, and
California has filed a response to Rite Aid's submission.  ECF No. 320.
24

25      [2] Due the COVID-19 pandemic, Rite Aid was not able to readily access documents stored
in hard-copy at its headquarters.  After receiving multiple extensions of time, Rite Aid was able to
26  submit the remaining documents on June 22, 2020.  ECF No. 317.

27      [3]  The court determined that oral argument would not materially assist in the resolution of
the April 8, 2020 motion for sanctions, and it was ordered submitted on the briefs and without
28  oral argument.  *See* E.D. Cal. L.R. 230(g).

1   I.      Relevant Background

2           The extensive procedural history in this action has been plagued by numerous discovery

3   disputes and exhaustive motion practice that will not be fully recounted here.  However, a brief

4   discussion of the procedural history is helpful to understand the parties' respective positions.

5   Relator Schmuckley filed this action in 2012, alleging claims against Rite Aid under the False

6   Claims Act, 31 U.S.C. §§ 3729, *et seq.*; the California False Claims Act, Cal. Gov't Code

7   §§ 126580, *et seq.*; and similar statutes enacted by other states.  In May 2017, California elected

8   to partially intervene.[4]  ECF No. 69.  Thereafter, California filed a complaint-in-intervention

9   ("CII"), and relator filed an amended complaint.  ECF Nos. 75, 79.

10          California's claims arise out of Rite Aid's alleged failure to comply with the requirements

11  of the state's Medicaid Program ("Medi-Cal") for obtaining reimbursement for dispensing certain

12  prescription medications.  According to California's CII, Medi-Cal provides reimbursement to

13  participating pharmacies, such as Rite Aid, that dispense covered drugs to eligible Medi-Cal

14  beneficiaries.  ECF No. 75 ¶¶ 16-20.  Medi-Cal maintains a list, known as the Medi-Cal List of

15  Contract Drugs ("CDL"), of all drugs that are subject to reimbursement.  *Id*. at ¶¶ 22-23.

16          The CDL includes certain medications that have been designated as "Code 1 drugs."  *Id*.

17  ¶¶ 37, 38.  To obtain reimbursement for dispensing Code 1 drugs, pharmacies must either (1)

18  obtain prior authorization from the California Department of Health & Human Services or (2)

19  "affirmatively certify that the dispensing of the drug meets the restrictions specified in the CDL."

20  *Id*. at ¶¶ 38, 39.  A pharmacy that dispenses a Code 1 drug must maintain documents showing that

21  the patient meets the Code 1 restrictions specified in the CDL.  *Id*. ¶¶ 40-41; *see* Cal. Code Regs.

22  tit. 22, § 51476(c)(2) (requiring dispenser of Code 1 drugs to "maintain readily retrievable

23  documentation of the patient's diagnostic or clinical condition information that fulfills the Code 1

24  restriction.").

25  /////

26  /////

27  

28          [4]  The United States and all states except California declined to intervene.  ECF Nos. 40, 41, 53, 72.

3

California alleges that from 2007 to 2014, Rite Aid failed to comply with these requirements and submitted to Medi-Cal false reimbursement claims for "Code 1 drugs" that its pharmacies dispensed.  More specifically, Rite Aid allegedly made false certifications of compliance with California's Code 1 drug regulations by: (1) not performing "the required Code 1 diagnosis review, verification and confirmation before dispensing the Code 1 drug"; (2) providing certification when "the Medi-Cal beneficiary actually did not have the Code 1 drug diagnosis" or condition restriction; and/or (3) failing "to adequately document its Code 1 review and compliance [with] Code 1 regulations."  *Id*.

In its first amended answer to California's CII, Rite Aid asserted an "improper defendant" affirmative defense, claiming that it is not a proper defendant because it is a holding company that does not operate any pharmacies in California.  ECF No. 147 at 29.  To investigate that defense, as well as to obtain evidence related to its claims, California served Rite Aid with its seventh set of Requests for Production of Documents ("RPD"), which sought documents concerning Rite Aid and its subsidiaries' corporate structures and dealings.  After Rite Aid failed to produce all responsive documents, California moved to compel Rite Aid to produce documents responsive to its RPD, Set 7.  ECF No. 249.  On November 5, 2019, the court granted California's motion to compel and ordered Rite Aid to produce, by no later than November 25, 2019, all documents responsive to California's RPD Nos. 17-38.  ECF No. 258.

California subsequently moved for sanctions under Rule 37, arguing that Rite Aid violated the court's November 5 order by failing to produce all responsive documents.  ECF No. 261.  That motion was granted in part, and Rite Aid was ordered to provide supplemental responses to many, but not all, of California's requests for production.  ECF No. 273.  Rite Aid was also ordered to reimburse California the reasonable expenses it incurred in filing its motion for sanctions.  Of particular significance to California' second and third motions for sanctions, the court declined to reach California's argument that Rite Aid violated the November 5 order by not producing any documents in response to RPD Nos. 23-26—requests seeking documents related to Rite Aid and its subsidiaries' board and committee meeting agendas and minutes that concern pharmacy business in California.  The parties' dispute over those requests could not be resolved

4

1  at that time because: (1) Rite Aid claimed that its search for responsive documents[5] resulted only

2  in the discovery of documents protected by the attorney-client privilege; and (2) under the court's

3  scheduling order, Rite Aid was not required to produce its privilege log until December 20, 2019,

4  after the hearing on California's motion.  ECF No. 272 at 11-16.

5  On December 20, 2019, Rite Aid served California with its privilege log, which identified

6  twenty-four documents.  ECF No. 276-3.  Rite Aid also produced thirty-three additional

7  responsive documents—each consisting of presentation material from board meetings.  *Id.*

8  Seven of these documents were produced with redactions and identified in the corresponding

9  privilege log, while the remaining twenty-four documents were produced in their entirety.  *Id.*;

10  ECF No. 276-4.

11  California's counsel subsequently emailed Rite Aid's counsel about California's concerns

12  with Rite Aid's privilege log.  ECF No. 276-4 at 2-3.  On January 8, 2020, having received no

13  response, California filed its second motion for sanctions, arguing that Rite Aid still had not

14  complied with the court's November 5, 2019 order requiring it to produce all documents

15  responsive to RPD Nos. 23-26 (i.e., board minutes, agendas, and related documents).  ECF No.

16  275.  In addition to requesting issue and evidentiary sanctions, California's motion sought an

17  order compelling Rite Aid to produce, without redaction, all minutes, agendas, and missing

18  agenda minutes that had been withheld as privileged.  *See* ECF No. 289.  California argued that

19  Rite Aid had waived the privilege over all withheld documents for failure to timely assert the

20  privilege.  *Id.* at 7.

21  On January 10, 2020, two days after California filed its second motion for sanctions, Rite

22  Aid produced redacted copies of the board agendas and minutes that corresponded to board

23  presentation material it previously produced, as well as a supplemental privilege log.  ECF No.

24  286-1 ¶ 15; ECF No. 286-7.  Notwithstanding this production, California continued to complain

25  that Rite Aid's production was deficient, noting that Rite Aid had not produced any board

26  material from Thrifty Payless, Inc. or any other subsidiary.  On February 18, 2020, Rite Aid

27  _____

28  [5]  Rite Aid conducted an electronic search for documents utilizing search terms the parties agreed upon.

1  provided California with a declaration from Susan Lowell, Rite Aid Hdqtrs. Corp.'s Vice

2  President of Tax & Payroll.  In her declaration, Ms. Lowell stated that neither Thrifty Payless,

3  Inc. nor Rite Aid Hdqtrs. Corp. held board meetings from 2006 to 2017.  Salazar Decl., Ex. G

4  (ECF No. 288-6).  Ms. Lowell's declaration was also accompanied by an additional production of

5  Rite Aid's board meeting agendas and minutes, as well as another supplemental privilege log

6  listing thirteen documents.  ECF No. 288-7.

7      California's second motion for sanctions was before the court for hearing on February 26,

8  2020.  ECF No. 293 (hearing transcript).  At the hearing, Rite Aid explained that it had produced

9  all documents *responsive* to California's discovery requests by December 20, 2019.  ECF No. 293

10  at 27.  With respect to the January 10 and February 18, 2020 productions, Rite Aid asserted that

11  the documents produced or identified in its second and third privilege logs were not responsive to

12  California's discovery requests.  *Id*.  Specifically, counsel stated that "we voluntarily decided to

13  give [California] additional documentation even though all the documents we have subsequently

14  produced do not relate to pharmacy in the state of California [and] do not discuss Code 1"

15  because California demanded "the minutes and agendas that corresponded to the responsive

16  presentations that we had logged or produced" on December 20, 2019.  *Id*.

17      At that hearing, the court deferred ruling on California's request for sanctions and

18  instructed Rite Aid to submit for *in camera* review all documents claimed to contain privileged

19  information.  *Id*. at 35-43.[6]  On March 11, 2020, the parties filed a joint request for instructions

20  regarding Rite Aid's submission of documents for *in camera* review.  ECF No. 294.  The parties

21  reported that they agreed that Rite Aid's submission should include all board presentations,

22  minutes, and agendas identified in the December 20, 2019, January 10, 2020, and February 18,

23  2020 privilege logs.  *Id*. at 2.  But they were unable to reach agreement as to whether Rite Aid

24  needed to submit the tabs, binders, and appendices that are referenced in the board meeting

25  agendas.  Rite Aid was instructed to include these documents with its submission, which was to

26  

27  ___

[6]  At the February 26, 2020 hearing, the parties could not agree on the scope of the documents that needed to be submitted for *in camera* review.  Accordingly, the parties were instructed to meet and confer about the specific documents that needed to be submitted.  ECF No. 293 at 42.

28  

6

1    be completed by April 8, 2020.  ECF No. 295.  Rite Aid was also ordered to submit supporting

2    declarations explaining the basis for each assertion of the privilege.  As for any tabs, binders, and

3    appendices not claimed to contain privilege information, Rite Aid was instructed to produce those

4    documents by April 8, 2020.  California was given until April 22, 2020 to file a response to Rite

5    Aid's declarations.  *Id*.

6          On March 27, 2020, the parties filed a joint motion to amend the deadlines related to the

7    court's *in camera* review.  ECF No. 300.  The motion explained that some of the board materials

8    were stored in hard-copy format at Rite Aid's headquarters, which had recently closed due to the

9    coronavirus pandemic.  *Id*.  Accordingly, the parties requested Rite Aid be given until April 22,

10   2020 to submit and/or produce the board material stored in hard-copy format.  The parties also

11   requested California be given until May 20, 2020 to reply to Rite Aid's supporting declarations.

12   *Id*.  That joint request was granted.  ECF No. 301.  On April 8, 2020, Rite Aid submitted for *in*

13   *camera* review documents that it maintained electronically.  *See* ECF No. 302.

14         On the same date, California filed its third motion for sanctions, which is also based on

15   Rite Aid's alleged failure to comply with the November 5, 2019 order.  ECF No. 303.

16   California's two pending motions for sanctions request that Rite Aid be found in contempt and be

17   subjected to evidentiary and issue sanctions.  ECF Nos. 275 at 3; ECF No. 303 at 15.  In the most

18   recently filed motion, California also argues that new revelations warrant compelling Rite Aid to

19   produce all board meeting material regardless of whether the material has any bearing on Rite

20   Aid's pharmacy business in California.  ECF No. 303 at 18-20.  Rite Aid has since made two

21   additional submissions of documents (both accompanied by supplemental declarations) and

22   California has filed a response.[7]  ECF Nos. 317, 320, 323.

23         Before addressing California's request for sanctions, the court first considers the

24   documents Rite Aid submitted for *in camera* review.

25   /////

26

27         [7]  As noted, Rite Aid experienced pandemic-related logistical difficulties in accessing
     hardcopy documents that were stored at its headquarters and was granted additional time to
28   compile and submit these documents.

7

1  II.      In Camera Review

2          A.      Attorney-Client Privilege and Work Product Doctrine

3          In cases involving both federal and supplemental state law claims, like the instant action,

4  federal privilege law applies.  *Agster v. Maricopa Cnty.*, 422 F.3d 836, 839 (9th Cir. 2005).  "The

5  attorney-client privilege protects confidential communications between attorneys and clients,

6  which are made for the purpose of giving legal advice."  *United States v. Richey*, 632 F.3d 559,

7  566 (9th Cir. 2011) (citing *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981)).  It "exists to

8  protect not only the giving of professional advice to those who can act on it but also the giving of

9  information to the lawyer to enable him to give sound and informed advice."  *Upjohn*, 449 U.S. at

10  390.  The "party asserting the attorney-client privilege has the burden of establishing the

11  relationship and the privileged nature of the communication," and "if necessary, to segregate the

12  privileged information from the non-privileged information."  *United States v. Ruehle*, 583 F.3d

13  600, 608-09 (emphasis in original).  "Because it impedes full and free discovery of the truth, the

14  attorney-client privilege is strictly construed."  *Id*. at 607.  The attorney-client privilege exists:

15
16          (1) Where legal advice of any kind is sought (2) from a professional
             legal adviser in his capacity as such, (3) the communications relating
             to that purpose, (4) made in confidence (5) by the client, (6) are at
17          his instance permanently protected (7) from disclosure by himself or
             by the legal adviser, (8) unless the protection be waived.

18  *Id*. (quoting *In re Grand Jury Investigation*, 974 F.2d 1068, 1071 n.2 (9th Cir. 1992)).  The party

19  asserting the privilege bears the burden of establishing each element.  *Id*. at 608.

20          In *Upjohn*, the Supreme Court addressed the application of the attorney-client privilege in

21  the context of a corporate client.  The Supreme Court "held that the privilege applies to

22  communications by any corporate employee regardless of position when the communications

23  concern matters within the scope of the employee's corporate duties and the employee is aware

24  that the information is being furnished to enable the attorney to provide legal advice to the

25  corporation."  *Admiral Ins. Co. v. U.S. Dist. Ct.*, 881 F.2d 1486, 1492 (9th Cir. 1989) (citing

26  *Upjohn*, 449 U.S. at 394).  Under this framework, courts have held that the privilege may apply to

27  "a communication between nonlegal employees in which the employees discuss or transmit legal

28  advice given by counsel," as well as "an employee [communication regarding] her intent to seek

8

1   legal advice about a particular issue." *United States v. Chevron Texaco Corp.*, 241 F. Supp. 2d

2   1065, 1077 (N.D. Cal. 2002); *see In re CV Therapeutics, Inc. Sec. Litig.*, 2006 WL 2585038, at *3

3   (N.D. Cal. Aug. 30, 2006) ("[W]here the specific purpose of the document is to seek legal advice

4   and the document is sent to nonlegal business staff for the purpose of informing them that legal

5   advice has been sought or obtained, the attorney-client privilege obtains even though the

6   document was provided to nonlegal personnel.") (internal quotations omitted); *AT&T Corp. v.*

7   *Microsoft Corp.*, 2003 WL 21212614, at *3 (N.D. Cal. Apr. 18, 2003) ("Communications

8   containing information compiled by corporate employees for the purpose of seeking legal advice

9   and later communicated to counsel are protected by attorney-client privilege.").

10         The work-product doctrine is a qualified privilege that protects from disclosure

11  "documents and tangible things prepared by a party or his representative in anticipation of

12  litigation." *United States v. Sanmina Corp.*, 968 F.3d 1107, 1119 (9th Cir. 2020) (quoting

13  *Admiral Ins. Co.*, 881 F.2d at 1494; Fed. R. Civ. P. 26(b)(3) ("Ordinarily, a party may not

14  discover documents and tangible things that are prepared in anticipation of litigation or for trial or

15  for another party or its representative (including the other party's attorney, consultant, surety,

16  indemnitor, insurer, or agent).").  Thus, the primary purpose of the doctrine is to provide

17  protection against litigation adversaries. *Samnina Corp.*, 968 at 1120; *Holmgren v. State Farm*

18  *Mut. Auto. Ins. Co.*, 976 F.2d 573, 576 (9th Cir. 1992).

19         The phrase "in anticipation of litigation" has both temporal and motivational components.

20  "[A]t the time she prepared the document, the attorney must at least have had a subjective belief

21  that litigation was a real possibility, and that belief must have been objectively reasonable," and

22  "the party claiming the privilege must demonstrate that in light of the nature of the document and

23  the factual situation in the particular case, the document can fairly be said to have been prepared

24  or obtained because of the prospect of litigation." *Equal Rights Ctr. v. Post Properties, Inc.*, 247

25  F.R.D. 208, 210 (D.D.C. 2008); *United States v. Adlman*, 134 F.3d 1194, 1200 (2nd Cir. 1998).

26  Documents prepared in the ordinary course of business or that would have been created in

27  essentially similar form irrespective of the litigation are not protectable as work product.  "Even if

28  such documents might also help in preparation for litigation, they do not qualify for protection

9

1    because it could not fairly be said that they were created 'because of' actual or impending

2    litigation." *Adlman*, 134 F.3d at 1202; *see Fru-Con Const. Corp. v. Sacramento Mun. Utility*

3    *Dist.*, 2006 WL 2050999, at *4, n.3 (E.D. Cal. July 20, 2006).

4           For documents that serve both a litigation and business purpose to receive protection, the

5    documents will be considered privileged if "in light of the nature of the document and the factual

6    situation in the particular case, the document can be fairly said to have been prepared or obtained

7    because of the prospect of litigation." *In re Grand Jury Subpoena*, 357 F.3d 900, 907 (9th Cir.

8    2004).  Thus, a document will be considered attorney work-product only where it "would not

9    have been created in substantially similar form but for the prospect of litigation." *Id*.

10          B.      Discussion

11          Rite Aid's *in camera* submission consists of 150 documents that are identified by tab

12   numbers.[8]  Chima Decl., Ex. A.  The documents consist of (1) agendas for Rite Aid's board of

13   directors' meetings, (2) minutes from board of directors and audit committee meeting, (3) board

14   meeting presentation material.

15          In support of its contention that these documents are privileged, Rite Aid relies solely on

16   three declarations—each accompanied by a privilege log—from Ron Chima, Vice President,

17   Litigation & Commercial Law for Rite Aid Hdqtrs. Corp.[9]  As discussed further below, Mr.

18   Chima's declarations contain only general statements that fail to explain the specific basis for

19   each assertion of privilege.  The corresponding privilege logs attempt to rectify this deficiency by

20   specifically addressing each redaction and withheld document.  But the logs' proffered

21   /////

22

23          [8]  Many of the tabs contain multiple, related documents.  For example, tab number 124
     includes minutes from six board meetings that were held on May 11, May 14, June 15, August 2,
24   August 11, and August 16, 2015.  As far as the court can discern, the minutes from these
     meetings were produced together because Rite Aid's board approved them at the same time.  To
25   avoid confusion, the court will generally treat each tab as a single document and, when necessary,
     cite specific redactions by the "Tab" page number—not the documents original page number.
26

27          [9]  As previously noted, the court received Rite Aid's documents in three batches.  Each
     submission included a declaration from Mr. Chima and a privilege log.  While each log addresses
28   different documents, Mr. Chima's three declarations are materially indistinguishable.

1    explanations are often vague and unhelpful, falling woefully short of demonstrating that each

2    redaction and withheld document is protected from disclosure.

3          Notwithstanding these shortcomings, the court has painstakingly reviewed each of Rite

4    Aid's redactions.  After multiple reviews, it is apparent that although many of the documents

5    contain privileged information, Rite Aid has failed to demonstrate that significant portions of the

6    withheld information are entitled to protection.

7                    1.    Board Meeting Agendas

8          Thirty-one of Rite Aid's documents consist of one-page agendas from board and

9    committee meetings.[10]  Although Rite Aid's submission reflects that it has withdrawn its assertion

10   of privilege and produced unredacted versions of all agendas, California contends that Rite Aid

11   failed to produce an unredacted version of the April 11, 2007 board meeting.  ECF No. 320 at 8-

12   9.  In response, Rite Aid states that a clerical error resulted in the agenda being produced with

13   redactions, and it confirmed that it will produce an unredacted version of the April 11, 2007

14   agenda.  If Rite Aid has not already done so, Rite Aid shall produce that unredacted version

15   forthwith.

16                   2.    Board and Committee Minutes

17         California also challenges Rite Aid's assertion of privilege over information contained in

18   its board and committee meeting minutes.  ECF No. 320 at 19-20.  This category includes sixty-

19   one documents—fifty-seven documents that were produced with redactions and four documents

20   that were withheld in their entirety.[11]

21         The vast majority of the documents Rite Aid produced contain several redactions.  To

22   address each redaction separately is simply not practical and would be waste of scarce judicial

23

24         [10]  The agendas are contained in documents 1, 4, 7, 10, 14, 17, 19, 21, 23, 25, 28, 30, 32,
25   34, 37, 40, 42, 45, 48, 51, 54, 57, 60, 63, 65, 68, 71, 74, 77, 80, and 83.

26         [11]  The board minutes are contained in document numbers 2, 5, 8, 11, 15, 18, 20, 22, 24,
27   26, 29, 31, 33, 35, 38, 41, 43, 46, 49, 52, 55, 58, 61, 64, 66, 69, 72, 75, 78, 81, 84, 89, 92, 96, 99,
     103, 106, 108, 112, 113, 116, 117, 120, 122, 124, 125, 126, 127, 128, 130, 131, 132, 139, 149,
     150.  Documents 94, 95, 101, 105, 109, 111, 115, 133, 135 include the committee meeting
28   minutes.

                                              11

1   resources.  The court, however, has performed the onerous task of carefully reviewing each

2   redaction and finds that the redactions identified in Appendix A to this order contain privileged

3   information.  For the remaining redactions, Rite Aid has failed to meet its burden of

4   demonstrating that the redactions are protected from disclosure, as detailed below.

5           First, most of the documents in this category include redactions that relate to

6   regulatory/legal updates that were presented at Rite Aid's board meetings.  *See*, *e.g.*, Doc. 20 at 5,

7   Doc. 38 at 9, Doc. 94 at 9-10.  Rite Aid contends that redactions in twenty-nine of the documents

8   contain information protected by attorney work-product.  The specific redactions reference

9   regulatory and legal updates that were provided to the directors at several board meetings.  These

10  updates were typically provided by Rite Aid's in-house counsel and/or its Chief Compliance

11  Officer, Anthony Bellezza.  Rite Aid explains that these regulatory/legal update presentations

12  were prepared with the assistance of in-house and outside counsel.  Chima Decl. ¶ 7.  The

13  regulatory/legal updates "are created because of various litigations, consent decrees,

14  governmental investigations, and legal requirements faced by Rite Aid stores, and the need to

15  update Rite Aid's board on these matters."  *Id*. ¶ 7.

16          Rite Aid argues that the details concerning these regulatory/legal updates are protected by

17  both the attorney work-product doctrine and the attorney-client privilege.  Rite Aid, however, has

18  failed to carry its burden under either doctrine.  Rite Aid claims these redactions are attorney

19  work-product because counsel exercises discretion in selecting the issues addressed in these

20  presentations, and redacted information reflects counsel's impressions as to the important legal

21  issues the company faces.  *See, e.g.,* Chima Decl., Ex. A at 3, 13, 18, 36-37, 73.  But Rite Aid

22  does not argue, much less demonstrate, that either the meeting minutes or the regulatory

23  presentations were prepared in anticipation of litigation.  *Sanmina Corp.*, 968 F.3d 1119 ("The

24  work-product doctrine . . . protects from discovery documents and tangible things prepared by a

25  party or his representative in anticipation of litigation.").  Indeed, Rite Aid does not attempt to

26  show that any of the documents submitted for *in camera* review were prepared in anticipation of

27  litigation.

28  /////

                                        12

1    Rite Aid also argues that the mere references to regulatory/legal updates reveal attorney-
2    client privileged communications.   Rite Aid explains that the regulatory/legal presentations were
3    "prepared by or in connection with counsel" and the redacted information relates "to discussions
4    regarding legal and regulatory issues among" its in-house counsel, Chief Compliance Officer,
5    management, and board members.  *See, e.g.,* Chima Decl., Ex. A at 2-3.  Generally,
6    communications intended to keep the client informed about legal developments and the
7    implications of certain activities are privileged.  *See In re CV Therapeutics, Inc. Sec. Litig.*, 2006
8    WL 1699536, *4 (N.D. Cal. June 16, 2006) ("The attorney-client privilege protects documents
9    which 'involve either client communications intended to keep the attorney apprised of continuing
10   business developments, with an implied request for legal advice based thereon, or self-initiated
11   attorney communications intended to keep the client posted on legal developments and
12   implications, including implications of client activity noticed by the attorney but with regard to
13   which no written request for advice from the client has been found.") (quoting *Jack Winter, Inc.
14   v. Koratron Co.*, 54 F.R.D. 44, 46 (N.D. Cal. 1971)); *Skansgaard v. Bank of America*, 2013 WL
15   828210, at *2 (W.D. Wash. Mar. 6, 2013) (business presentation document reflecting counsel's
16   assessment of legal risk was privileged).  But Rite Aid's vague and conclusory assertion that
17   these redactions relate to legal and regulatory issues is insufficient to establish that the
18   information is privileged.  *Dolby Labs. Licensing Corp. v. Adobe Inc.*, 402 F. Supp. 3d 855, 866
19   (N.D. Cal. 2019) (holding that a "vague declaration that states only that the document 'reflects'
20   an attorney's advice is insufficient to demonstrate that the document should be privileged.").
21        Moreover, review of the redacted statements fails to substantiate Rite Aid's assertion of
22   the privilege.  The withheld statements disclose only the general topics covered by the
23   presentations, without providing any details regarding the covered topics.  For example, many
24   redactions reflect that an update was provided on a consent decree, an audit, and/or compliance
25   programs.  But the minutes do not include any additional information about these topics.
26   Specifically, they do not indicate what was actually said.  Other redactions reflect that a litigation
27   update was provided about one or more court case, which is identified only by the name of one of
28   the parties to the action.  Aside from the party's name, no other information about the case or the

1    briefing about the case is detailed in the minutes.  Another redaction simply reflects that in-house

2    counsel commented on the status of a "legal matter," with no other information bearing on the

3    nature of the legal matter.  Such general information does not reveal the specific nature of any

4    potential legal advice sought or rendered on the identified subjects.  Consequently, Rite Aid has

5    failed to show that the redactions referencing regulatory/legal updates are appropriate.  *See In re*

6    *Universal Serv. Fund Tel. Billing Practices Litig.*, 232 F.R.D. 669, 675 (D. Kan. 2005) ("A

7    general description of the work performed by the attorney is not protected by the privilege.  Acts

8    or services performed by an attorney during the course of the representation are not within the

9    privilege because they are not communications.  The subject matter of meetings with an attorney

10   . . . [is] also not protected by the privilege."); *In re Fischel*, 557 F.2d 209, 211 (9th Cir. 1997)

11   ("The privilege does not extend . . . beyond the substance of the client's confidential

12   communications to the attorney."); *cf. Clarke v. Am. Commerce Nat. Bank*, 974 F.2d 127, 129

13   (9th Cir. 1992) ("[T]he the identity of the client, the amount of the fee, the identification of

14   payment by case file name, and the general purpose of the work performed are usually not

15   protected from disclosure by the attorney-client privilege.").

16        Rite Aid has also redacted nearly all references to potential business transactions,

17   including discussions related to divestiture of assets and potential mergers and acquisitions.  Rite

18   Aid claims that statements related to these transactions are privileged because in-house and

19   outside counsel represented its interests in pursuing these potential business ventures.  *See, e.g.,*

20   Chima Decl., Ex. A at 20, 82-83.  While a few of the redactions concerning transactions disclose

21   the substance of communications related to legal advice from outside counsel, most do not.

22   Instead, many reflect statements from in-house counsel, Rite Aid management, or a third-party

23   financial advisor about the status of a potential transaction, the financial and business

24   implications of the proposed business deal, and discussions about alternative business

25   opportunities.  *See, e.g.,* Doc. 24 at 6; Doc. 84 at 5-8; Doc 117 at 2-6.

26        The minutes do establish that outside counsel was retained to provide Rite Aid legal

27   advice in relation to various transactions, and that counsel was present when these business

28   dealings were discussed.  But outside counsel's presence at these meetings does not automatically

14

1    render all discussions about the transactions privileged.  *See Simon v. G.D. Searle & Co.*, 816

2    F.2d 397, 403 (8th Cir. 1987) ("[M]inutes of business meetings attended by attorneys are not

3    automatically privileged."); *Orthopaedic Hospital v. DJO Global, Inc.*, (S.D. Cal. Dec. 22, 2020)

4    ("While the Court is cognizant of the fact that discussions in board meetings may be intertwined

5    with discussions of legal advice rendered by counsel (who may or may not be present at the

6    meeting), this does not by default cloak all board meeting minutes in a shroud of secrecy.").

7    Instead, Rite Aid bears the burden of demonstrating that each redacted communication was

8    primarily made for the purpose of facilitating legal advice, as oppose to primarily serving a

9    business purpose.  *See McCaugherty v. Siffermann*, 132 F.R.D. 234, 238 (N.D. Cal. 1990)

10   (finding that where communications between attorney and client primarily relate to a business

11   objective, "the court should sustain an assertion of privilege only when there is a clear evidentiary

12   predicate for concluding that *each* communication in question was made *primarily* for the

13   purpose of generating legal advice.  No privilege can attach to any communication as to which a

14   business purpose would have served as a sufficient cause . . . ."); *United States v. Chevron Corp.*,

15   1996 WL 264769, *3 (N.D. Cal. Mar. 13, 1996) ("It is not sufficient that 'some measure' of legal

16   advice be exchanged.  'A party seeking to withhold discovery based upon the attorney-client

17   privilege must prove that all of the communications it seeks to protect were made primarily for

18   the purpose of generating legal advice.'"); *see also In re Chase Bank USA, N.A. "Check Loan"*

19   *Contract Litigation*, 2011 WL 3268091, *2 (N.D. Cal. July 28, 2011) (holding that a

20   communication "does not become privileged by the mere suggestion of a legal issue ancillary to

21   the main purpose of the communication.").

22        This is especially true for communications with in-house counsel, who often serve as both

23   business and legal advisors.  *See Lenz v. Universal Music Corp.*, 2009 WL 3573990 (N.D. Cal.

24   Oct. 30, 2009) ("The presumption [of privilege] that attaches to communications with outside

25   counsel does not extend to communications with in-house counsel . . . [b]ecause in-house counsel

26   may operate in a purely or primarily business capacity in connection with many corporate

27   endeavors.") (some alteration in original); *Chevron Texaco Corp.*, 241 F. Supp. 2d at 1076 (citing

28   *In re Sealed Case*, 737 F.2d 94 (D.C. Cir. 1984) ("With respect to internal communications

15

1    involving in-house counsel, [the privilege holder] must make a 'clear showing' that the 'speaker'

2    made the communications for the purpose of obtaining or providing legal advice.")

3           Here, most of Rite Aid's redactions concern the status of negotiations, information about

4    the other company involved in the transaction, and the potential financial implications of various

5    transactions.  Thus, it is apparent that these redactions—with the exception of those identified in

6    Appendix A— are of communications that were made primary for a business purpose and are

7    therefore not privileged.  *Byrnes v. Empire Blue Cross Blue Shield*, 1999 WL 1006312, at *5

8    (S.D.N.Y. Nov. 4, 1999) (data "intended to assist the business decision-makers to assess the

9    economic impact of possible alternatives" does not reflect the performance by counsel of legal

10   services and cannot be protected even if funneled through counsel); *In re Syncor ERISA*

11   *Litigation*, 229 F.R.D. 636, 644-45 (C.D. Cal. 2005) (finding that acquiring corporation's "initial

12   review of [target corporation's] operations was solely for the business purpose of a potential

13   merger" and therefore not protected by the attorney-client privilege)

14          In a similar vein, several of Rite Aid's redactions concern communications that appear to

15   relate to typical business operations, with no suggestion that these business discussions related

16   directly to legal advice.  For example, Rite Aid redacted all discussions touching on board

17   members' compensation.  *See, e.g.,* Doc. 35 at 5-6; Doc. 96 at 8 ¶ 6; Doc. 106 at 5-6.  Rite Aid

18   claims these redactions reflect discussions involving in-house counsel "regarding corporate

19   governance matters" and "legal advice regarding board members' compensation."  Chima Decl.,

20   Ex. A at 28, 99, 111.  Again, Rite Aid's vague explanation fails to carry its burden.  *Dolby Labs.*,

21   402 F. Supp. 3d at 866.  And review of these redactions fails to reveal that the statements were

22   intended to provide or solicit advice on any particular legal matter.  *see also In re Chase Bank*

23   *USA*, 2011 WL 3268091 at *2 (holding that a communication "does not become privileged by the

24   mere suggestion of a legal issue ancillary to the main purpose of the communication.").

25          As another example, Rite Aid withheld excerpts of the minutes that pertain to a data

26   breach and data security.  *See, e.g.* Doc. 78 at 13; Doc 84 at 13.  There is no dispute that a data

27   breach is the type of event that could potentially subject a company to liability.  But review of the

28   /////

16

1    relevant communications, as well as Rite Aid's declaration and privilege log, fail to demonstrate

2    that the communications served a legal rather than a business purpose.

3           Rite Aid also has redacted portions of several minutes that summarize legal compliance

4    training that outside counsel provided to the board members.  *See* Doc. 18 at 7; Doc. 26 at 4; Doc.

5    35 at 7; Doc. 46 at 7 ¶ 5; Doc. 89 at 7; Doc 99 at 4; Doc. 116 at 110.  At first glance, these

6    redactions sections appear to consist of legal advice counsel provided regarding several, albeit

7    general, legal issues Rite Aid has, or is likely to, encounter.  However, as discussed below in

8    relation to Rite Aid's board presentation material, PowerPoint presentation slides provided in

9    conjunction with the compliance training demonstrate that the training does not constitute

10   confidential legal advice.

11          Lastly, Rite Aid also completely withheld four documents—documents 124, 125, 130, and

12   131.  These documents consist of minutes from several special meetings of the board of directors

13   that were held to discuss potential mergers and business transactions.  Review of these documents

14   reveals that many of the communications are not privileged.  As an initial matter, the first few

15   paragraphs of each minutes merely identify the individuals present at the meeting and the subject

16   matter the board intended to address.  Such factual information does not constitute

17   communications, and therefore is not protected by the privilege.  *See Upjohn*, 449 U.S. at 395

18   ("The privilege only protects disclosure of communications; it does not protect disclosure of the

19   underlying facts by those who communicated with the attorney."); *see also In re Universal*

20   *Service Fund*, 232 F.R.D. at 675 ("A general description of the work performed by the attorney is

21   not protected by the privilege . . . . The subject matter of meetings with an attorney, the persons

22   present, the location of the meeting, or the persons arranging the meetings are also not protected

23   by the privilege.").

24          More significantly, these minutes reflect that while outside and in-house counsel were

25   present at the meetings, many of the conversations do not involve the rendering of legal advice.

26   The minutes largely memorialize communications related to the financial implications of

27   potential business transaction and the status of discussions with other entities involved in

28   potential transactions.  Having thoroughly reviewed the minutes in these documents, the court

1  finds that only the sections identified in Appendix A are privileged.  Accordingly, Rite Aid shall

2  produce its board and committee meeting minutes with all other redactions removed.

3          3.   <u>Board Presentation Material</u>

4       This category consists of presentation material that were utilized during Rite Aid's board

5  meetings.  Rite Aid's amended privilege log identifies 20 board presentation documents that were

6  withheld as privileged, plus an additional 34 documents Rite Aid produced with redactions.[12]

7       Documents 3, 6, 9, 12, 13, 16, 145, 147 are presentation material related to regulatory risk

8  assessments and corporate governance updates.  These same type of assessments, and statements

9  related to them, are also found in the following documents that Rite Aid produced with redaction:

10  Doc. 27 at 7, 10-35; Doc. 36 at 3-30; Doc. 39 at 31-62; Doc. 44 at 55-76; Doc. 47 at 14-39; Doc.

11  50 at 39-60; Doc. 53 at 26-40; Doc. 56 at 65-81; Doc. 59 at 19-37, 54-60; Doc. 62 at 11-29; Doc.

12  67 at 10-31; Doc. 70 at 70-84, 96-99; Doc. 73 at 10-28, 44-50; Doc. 76 at 17-36; Doc. 79 at 24-

13  46; Doc. 82 at 74-89; Doc. 87 at 9-27, 43, 51; Doc. 88 at 7-29; Doc. 90 at 2-23; Doc. 91 at 2-40,

14  45-56; Doc. 93 at 22-51, 58; Doc. 98 at 7, 10-35; Doc. 100 at 3-28, 35; Doc. 102 at 8-41, 44-72;

15  Doc. 104 at 33-59; Doc. No. 110 at 2-47, 50-70;  Doc. 141 at 22, 27, 29-30; Doc. 142 at 31-31[13];

16  Doc. 143 at 1-8, 11-40; Doc. 148 at 25-41, 47.

17       Rite Aid's supporting declaration states that in-house and outside counsel assisted in

18  preparing the presentation materials, including the regulatory update, and that the documents are

19  maintained as confidential.  Chima Decl. ¶¶6-9.  Rite Aid further explains that the presentations

20  reflect counsel's judgment as to the most significant legal issues facing the company and are

21  prepared to facilitate the board's understanding of these issues.  *Id*. at ¶¶ 8-9.  Review of the

22  documents confirms Rite Aid's representations that these documents consist of legal updates and

23  strategies for addressing various legal issues.  These regulatory risks assessments highlight

---

[12]  Rite Aid withheld documents 3, 6, 9, 12, 13, 16, 86, 87, 97, 107, 114, 118, 119, 121, 123, 129, 137, 144, 145, and 147.  Rite Aid produced the following documents with redactions: Document Nos. 27, 36, 39, 44, 47, 50, 53, 56, 59, 62, 67, 70, 73, 76, 79, 82, 85, 88, 90, 91, 93, 98, 100, 102, 104, 110, 134, 136, 138, 140, 141, 142, 143, 148.

[13]  Pages 33 and 34 of document 142 is a corporate integrity agreement.  Nothing before the court suggests that this document is privileged.  Accordingly, these pages must be produced.

1   various regulatory issues known to Rite Aid; the level of concern (or priority status) for each

2   issue; and, in some instances, the legal consequence that could potentially result from the issue

3   and/or recommendations to address the problem area.  They also reflect information about

4   specific legal matters—including ongoing litigation, governmental investigations, and consent

5   decrees—and Rite Aid and its counsel's strategies and efforts to address these matters.

6          Accordingly, these documents reflect information related to counsel's legal advice and are

7   therefore covered by the attorney-client privilege.  *See In re CV Therapeutics, Inc. Sec. Litig.*,

8   2006 WL 1699536, *4 (N.D. Cal. June 16, 2006) ("The attorney-client privilege protects

9   documents which 'involve either client communications intended to keep the attorney apprised of

10  continuing business developments, with an implied request for legal advice based thereon, or self-

11  initiated attorney communications intended to keep the client posted on legal developments and

12  implications, including implications of client activity noticed by the attorney but with regard to

13  which no written request for advice from the client has been found.") (quoting *Jack Winter, Inc.*,

14  54 F.R.D. at 46); *Skansgaard*, 2013 WL 828210 at *2 (finding business presentation documents

15  reflecting counsel's assessment of legal risk were privileged).  The court is also satisfied that the

16  transaction update in document 140, as well as the other redaction to this document, are

17  privileged.

18         Documents 118 and 119 are also privileged.  Document 118 is a presentation prepared by

19  outside counsel that summarizes legal advice and describes potential strategies to address a

20  shareholder proposal.  Document 119 consists of a packet of documents outside counsel drafted

21  and compiled in relation to the legal advice contained in document 118.  These include counsel's

22  drafts and proposed amendments and edits to certain corporate documents.  The court is satisfied

23  that the communications in these documents are privileged.

24         The record also reflects that many of the redactions to the documents Rite Aid produced

25  contain privileged communications.  Specifically, several of the redacted pages consist of draft

26  proposals and legal memoranda that contain updates, opinions, and/or advice on a variety of legal

27  issues, including ongoing litigation, settlements, governmental investigation, stockholder

28  proposals.  These include the following redactions:  Doc. 27 at 36-39; Doc. 36 at 38-42; Doc. 39

19

at 1, 5, 14, 67-71; Doc. 44 at 86-90; Doc. 47 at 1-5; Doc. 50 at 16, 20, 29, 33-36; Doc. 53 at 1-4; Doc. 56 at 30-34; Doc. 59 at 1-6; Doc. 62 at 1-7, Doc. 67 at 1-7; Doc. 70 at 33-38; Doc. 73 at 1-7; Doc. 76 at 8-14; Doc 79 at 1-7; Doc. 82 at 32-37; Doc. 85 at 1-6; Doc. 88 at 31-35; Doc. 90 at 31-36; Doc. 91 at 57-59; Doc. 93 at 60-63; Doc. 98 at 36-39; Doc. 100 at 37-40; Doc. 102 at 73-77; Doc. 104 at 67-71, Doc 110 at 74-78; Doc. 143 at 42-75; Doc. 146. at 2-12, 14-38; Doc. 148 at 51-56.  Upon review of these redactions, the court finds that the information contained therein is privileged.

Document 121 is a summary of a draft agreement and plan of merger.  The document summarizes the principal terms of a merger agreement for a potential transaction.  The draft also includes counsel's redline edits and proposed modifications to the agreement.  Thus, the document reflects counsel's impressions and advice regarding the potential agreement and is therefore privileged.  *See In re Banc of California Sec. Litig.*, 2018 WL 6167907, at *2 (C.D. Cal. Nov. 26, 2018).  The same is true for the redacted section of document 146, which contains counsel's drafts of equity proposals.

However, document 121 also includes a strategic analysis report that was prepared by Citibank.  Doc. 121 at 121-144.  Rite Aid claims the report is privileged because it was "prepared by Citibank at the direction of Skadden, Arps, Slate, Meagher, and Foam," Rite Aid's outside counsel.  Chima Decl., Ex. A at 125.  But documents prepared by a third-party at the request of counsel are not automatically privileged.  *In re Premera Blue Cross Customer Data Sec. Breach Litig.*, 296 F. Supp. 3d 1230, 1242-43 (D. Or 2017) ("Having outside counsel hire a public relations firm is insufficient to cloak that business function with the attorney-client privilege.").  Instead, the documents must have been prepared for the purpose of assisting counsel in providing legal advice.  *See Richey*, 632 F.3d at 566 ("The attorney-client privilege may extend to communications with third parties who have been engaged to assist the attorney in providing legal advice.  If the advice sought is not legal advice, but, for example, accounting advice from an accountant, then the privilege does not exist.").  Rite Aid's vague explanation is insufficient to establish that Citibank's report was prepared for the purpose of assisting in rendering legal advice to Rite Aid.  Moreover, the board meeting minutes, *supra*, demonstrate that Citibank's

20

1   representative primarily provided business advice related to transactions.  Accordingly, Rite Aid

2   has failed to demonstrate that pages 121-144 are privileged, and they must be produced.

3         The same reasoning applies to documents 129 (updated version of the report found in

4   document 121), 137 (report prepared by ISS relating to potential merger), and 144 (debt report

5   prepared by Citibank).  Because Rite Aid's assertion of privilege over these documents is based

6   on its conclusory declaration, it has failed to show that they are privileged.  *Dolby Labs.*, 402 F.

7   Supp. 3d at 866.  Likewise, Rite Aid must also produce the board presentation material that was

8   redacted from documents 134, 136, 138.  These presentations discuss potential business

9   opportunities, with nothing indicating that they were created to assist counsel in providing legal

10  advice.  Accordingly, they too must be produced.

11        Rite Aid has also failed to meet its burden as to the memorandum appearing at pages 47-

12  48 of documents 79.  Rite Aid contends that this memorandum is privileged because it is "a legal

13  memorandum prepared by counsel providing legal advice to Rite Aid's board regarding a data

14  breach incident."  Chima Decl., Ex. A at 78.  Contrary to Rite Aid's contention, the document

15  does not reflect legal advice from counsel.  And while the top of the first page specifically states

16  that it is a privileged communication, its content does not suggest that it was prepared to help

17  facilitate legal advice.  Instead, the memorandum is little more than a factual summary of a data

18  breach.  Accordingly, it must be produced without redaction.

19        The remaining six documents— 86, 87, 97, 107, 114, 123—are PowerPoint presentations

20  prepared by the law firm Morgan, Lewis & Bockius LLP and provided to the board for its annual

21  compliance training for 2011 through 2015 and 2017.  These documents consist of basic legal

22  information and general guidelines for promoting effective compliance measures and programs.

23  A cursory glance might lead to the conclusion that the documents contain counsel's general legal

24  advice.  However, the information in these documents is, at most, loosely tailored to Rite Aid's

25  specific legal concerns.  Unlike many of the other submitted documents that are labeled attorney-

26  client privileged and/or attorney work-product, the training material is simply labeled

27  "Confidential Proprietary Information," not privileged or attorney work-product.  But more

28  significantly, the training materials from 2015 and 2017 explicitly states that "[t]his material is

21

1   provided for your convenience and *does not constitute legal advice* or create an attorney-

2   relationship."  Doc. No. 86 at 36; Doc. No. 123 at 31 (emphasis added).

3       Rite Aid's explanation as to why these documents are protected from disclosure further

4   calls into doubt Rite Aid's position.  Rite Aid contends that the 2017 training material (document

5   86) constitutes attorney work-product, while it argues that the remaining training materials are

6   protected from disclosure under the attorney-client privilege.  Chima Decl., Ex. A at 86, 99, 111,

7   118, 125.  Aside from the inconsistent positions, Rite Aid proffers only vague explanations for

8   why the documents are protected from disclosure—the presentation provides legal advice

9   regarding compliance with certain statutes.  *See* Chima Decl., Ex. A at 86, 99, 111, 118, 127-28.

10  The conclusory explanations fails to satisfy Rite Aid's burden, especially in light of the other

11  discrepancies.  *See Chao v. Mazzola*, 2006 WL 2319721, * 2 (N.D. Cal. Aug. 10, 2016) (asserting

12  party bears the burden of establishing that each communication "meets all the elements of the

13  privilege.").  Accordingly, Rite Aid must produce the compliance training material.

14  III.    <u>California's Second and Third Motions for Sanctions</u>

15      California's second and third motions for sanctions seek an order (1) prohibiting Rite Aid

16  from introducing evidence in support of its "improper defendant" defense, (2) striking Rite Aid's

17  "improper defendant" affirmative defense, (3) conclusively finding that Rite Aid and its entities

18  acted with the requisite scienter and deeming the conduct of the subsidiaries attributable to Rite

19  Aid[14], (4) holding Rite Aid in contempt, and (5) awarding California the reasonable expenses it

20  incurred in bringing its motions.  ECF Nos. 275 at 3; ECF No. 303 at 15.  In its third motion,

21  California further argues that new revelations justify compelling Rite Aid to produce all board

22  meeting material regardless of whether the documents have any bearing on Rite Aid's pharmacy

23  business in California.  ECF No. 303 at 18-20.

24  /////

25

26      [14]  To succeed on its CFCA claims, California must establish "(1) a false statement or
    fraudulent course of conduct, (2) made with scienter, (3) that was material, causing (4) the
27  government to pay out money or forfeit moneys due."  *United States ex rel. Hendow v. Univ. of
    Phoenix*, 461 F.3d 1166, 1174 (9th Cir. 2006); *San Francisco Unified Sch. District ex rel.
28  Contreras v. First Student, Inc.*, 224 Cal. App. 4th 627, 646 & n.9 (2014).

1          A.    Rule 37 Standards

2          Where a party fails to obey a court order compelling discovery, the court may issue

3    sanctions, including "(ii) prohibiting the disobedient party from supporting or opposing

4    designated claims or defenses, or from introducing designated matters in evidence; (iii) striking

5    pleadings in whole or in part; (iv) staying further proceedings until the order is obeyed; . . . or

6    (vii) treating as contempt of court the failure to obey any order except an order to submit to a

7    physical or mental examination." Fed. R. Civ. P. 37(b)(2)(ii)-(iv), (vii).  District courts have

8    great discretion in deciding whether to impose sanctions under Rule 37(c)(1).  *See Yeti by Molly,*

9    *Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001) ("[A]lthough we review

10   every discovery sanction for an abuse of discretion, we give particularly wide latitude to the

11   district court's discretion to issue sanctions under Rule 37(c) (1)").

12         Civil contempt, which is one of the sanctions sought by California, "consists of a party's

13   disobedience to a specific and definite court order by failure to take all reasonable steps within

14   the party's power to comply."  *Reno Air Racing Ass'n, Inc. v. McCord*, 452 F.3d 1126, 1130 (9th

15   Cir. 2006).  A sanction for civil contempt is intended to coerce the party in contempt to comply

16   with the court's order in the future, with the sanction conditioned on continued noncompliance.

17   *Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468, 1481 (9th Cir. 1992).  "The

18   moving party has the burden of showing by clear and convincing evidence that the contemnors

19   violated a specific and definite order of the court."  *Federal Trade Comm'n v. Affordable Media*,

20   179 F.3d 1228, 1239 (9th Cir. 1999).  To establish that civil contempt is appropriate, plaintiffs

21   must demonstrate "(1) that [the District] violated the court order, (2) beyond substantial

22   compliance, (3) not based on a good faith and reasonable interpretation of the order, (4) by clear

23   and convincing evidence."  *United States v. Bright*, 596 F.3d 683, 694 (9th Cir. 2010).  Once

24   California makes this showing, the burden shifts to Rite Aid to demonstrate that it "took all

25   reasonable steps within [its] power to insure compliance with" the court's order.  *Hook v. Arizona*

26   *Dept. of Corrections*, 107 F.3d 1397, 1403 (9th Cir. 1997).

27   /////

28   /////

23

1          B.      Discussion

2                  In its second and third motions for sanctions, California argues that Rite Aid should be

3          sanctioned because it has continued to not comply with the court's November 5, 2019 order

4          requiring it to produce documents responsive to California's RPD Nos. 23-26.  ECF Nos. 275,

5          303.  California claims that Rite Aid "continues to improperly narrow the scope of discovery,

6          improperly withhold relevant documents" and hid documents from California and the court.  ECF

7          No. 303 at 14; ECF No. 289 at 5-7.  California also claims that Rite Aid has been deceitful with

8          respect to the search for documents it conducted, and therefore should be ordered to produce *all*

9          nonprivileged board materials.  ECF No. 303 at 20.

10                 California claims that Rite Aid hid the fact that not all of its documents were stored

11         electronically.  It explains that in October 2019, Rite Aid offered to run keyword searches on the

12         board materials because the relevant documents it would need to search was "voluminous."  *Id*. at

13         16.  California contends, however, that at no time during its meet and confer efforts did "Rite Aid

14         ever tell Plaintiffs that (a) a large part of the materials are in hard-copy format and (b) the volume

15         of hard-copy materials" was reviewed by Rite Aid's counsel in three days."  *Id*. at 16.  California

16         contends that it was not until March 19, 2020, when Rite Aid's counsel requested a two-week

17         extension of time to produce nonprivileged board materials stored in "hard copy format" at Rite

18         Aid's headquarters, that California learned that not all responsive documents were stored

19         electronically.  *Id*. at 14.  California claims that had it known that some of the information was

20         stored in hard-copy format and could be reviewed in only three days, it would not have agreed to

21         Rite Aid's proposed keyword searches.  *Id*. at 16.

22                 In opposition, Rite Aid first argues that California "does not and cannot identify a

23         violation of any court order."  ECF No. 286 at 2-3.  It further contends that board minutes and

24         agendas were "'produced voluntarily,' and in the absence of any court order."  *Id*. at 2.  With

25         respect to documents maintained in paper format, Rite Aid's counsel states that he initially

26         believed that all documents were stored electronically, but he learned on November 14, 2019 that

27         board materials pre-dating September 2011 were available only in hard-copy format.  Decl. of

28         Benjamin P. Smith (ECF No. 305-1) ¶ 8; Decl. of Suzanne West (ECF No. 305-2) ¶ 4.  Counsel

24

1    further contends that, contrary to California's contention, it previously disclosed that some of the

2    documents were stored in paper format.  ECF No. 305 at 13.  In that regard, Rite Aid notes that its

3    counsel specifically stated at the December 2019 hearing that "paper records were also searched"

4    for responsive documents.  *Id.*; *see* ECF No. 272 at 12:20-13:8.

5         The court agrees that there was a lack of clarity, at least initially, surrounding Rite Aid's

6    search for responsive documents, including the scope of material that would need to be reviewed

7    to discover responsive documents.  But any failure by Rite Aid to disclose the specifics about the

8    burden of finding responsive documents does warrant the severe sanctions California now seeks.

9    The primary issue before the court is whether Rite Aid conducted a reasonable search and

10   produced responsive documents it discovered.  There is no dispute that Rite Aid, in addition to

11   performing an electronic search based upon agreed search terms, searched its paper documents

12   for responsive documents and produced those it believed to be responsive.  California's second

13   and third motions fail to explain how Rite Aid's search for those documents was deficient.

14   Instead, California merely claims that Rite Aid should not be believed to have conducted a proper

15   search because of its alleged failure to disclose that some documents were stored in paper format.

16        As highlighted by these arguments, the parties' dispute boils down to a lack of trust that

17   has resulted from counsel's failure to effectively communicate with each other.  But Rite Aid is

18   not solely to blame for that failure.  California, too, has demonstrated impatience with the meet

19   and confer process.  The timing of its third motion for sanctions suggests little engagement in the

20   meet and confer requirement prior to seeking judicial intervention.  Indeed, California filed its

21   third motion for sanctions before Rite Aid had an opportunity to provide the documents it was

22   ordered to submit for *in camera* review in connection with the second motion.  California's lack

23   of patience has required Rite Aid to address a motion that would have largely been resolved by

24   the court's *in camera* review.

25        The record is also filled with other examples of the parties' mutual failures to meet and

26   confer.  In August 2020, California filed a motion to compel Rite Aid to produce documents

27   (ECF No. 331), its fourth motion for sanctions against Rite Aid (ECF No. 333), and a motion to

28   /////

compel Rite Aid to produce electronically stored information (ECF No. 340).[15]  As detailed in the court's September 15, 2020 order, the briefing in support of California's motion to compel documents, which spanned more than 180 pages, demonstrated a failure to adequately meet and confer.  *See* ECF No. 353.  With respect to California's motion to compel electronically-stored information, the briefing reflected the parties were continuing to discuss potential search terms for locating ESI at the time California filed its motion.  These motions further demonstrate a proclivity for foregoing this court's local rules and the Federal Rules' requirement that parties meet and confer prior to seeking judicial intervention.  *See* Fed. R. Civ. P. 37(a)(1) (requiring a motion to compel to include "include a certification that the movant has in good faith conferred or attempted to confer with the person or party failing to make disclosure or discovery in an effort to obtain it without court action."); E.D. Cal. L.R. 251(b) ("Counsel for all interested parties shall confer in advance of the filing of the motion or in advance of the hearing of the motion in a good faith effort to resolve the differences that are the subject of the motion. Counsel for the moving party or prospective moving party shall be responsible for arranging the conference, which shall be held at a time and place and in a manner mutually convenient to counsel.").

But more fundamentally, the court's *in camera* review does not substantiate California's contention that Rite Aid improperly narrowed the scope of discovery.  California's RPD Nos. 23-26 seek documents related to Rite Aid and its subsidiaries' board and committee meeting agendas and minutes that *concern pharmacy business in California*.  Most of the documents have no bearing on Rite Aid's California pharmacy business or Code 1 compliance.  Thus, it appears that the majority of the documents at issue were produced, not in order to comply with the November 5, 2019 order, but to appease California's counsel.  And while Rite Aid has been unduly liberal with its assertion of the attorney-client privilege, *see supra*, nothing in the records demonstrates that Rite Aid has still not produced—either to California or to the court for *in camera* review—all responsive documents.  Consequently, there is no basis in the record for imposing further sanctions.

---

[15]  The motion to compel electronically stored information was jointly filed by relator and California.  ECF No. 340.

1    Accordingly, California's second and third motions for sanctions (ECF Nos. 275 and 303)

2    are denied.

3    IV.    Sanctions Previously Awarded in Relation to First Motion

4    The sole remaining matter is determining the appropriate amount of attorney's fees

5    California is entitled to receive in relation to its initial motion for sanctions.  California seeks

6    $14,970 in fees for 55 hours of work performed by attorneys Bernice Yew, Emmanuel Salazar,

7    Vincent DiCarlo at an hourly rate of $220, and 14 hours of work performed by legal analyst

8    Anete Millers at an hourly rate of $205.  ECF No. 274.  Rite Aid does not object to California's

9    hourly rate but contends that the number of hours expended by California's counsel was

10   unreasonable.  ECF No. 277.

11       A.    Standard for Assessing Fees

12   In assessing the reasonableness of a request for attorney's fees, courts use the lodestar

13   method.  *Staton v. Boeing Co.*, 327 F.3d 938, 965 (9th Cir. 2003).  In applying the lodestar

14   method, "a district court must start by determining how many hours were reasonably expended on

15   the litigation, and then multiply those hours by the prevailing local rate for an attorney of the skill

16   required to perform the litigation."  *Moreno v. City of Sacramento*, 534 F.3d 1106, 1111 (9th Cir.

17   2008).  "In addition to computing a reasonable number of hours, the district court must determine

18   a reasonable hourly rate to use for attorneys and paralegals in computing the lodestar amount."

19   *Gonzalez v. City of Maywood*, 729 F.3d 1196, 1205 (9th Cir. 2013).  "The Supreme Court has

20   consistently held that reasonable fees 'are to be calculated according to the prevailing market

21   rates in the relevant community.'"  *Van Skike v. Dir. Off. Of Workers' Comp. Programs*, 557 F.3d

22   1041, 1046 (9th Cir. 2009).

23       B.    Discussion

24   As a threshold matter, Rite Aid argues that California should not be granted fees for

25   failure to comply with the court's instruction that the parties meet and confer about California's

26   claimed fees.  ECF No. 277 at 3, 8.  According to Rite Aid, at the hearing on the motion, the court

27   specifically ordered the parties to meet and confer to try and resolve any dispute over the fee

28   /////

27

1   amount prior to California submitting its billing.[16]   Rite Aid overstates the matter.   The court first

2   determined that California should be compensated with an award of fees for having to litigate the

3   motion.   Then, after instructing California to file its billing records and granting Rite Aid's

4   request to file a response, the court suggested that California's counsel "do what [he] can to try

5   and meet and confer and see if [he] can pare down the amount being sought . . . ."   ECF No. 272.

6   The court's statement was intended to encourage the parties to meet and confer to narrow

7   disputes—a task that, as detailed above, has proven challenging for the parties in this litigation.

8   The court did not require a meet and confer as a prerequisite to filing necessary billing

9   documentation.   Accordingly, it will not penalize California for declining to engage in a process

10   that has often proved futile in this litigation.

11          Nonetheless, the court finds it necessary to reduce California's fee request in some

12   respects.   First, California seeks reimbursement for several discovery related tasks that are not

13   directly related to litigating its motion for sanctions.   These tasks include: 2.5 hours Mr. Salazar

14   and Ms. Millers collectively spent preparing for and attending a telephonic conference with Rite

15   Aid's Counsel; 2 hours for Ms. Millers to update a discovery spreadsheet and send a "recent

16   discovery set to litigation support services for uploading into electronic document repository"; 3

17   hours for Ms. Yew to review Rite Aid's supplemental production and responses; 3 hours for Mr.

18   Salazar to determine "the completeness of documents identified as responsive that fall within the

19   scope of each document request, RFP Nos. 17 to 18"; and 1.5 hours Mr. Salazar spent reviewing

20   Rite Aid's December 9, 2019 supplemental response.

21   /////

22

23          [16]  Rite Aid also urges the court to award California no fees, arguing that circumstances
     make any fee award unjust.   ECF No. 277 at 3-4; see Fed. R. Civ. P. 37(b)(2)(C).   It further
24   argues that California did not prevail on its first motion for sanctions, and therefore should not be
     awarded fees, because the court declined to impose the evidentiary and issue sanctions California
25   sought.   The court has already adjudicated California's first motion for sanctions and determined
     that the circumstances warranted the imposition of monetary sanctions but not evidentiary or
26   issue sanctions.   See Fed. R. Civ. 37(b)(2)(C) (authorizing an award of sanctions "[i]nstead of or
     in addition to" evidentiary or issue sanctions).   Rite Aid was granted an opportunity to respond to
27   California's billing records.   But it was not invited to relitigate the underlying motion, and any
     attempt to do so here is denied.
28

28

1    Reviewing discovery responses for completeness, updating discovery spreadsheets,

2 meeting and conferring to address deficient responses, and reviewing supplemental productions

3 are all tasks California would have performed regardless of whether it moved for sanctions.

4 Accordingly, it is not entitled to reimbursement for the cost of completing these tasks. *See NNN*

5 *Siena Office Park I 2, LLC v. Wachovia Bank Nat. Ass'n* , 2013 WL 6859838, *1 (D. Nev. Dec.

6 2013) (finding prevailing party was not entitled to fees for time spent reviewing "Plaintiffs'

7 deficient responses, meeting and conferring, and attempts to resolve the dispute without court

8 intervention" because defendant would have performed these tasks "whether or not a motion to

9 compel was filed."); *Wagafe v. Trump*, 2019 WL 954980, at *6 (W.D. Wash. Feb. 27, 2019)

10 (finding that fee award "should be limited to the time incurred litigating the Motion to Compel,

11 not the resulting discovery communications . . . ."); *see also Good Tire & Rubber Co. v. Haeger*,

12 137 S. Ct. 1178, 1186 (2017) (holding that a sanction awarding fees must be calibrated to

13 encompass "the legal bills that the litigation abuse occasioned . . . [and not] fees that would have

14 been incurred without the misconduct.").

15    California has also failed to demonstrate that certain tasks counsel performed were

16 necessary to litigating the sanctions motion.  Mr. Salazar, Ms. Millers, Ms. Yew, and Mr. DiCarlo

17 each spent 1.5 hours attending a meeting "regarding updates on motions for sanctions, discovery

18 assignments, and delegation of legal research topics."  As an initial matter, it is not clear whether

19 discussions about "discovery assignments" related specifically to the sanctions motion or other

20 discovery matters needing counsel's attention.  As a result, the court is unable to determine what

21 portion of counsel's time was spent addressing California's motion.  More significantly,

22 California has not shown that the meeting was necessary to litigate its motion.  The team meeting

23 was held on December 4, 2019, the same day Rite Aid filed its opposition.  ECF No. 262, ECF

24 No. 274-1 at 3.  But the opposition was filed at approximately 7:00 p.m.  ECF No. 262.  And

25 while billing records reflect that Mr. Salazar reviewed the opposition and its supporting exhibits

26 the same day Rite Aid filed it, they also show that his review took two hours.  Thus, there is no

27 basis for assuming that the "updates" related to the opposition, and the only task performed

28 before the meeting was the conference both Mr. Salazar and Ms. Yew attended with Rite Aid's

1  counsel the prior day.  Accordingly, the record fails to demonstrate time spent preparing for and

2  attending the meeting were necessary to litigate the sanctions motion.  *Hensley*, 461 U.S. at 437

3  ("A fee applicant bears the burden of establishing entitlement to an award and documenting the

4  appropriate hours expended . . . .").

5          Likewise, California has failed to demonstrate that the .75 hours Ms. Yew spent

6  communicating with "relator and support staff regarding discovery issues and motion for

7  sanctions" was necessary to litigate the motion.  The relator did not join in California's first

8  motion for sanctions, nor would it have been appropriate for relator to have done so.  The motion

9  was based on Rite Aid's failure to comply with the court's November 5, 2019 order requiring it to

10  produce all documents responsive to California's—not relator's—discovery requests.

11  Accordingly, this time will also be excluded from the fee award.

12          Rite Aid also argues that California should not be awarded fees for both Mr. Salazar and

13  Ms. Yew to attend the December 11 hearing.  ECF No. 274-1.  The U.S. Court of Appeals for the

14  Ninth Circuit has advised district courts "to examine with skepticism claims that several lawyers

15  were needed to perform a task, [such as] three lawyers appear for a hearing when one would do."

16  *Democratic Party of Wash. State v. Reed*, 388 F.3d 1281, 1286 (9th Cir. 2004).  But having more

17  than one attorney participate at hearing is sometimes necessary to effectively represent the

18  client's interest.  Here, the court has had several occasions to observe Mr. Salazar and Ms. Yew's

19  interactions during court proceedings.  While Mr. Salazar is the attorney responsible for arguing

20  California's position, he doesn't perform his duties without assistance.  On several occasions he

21  has consulted Ms. Yew prior to responding the court's questions, and Ms. Yew has provided

22  assistance in locating documents or information.  Thus, her participation at the hearing is not

23  duplicative.  *See id*. at 1287 (observing that when an attorney attends a hearing "because their

24  assistance is or may be needed by the lawyer arguing the case, as when a judge asks 'where is that

25  in the record,' and one lawyer must frantically flip through pages and find the reference to hand

26  to the lawyer arguing, then the assistance is most definitely necessary.").

27          The remaining billing entries reflect Mr. Salazar and Ms. Yew collectively spent 2.5 hours

28  drafting and filing the motion for sanctions; 2 hours reviewing and analyzing Rite Aid's

1  opposition to the motion; 3.25 hours researching issues related to the motion; 16.75 hours drafting

2  and finalizing the reply to Rite Aid's opposition; 15.75 hours drafting the supporting declaration

3  and preparing exhibits; 2 hours to draft a supplement declaration; and 4 hours to attend the

4  hearing on the motion.  ECF No. 274-1.  Mr. DiCarlo also spent 2 hours to review and approve

5  the reply brief for filing, and Ms. Millers spent 10.5 hours researching issues related to

6  California's motion.  The costs of performing these tasks were necessarily incurred in litigating

7  California's motion.  Further, the court cannot conclude that the time spent performing each task

8  was unreasonable or excessive.

9       Based on the foregoing, California is entitled to fees in the amount of $12,928.00 for

10  48.25 hours of work performed by attorneys Mr. Salazar, Ms. Yew, and Mr. DiCarlo, at a rate of

11  $220, and 10.5 hours of work performed by Ms. Millers, at a rate of $205.

12  V.    Conclusion

13       Accordingly, it is hereby ORDERED that:

14       1.  Within fourteen days from the date of service of this order, Rite Aid shall produce the

15  withheld documents in accordance with this order;

16       2.  California's January 8 and April 8, 2020 motions for sanctions (ECF Nos. 275 & 303)

17  are denied; and

18       3.  Within fourteen days from the date of service of this order, Rite Aid shall reimburse

19  California, in the amount of $12,928.00, the reasonable expenses it incurred in bringing its

20  November 27, 2019 motion for sanctions.

21  DATED:  March 30, 2021.

22

23                                      EDMUND F. BRENNAN
                                        UNITED STATES MAGISTRATE JUDGE

24

25

26

27

28

Appendix A

Privileged Portions of Board and Committee Minutes

- Document 2: redactions at page 13; page 16; page 18; page 20.

- Document 5: redaction at page 7, second sentence of paragraph 4.

- Document 8: redaction at page 2.

- Document 11: redactions at page 2; page 3, paragraph 1[1].

- Document 15: redactions at page 4; page 5; page 10, paragraph 5 (except for the paragraph's last sentence).

- Document 18: redaction at page 10, first four words of paragraph 3 only.

- Document 20: no privileged communications.

- Document 22: redactions to page 3, paragraph 1 only; page 12, first four words of paragraph 7.

- Document 24: no privileged communications.

- Document 26: redaction at page 6.

- Document 29: redaction at page 2.

- Document 31: no privileged communications.

- Document 33: redaction at page 7.

- Document 35: redactions at pages 1-2.

- Document 38: redactions at page 9, paragraph 5.

- Document 41: no privileged communications.

- Document 43: redactions at page 2; page 7.

- Document 46: no privileged communications.

---

[1] To avoid confusion, the court treats paragraphs that begin at the bottom of one page and conclude on the next as two separate and distinct paragraphs—one paragraph at the bottom of the first page and the other at the top of the next page. For example, page 2 of document 11 contains two complete paragraphs that are followed by a partial paragraph (beginning with "The Board then.") that concludes on page 3. This last paragraph is referred herein as paragraph 3 of page 2 and paragraph 1 of page 3.

1

- Document 49: redactions at page 4; page 5.

- Document 52: redactions at page 5; page 6.

- Document 55: redactions at page 5; page 9.

- Document 58: redactions at page 6; page 7, paragraphs 1 and 2; page 8, paragraph 9; page 10, paragraphs 1 and 4; pages 11-13; page 14, paragraph 1 only.

- Document 61: redactions at page 2, paragraph 3.

- Document 64: no privileged communications.

- Document 66: redactions at pages 2-3.

- Document 69: redactions at pages 2-4; page 8.

- Document 72: redactions at pages 3-4.

- Document 75: redactions at page 2, paragraph 3; page 3, paragraphs 2 and 3; pages 4-5.

- Document 78: redactions at page 2, paragraphs 2 and 3; page 3-7.

- Document 81: redactions at page 2, paragraph 3.

- Document 84: no privileged communications

- Document 89: redaction at page 10, first four words of paragraph 3;

- Document 92: redactions at page 3, paragraph 1.

- Document 94: no privileged communications.

- Document 95: no privileged communications.

- Document 96: no privileged communications.

- Document 99: redaction at page 6.

- Document 101: redactions at page 5.

- Document 103: no privileged communications.

- Document 105: no privileged communications.

- Document 106: redactions at page 7.

- Document 108: redactions at pages 12-13.

- Document 109: no privileged communications.

- Document 111: redaction at page 8.

- Document 112: no privileged communications.

- Document 113: redactions at page 2; page 7.

- Document 115: no privileged communications.

- Document 116: redactions at page 8-9.

- Document 117: redactions at page 4, paragraph 4; page 5, paragraphs 1-3; page 10, paragraph 2; page 11, paragraphs 1 & 3; page 12; page 13, paragraph 1 and second sentence of paragraph 4 (beginning with "During this session"); page 14, paragraph 1; page 19, second and third sentences of paragraph 1 (beginning with "Mr. Stanley relayed"; page 23; page 24.

- Document 120: redactions at page 5; page 6, paragraph 2.

- Document 122: redactions at page 5, 9.

- Document 124: redactions at page 4, paragraphs 2 and 3; page 7, paragraph 2; page 9, paragraph 4; page 10, paragraph 1; page 14, paragraphs 3; page 21, paragraph 3; page 22, paragraph 4; page 23, paragraph 2; page 26, paragraph 2; page 27, paragraph 3; page 28, paragraph 1 (first two lines on page); page 30, paragraph 4; page 31, paragraphs 1-3; page 37, paragraph 2; page 38, paragraphs 1 and 2; page 39, first complete sentence of paragraph 1.

- Document 125: page 2, sentence three of paragraph 5 (immediately following "September 11, 2015."); page 3, paragraph 1; page 5, paragraphs 2-4; page 6; page 7, paragraph 1 and 2; page 8, all of paragraph 4 except for the first sentence; page 9, paragraphs 1-4; page 14, paragraph 2 (last three lines of page 14); page 15; page 16, paragraph 1; page 19, paragraphs 3 and 4; page 20, paragraphs 1, 3, 4.

- Document 126: redactions at pages 1 and 2; page 6, beginning at bullet point "iv" of paragraph 2 through the end of the page; page 7; page 18, paragraph 3 except for the paragraph's first line and last sentence; pages 25-27; page 28, paragraphs 1-4; page 29, paragraph 2; page 30-35; page 38, paragraphs 2 and 3; page 39, paragraph 3 and 4.

- Document 127: redactions at pages 2-12; page 20, paragraph 4; page 21; page 22, paragraph 1; page 23, paragraphs 3 and 4; pages 24 & 25; page 26, paragraph 1

- Document 128: redactions at pages 2-4; page 8.

- Document 130: redactions at page 2, paragraphs 2 and 3; page 3; page 4, paragraphs 1 and 2; pages 8-10; page 11, paragraphs 1 and 2; page 13, paragraphs 3 and 4; page 14; page 15, paragraph 1 and 2; pages 16-19; page 21, paragraphs 2 (beginning at second sentence)

and 3; page 22, paragraphs 1 and 2; page 24, last paragraph; page 25; page 26, paragraph 1; page 27, paragraph 2; page 28; page 29, paragraphs 1 and 2; page 31 (except for the page's first two lines); page 32; page 33, paragraphs 1-3; page 35, last sentence of paragraph 2 and paragraph 3; page 36; page 37-38; page 39, paragraphs 2 and 3; page 40, paragraphs 2 and 3; page 41 (entire page except last line); page 42, paragraph 1.

- Document 131: redactions at page 2, paragraphs 2 and 3; pages 3-5; page 6, paragraphs 1; page 7, paragraph 2 (beginning at line two); page 8; page 9, paragraphs 2-4; page 10; page 11, paragraph 1; pages 12-23; page 25, paragraph 3; page 26; page 27, paragraphs 2 and 3; page 31, paragraphs 3 and 4; page 32, paragraphs 1 and 2; page 35, paragraph 3; pages 36-37; page 38-41; page 42, paragraphs 1 and 2; page 44, paragraphs 2 and 3; page 45, paragraphs 1-3; page 47, paragraphs 2 and 3; pages 48-56.

- Document 132: redactions at pages 2-3.

- Document 133: redactions at page 6; page 11

- Document 135: redaction at page 4.

- Document 139: redactions at page 3; page 4, paragraphs 5-6; page 17, last sentence of paragraph 3; pages 18-19.

- Document 149: redactions at page 9-10.

- Document 150: redactions at pages 4-5; page 7; page 10.